| |
|---|
| **UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY** |
| *Caption in Compliance with D.N.J. LBR 9004-2*<br><br>**A.Y. STRAUSS LLC**<br>Eric H. Horn, Esq.<br>David S. Salhanick, Esq.<br>Deanna R. Olivero, Esq.<br>290 West Mount Pleasant Avenue, Suite 3260<br>Livingston, New Jersey 07039<br>Tel. (973) 287-0966<br>Fax  (973) 533-0127<br>ehorn@aystrauss.com<br>dsalhanick@aystrauss.com<br>dolivero@aystrauss.com<br><br>*Proposed Counsel to the Debtor<br>and Debtor in Possession* |

| | |
|---|---|
| In re:<br><br>Work 'N Gear, LLC,<br><br>      Debtor. | Chapter 11<br><br>Case No. 25-_____ (___) |

## DECLARATION OF LARRY NUSBAUM IN SUPPORT
## OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, Larry Nusbaum, hereby declare under penalty of perjury that the following is true and correct:

  1. I am the Interim President of Work 'N Gear, LLC, the Debtor and Debtor-in-Possession ("**Debtor**"). I have over thirty-six years of experience in operational roles and turnaround consulting. My expertise includes operations restructuring, business plan analysis, performance improvement, cash and vendor management, workouts, bankruptcy consulting, and interim management. I have assisted clients with restructurings both inside and outside of court, assisted and advised on the design and evaluation of financial packages and presentations to

various types of lenders and equity investors, and acted as financial advisor to boards of directors and/or principal shareholders in the purchase or sale of numerous businesses. I have advised companies, lenders, and investors in a variety of industries and acted as financial advisor and chief restructuring officer in a number of industries, including manufacturing, real estate and hospitality, education, food and beverage, apparel, and retail.

2. On May 17, 2025, I formally assumed the position of Debtor's interim president, with the aim of guiding Debtor in its business reorganization and creditor negotiations. Subsequently, as it became increasingly apparent that a bankruptcy filing would be necessary, my focus shifted to preparing Debtor for the filing of this chapter 11 bankruptcy.

3. I submit this declaration (the "**Declaration**") to assist the Court and parties-in-interest in gaining an understanding of the circumstances that led to the commencement of this chapter 11 case (the "**Chapter 11 Case**") and in support of Debtor's petition and motions requesting various types of "first-day" relief (collectively, the "**First Day Motions**"). I have full authority to submit this Declaration on behalf of Debtor.

4. Except as otherwise indicated herein, the facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents and information, my discussions with Debtor's principal and senior management team, and information provided to me by Debtor's professional advisors. If I were called upon to testify, I would testify competently to the facts set forth herein.

5. On the date hereof (the "**Petition Date**"), Debtor filed a voluntary petition with the Court for relief under chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**"). Debtor continues to operate its businesses and manage its properties as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

**PRELIMINARY STATEMENT**

6. Solely between its inventory and intellectual property, Debtor, a national retailer of workplace and healthcare apparel and footwear, has assets with an aggregate liquidation value above $21 million. Debtor owes its sole secured creditor, Eastern Bank ("**Secured Lender**"), only $1,273,294.35. Debtor has never failed to make an interest payment to Secured Lender. But Secured Lender has nonetheless manufactured a default of the subject credit agreement, by substantially inflating its reserve requirements, squeezing Debtor's liquidity, and effectively forcing Debtor to breach a loan covenant. None of this should have happened, and Debtor should never have been forced to seek bankruptcy protection. But what should have happened is not what occurred, and because Secured Lender orchestrated and manufactured an unnecessary default, Debtor had no choice but to file this case.

7. Making matters worse, Secured lender's shocking conduct on July 15, 2025 forced Debtor to file this case on an emergent basis. Prior to July 15, 2025, Secured Lender permitted Debtor to utilize its cash to pay its employees and vendors and fund the other necessary expenses of its business. However, on July 15, 2025, abruptly and without notice, Secured Lender swept all of Debtor's funds from its accounts. This sweep included taking the funds in a specific Debtor account designated for the payment of employee health costs. Secured Lender was aware of the purpose of this account, but swept its cash anyway. As a result, Debtor now faces employee health claims it has no ability to readily fund. This heartless conduct by Secured Lender has jeopardized the health and well-being of Debtor's employees and threatens immediate harm which must be addressed.

8. Part I of this Declaration provides an overview of Debtor's business and capital structure. Part II provides a discussion of the events leading to the commencement of the Chapter

11 Case and Debtor's prepetition restructuring efforts. Part III (a) sets forth Debtor's plan for this case, including details regarding Debtor's strategy to restructure its debt and/or market and sell some or substantially all of its assets pursuant to one or more transactions under section 363 of the Bankruptcy Code, and (b) reaffirms the relief requested in the First Day Motions.

## PART I

## OVERVIEW OF DEBTOR'S BUSINESSES AND CAPITAL STRUCTURE

9. On March 7, 2002, Debtor was formed as a limited liability company in the State of New York. Debtor is the largest United States retailer specializing in work apparel, footwear and healthcare apparel.

10. Debtor's parent, Work 'N Gear, Inc. ("**WNG Inc.**"), is incorporated in Delaware and headquartered in Braintree, MA. The Debtor operates thirty-five (35) brick and mortar retail stores located in eleven (11) different states, primarily in the Northeastern and Midwestern United States; operates an online internet retail store; and operates a 14,000 square foot distribution facility in Avon, Massachusetts, which serves in-store and online customers. A substantial amount of the Debtor's stores and business is operated in its five (5) brick and mortar stores located throughout New Jersey, including a location in Lakewood, New Jersey, which Debtor intends to convert into an outlet store.

11. Debtor is a privately owned company, with 100% of its membership interests held by WNG Inc. WNG Inc. is wholly owned by its sole shareholder, Anthony DiPaolo ("**DiPaolo**"). DiPaolo also serves as Debtor's Chief Executive Officer. Debtor does not operate any subsidiary or affiliate companies.

**A.    Debtor's Business**

12. Debtor is a retail seller of workplace apparel and footwear, as well as healthcare scrubs and attire utilized by first responders and healthcare professionals. Debtor offers over two-hundred and fifty (250) different brands for sale, including their own private label brands, making Debtor a "one-stop shop" for all workwear apparel and footwear needs. Debtor's wide assortment of workwear, scrubs, footwear, and accessories provides consumers with an opportunity to purchase all their workwear needs in a single location, which is unique to the workplace apparel market and often serves as a one-stop destination for its customers.

13. With an average store size of approximately 4,500 square feet, the typical store operated by Debtor generates average annual sales of approximately $1M.

14. The locations at which Debtor operates its retail business are not owned by Debtor. Debtor leases these properties from various landlords to whom Debtor must pay monthly rent.

15. Debtor currently employs approximately 154 employees, consisting of 81 full-time employees and 73 part-time employees.

16. Debtor's anticipated gross revenue for the fiscal year 2026 (which ends in January 2026) is approximately $38.8 million.

**B.    Debtor's Capital Structure**

17. As of the Petition Date, Debtor has outstanding debt obligations in the amount of approximately $5,501,000.00.

18. The debt obligations include an approximately $ 1,273,294.35 secured loan held Secured Lender, under a Credit Agreement between, *inter alia*, Debtor and Secured Lender, dated as December 7, 2021 (the "**Original Credit Agreement**"), as amended by the First Amendment to Credit Agreement, dated April 9, 2025 (the "**Amendment**") (as amended, the "**Credit**

**Agreement**"). The Credit Agreement is secured by a separate Security Agreement, dated as of December 7, 2021 (the "**Security Agreement**"), under which Secured Lender holds a security interest in certain "Collateral," as defined therein.

19. Debtor's debt obligations further include approximately $3,921,000.00 in unsecured debt owed collectively to approximately 200 creditors. This sum includes unpaid unpaid rent and trade debt.

20. As of the Petition Date, Debtor has estimated accounts receivable of $377,500.00.

## PART II

## EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE

**A.    Secured Lender's Unjustified Reserve Increases**

21. Debtor was profitable for most of its operational history, and remained profitable in fiscal year 2023. However, beginning in 2024 and continuing to date, Debtor has faced significant operational and financial challenges. Specifically, Debtor has struggled with a variety of factors that have negatively impacted sales and profitability. These factors include increased turnover within Debtor's management team, supply chain and product availability challenges, increased competition in the healthcare apparel supply market, heightened inflation and an economic downturn within Debtor's consumer submarket, and other national and local economic trends.

22. However, Debtor's operational and fiscal challenges were greatly exasperated and worsened by the predatory conduct of its Secured Lender.

23. Under the Credit Agreement, in determining the amount of credit available to Debtor, Secured Lender is permitted to impose reserve requirements ("**Reserves**"). These Reserves reduce the amount of credit available to Debtor on a dollar-for-dollar basis.

24. At the outset of the Original Credit Agreement, Secured Lender established a Reserve for gift cards (the "**Gift Card Reserve**"), which was supposedly intended to mitigate against the liability from Debtor's outstanding gift cards.

25. At all times prior to November 2024, the Gift Card Reserve was set at 50% of outstanding gift cards.

26. However, beginning in November 2024, Secured Lender abruptly increased the Gift Card Reserve to 75% of outstanding gifts cards. This increase to the Gift Card Reserve was unreasonable and was not justified by any material change in Debtor's position or the consumer market, which Debtor closely tracks.

27. Additionally, in November 2024, Secured Lender imposed an entirely new Reserve, in the sum of $720.000.00, supposedly to mitigate against liability from Debtor's future rent obligations (the "**Rent Reserve**"). Secured Lender's sudden imposition of a new, $720,000 Rent Reserve was unreasonable and was not justified by any material change in Debtor's position or the consumer market.

28. These arbitrary increases to the Reserves unnecessarily constrained Debtor's liquidity, hamstringing its business growth.

**B.     Debtor's Creation and Implementation of the Strategic Plan**

29. In March 2025, I was hired by Debtor to serve as its President.

30. After being hired, I created a comprehensive strategic plan to reorganize Debtor's business and increase its profitability (the "**Strategic Plan**"). The key features of the Strategic Plan included:

- Financial Bridge – reconciling prior year financial results (EBITDA) to the new plan.

- Personnel & Corporate Cost Reductions – planned personnel changes &

7

- cost reductions.

- Sales & Marketing – undertake key opportunities & initiatives underway to drive sales growth.

- Inventory Management – tighten and rebalance the inventory assortment to meet customer demand and improve gross margin.

- Store Operations – enhanced in-store visual presentation, close under-performing stores, and reduce occupancy costs.

29. Debtor acted quickly to implement the Strategic Plan. Debtor hired Robert Grosskopf ("**Grosskopf**"), a former President of Gordon Brothers Retail and recognized liquidation expert with over three decades of experience, to oversee the closure and liquidation of Debtor's unprofitable stores. Debtor recently closed and liquidated one store, and two additional stores are presently being liquidated and should be closed before the end of July. In all, Debtor plans to close seven (7) stores within thirty (30) days of the commencement of this case.. These store closures are expected to materially improve Debtor's profitability. Debtor has kept Secured Lender informed of these developments.

**C.    Secured Lender's Additional Unjustified Actions Further Constrain Debtor's Liquidity**

31. In March and April 2025, I had conversions with representatives of Secured Lender, in which I outlined the key goals of the Strategic Plan and asked that Secured Lender reduce or eliminate the Rent Reserve and Gift Card Reserve. I explained to Secured Lender's representatives that these onerous Reserves were severely hampering Debtor's ability to operate its business.

32. In April 2025, Secured Lender offer to reduce the Gift Card Reserve to 50% of outstanding gift cards, and to reduce the Rent Reserve to $220,000.00, but that offer was contingent upon Debtor's execution of the Amendment, which would materially alter the formula by which a "Covenant Trigger Event" is calculated.

33. Under the Credit Agreement, upon the occurrence of a "Covenant Trigger Event," Debtor is required to maintain a certain "Fixed Charge Coverage Ratio" or be deemed in default. As such, the occurrence of a "Covenant Trigger Event" is potentially devasting to Debtor.

34. Secured Party's inclusion of a "Fixed Charge Coverage Ratio" provision in the Credit Agreement was unusual, because such provisions are typically included in cash flow agreements, rather than in asset-based credit agreement (secured by collateral) like the Credit Agreement.

35. Under the Original Credit Agreement, the "Covenant Trigger Event" was tied to Debtor's available Borrowing Base. So long as Debtor's Borrowing Base exceeded $1.5 million and Debtor was not in default of the agreement, no Covenant Trigger Event would occur.

36. However, under the Amendment, even if Debtor's Borrowing Base exceeds $1.5 million and Debtor is not in default, a Covenant Trigger Event may still occur. Under the Amendment, if "the Borrowing Base calculated without regard to Letter of Credit Usage, minus the sum of the outstanding [loan advances] and Letter of Credit Usage" dips below $1.5 million, a Covenant Trigger Event may occur.

37. As such, Debtor's execution of the Amendment made it substantially more likely that Debtor would default under the Credit Agreement.

38. Debtor did not want to execute the Amendment, but was constrained to do so, and did so under duress, to achieve a reduction in the onerous Reserve accounts.

39. In May 2025, Debtor obtained audited financials for fiscal year 2025 (the "**2025 Audit**"). The 2025 Audit indicated that there was no going concern with respect to Debtor's business. Debtor shared the 2025 Appraisal with Secured Lender.

40. Nevertheless, on or about June 6, 2025, Secured Lender abruptly advised Debtor, without explanation, that Debtor's credit account with Secured Lender was "in workout." On June 10, 2025, I met with Secured Lender's Head of Workout and asked her why Debtor's account had been designated "in workout." She was unable to provide me with an explanation.

41. In June 2025, Secured Lender began enforcing, for the first time, a dollar-for-dollar Reserve for Debtor's past due rent (the "**Past Due Rent Reserve**").

42. In July 2025, Secured Lender abruptly increased the Gift Card Reserve to 100% of outstanding gift cards. This increase was unreasonable and was not justified by any material change in Debtor's position or the consumer market.

43. These actions, together with Secured Lender's earlier conduct, constrained Debtor's liquidity even further, making it nearly impossible for Debtor to profitably operate its business. These actions also harmed Secured Lender, by preventing Debtor from replenishing its inventory, which is Secured Lender's primary collateral under the Credit Agreement.

**D.    Secured Lender Declares as Event of Default and Accelerates the Loan**

44. As a consequence of Secured Lender's manufactured, unjustifiable conduct, a Covenant Trigger Event occurred under the terms of the Credit Agreement.

45. Under Section 5.3(a) of the Credit Agreement:

> Upon the occurrence of a Covenant Trigger Event, the Fixed Charge Coverage Ratio shall be immediately tested as of the most recently ended fiscal quarter for which financial statements were required to be delivered…and for so long as a Covenant Trigger Period shall continuing, the Borrower will maintain a Fixed Charge Coverage Ratio measured quarterly on a trailing twelve (12) month basis at the end of each quarter of not less than 1.10 to 1.0.

46. Under Section 7.1 of the Credit Agreement, which sets forth "Events of Defaults" under the Credit Agreement, Debtor's failure to comply with Section 5.3 of the Credit Agreement constitutes an Event of Default.

47. Under Section 7.2 of the Credit Agreement, which sets forth the remedies available upon an Event of Default, Secured Lender is entitled, among its other remedies, to accelerate and declare immediately payable the entire debt owed by Debtor.

48. By Notice of Default and Reservation of Rights dated as of July 24, 2025, Secured Lender advised Debor that an Event of Default has occurred under the Credit Agreement, based upon Debtor's alleged failure to maintain a Fixed Charge Coverage Ratio of not less than 1.10 to 1.0 following a Covenant Trigger Event. The notice further advised Debtor that, under the terms of the Credit Agreement, as a consequence of the Event of Default, Secured Lender has no further obligation to extend credit to Debtor.

49. By Notice of Acceleration delivered on or about July 9, 2025, Secured Lender advised Debor that it was accelerating Debtor's indebtedness and declaring same immediately due and payable.

50. Faced with a loan default and the evaporation of its credit line, it became clear that Debtor would have no choice but to file this Chapter 11 Case.

**E.    Secured Lender Abruptly Sweeps Debtor's Funds, Including Funds Designated for Employee Health Care Costs**

51. Secured Lender's bad faith conduct persisted, and worsened, on July 15, 2025, forcing Debtor to expedite its filing of this case. As noted above, prior to that date, Secured Lender has permitted Debtor to utilize its cash to pay Debtor's expenses. However, on July 15, 2025, Secured Lender suddenly swept all of Debtor's funds, included funds held in a specific Debtor account designated for the payment of employee health costs.

11

52. Secured Lender was fully aware of the health care account, but swept all the funds in the account anyway. Debtor now faces employee health claims it cannot readily fund. This is an extremely serious health and safety issue which must be addressed immediately.

## PART III

## DEBTOR'S INTENDED CHAPTER 11 PLAN

53. As part of its planned reorganization in this case, Debtor intends to continue implementing its prepetition strategic plan to maximize its profits, shutter unprofitable stores, and maximize the available recovery for its stakeholders and creditors.

54. Debtor does not represent a true credit risk. Debtor's indebtedness under the Credit Agreement is approximately $1.27 million. Debtor obtained an appraisal of its inventory from Gordon Brothers, dated April 23, 2025, which assessed the liquidation value of Debtor's inventory at $7,697,646.00, and Debtor obtained an appraisal of its intellectual property ("IP") from Fallingst Technologies Inc, dated June 12, 2025, which assessed the liquidation value of Debtor's IP at $13,560,000.00. Just between its inventory and IP, Debtor's assets are worth more than sixteen (16) times Debtor's indebtedness to Secured Lender. Yet, by arbitrarily increasing the Reserves and manufacturing an Event of Default, Secured Lender has forced Debtor into bankruptcy.

55. Through this bankruptcy proceeding, Debtor intends to continue the restructuring process that began in earnest with my hiring. Debtor intends to consider all strategic options to maximize the value of its business and properties for the benefit of its estate and creditors.

56. Debtor's ownership, management, and I have concluded that the best strategy for maximizing the value of Debtor's estate for the benefit of its stakeholders and creditors is by continuing Debtor's business as a going concern. Debtor's restructuring plan includes a planned restructuring of its debt, which will require discussions and negotiations with Secured Lender and

other creditors, including Debtor's landlords and vendors. The restructuring will likely include the closure of additional store locations and the rejection of leases, a potential reduction in employee headcount, and potentially the sale of some or substantially all of Debtor's assets.

57. In order to realize its bankruptcy goals, prevent the collapse of its business, and ensure that critical employees, vendors, and other expenses are paid, it is critical that Debtor have use of its cash collateral, and that the Court also grant the other emergent relief sought in the First Day Motions, which are incorporated by reference herein. Debtor must be able to operate its stores, pay its critical expenses, and generate revenue for the benefit of its creditors.

## PART IV

## FIRST DAY MOTIONS

58. I have reviewed all of the facts set forth in each of the Debtor's "first-day" motions. The facts are incorporated herein as if fully set forth herein. They are based on my personal knowledge unless noted otherwise.

*[signature page follows]*

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: July 16, 2025

*/s/ Larry Nusbaum*
Larry Nusbaum