UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY
**STARK & STARK, P.C.**
Joseph H. Lemkin, Esq. (JL-2490)
Thomas S. Onder, Esq. (TSO-7880)
100 American Metro Blvd.
Hamilton, NJ 08619
(609) 791-7022 (Telephone)
(609) 895-7395 (Facsimile)
jlemkin@stark-stark.com
tonder@stark-stark.com

In Re:

WORK 'N GEAR, LLC,
                                    Debtor.

Case No. 25-17472 (MEH)

Chapter 11

Hearing Date: April 21, 2026 at
10:00 am EST

Objection Deadline: April 14, 2026

## MOTION OF LEVIN PROPERTIES, L.P. TO COMPEL THE IMMEDIATE PAYMENT OF DEBTOR'S POST-PETITION LEASE OBLIGATIONS

Levin Properties, L.P. (the "Landlord"), by and through its undersigned counsel, respectfully moves for entry of an order, substantially in the form attached hereto (the "Proposed Order"), compelling debtor, Work 'N Gear, LLC (the "Debtor") to immediately pay those obligations that have accrued during the post-petition, pre-rejection period under a commercial lease entered into by and between the Landlord and Debtor on or about on or about April 1, 1998 (the "Lease") for premises located at the Clifton Plaza, 1006 US Highway 46, Unit #1, Clifton, NJ 07013 (the "Premises"), that remain outstanding despite effort of Landlord to obtain payment without need to resort to Court intervention, as is required pursuant to the Lease and 11 U.S.C. §§ 365(d)(3).

In support of the Motion, Landlord states as follows:

### JURISDICTION AND VENUE

1. This Court has jurisdiction to consider this Motion under 28 U.S.C. §§ 157 and 1334.

4897-4589-3021, v. 5

2. This matter is a core proceeding under 28 U.S.C. § 157(b)(2). This Court has the constitutional authority to enter a final order in this matter. If it is determined that the bankruptcy judge does not have constitutional authority to enter a final order or a judgment in this matter, Landlord consents to entry of a final order or judgment.

3. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

4. The statutory predicates for the relief requested herein are 11 U.S.C. §§ 365(d)(3) and 503(b)(1).

**BACKGROUND**

5. On July 16, 2025 (the "Petition Date"), Debtor commenced this chapter 11 case by (the "Chapter 11 Case") filing a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of New Jersey (the "Court").

6. No trustee or examiner has been appointed, and Debtor continues to operate its business as debtor in possession pursuant to Bankruptcy Code §§ 1107 and 1108.

7. As of the Petition Date, Landlord's predecessor in interest was the lessor of Premises located at Clifton Plaza, 1006 US Highway 46, Unit #1, Clifton, NJ 07013, leased to the Debtor under that certain Lease Agreement dated February 11, 1998. "Lease"). A true and correct copy of the Lease is attached hereto as Exhibit "A".

8. The Lease was subsequently amended with a sixth amendment (the "Sixth Amendment" dated October 9, 2023.[1]  A true and correct copy of the Sixth Amendment is attached hereto as Exhibit "B".  Hereinafter, the Lease and Sixth Amendment shall be collectively referred to as the "Lease".

9. Under the Lease, Debtor was required to pay Landlord base rent on the first calendar day of each month without setoff or demand in the amount of $11,345.56 during the period March 1,

---

1 Copies of the other amendments can be provided upon request.

4

2025 thru February 28, 2026 (the "Base Rent"). *See Sixth Amendment* § 2 Ex. B; Lease §5, Ex. A.

10. The Lease also requires Debtor to pay its proportionate share of, among other things, real estate taxes ("Taxes") and costs incurred in connection with the ownership, operation, management and maintenance of the Premises ("CAM" and, together with Taxes, the "Additional Rent," and, collectively with Base Rent and Taxes, "Rent"). *See* Lease Section 5.07 and § 6, Ex. A.

11. The Lease was rejected pursuant to the *Third Omnibus Order, Pursuant to Sections 105(a), 365(a), and 554(a) of the Bankruptcy Code, Authorizing the Debtor to Reject Certain Unexpired Leases of Nonresidential Real Property and Abandon Personal Property, Effective as of the Rejection Date* docketed on February 11, 2026, (Dkt. No. 257) (the "Rejection Order"), effective as of February 11, 2026 (the "Rejection Date"). A true and correct copy of the Rejection Order is attached hereto as Exhibit "C".

12. Debtor vacated the Premises, but has not paid all of Rent that has accrued during the post-petition, pre-Rejection Date period totaling $22,816.04, plus any additional rents (the "Administrivia Expenses"). A true and correct copy of Landlord's filed Administrative Expense claim is attached hereto as Exhibit "D".

13. The Administrivia Expenses remain outstanding. Since it is undisputed that these amounts must be *timely* "performed" or paid in full pursuant to Section 365(d)(3) as accruing prior to the Rejection Date, yet still remain due and owing and also apparent that Debtor's limited amount of estate assets are depleted with each passing week, including in connection with professional fees, Landlord requests the Court's assistance in compelling Debtor to meet its contractual and statutory obligations to Landlord.

4897-4589-3021, v. 5

## BASIS FOR RELIEF

14. Pursuant to section 365(d)(3) of the Bankruptcy Code, a debtor-in-possession must "timely perform all post-petition obligations" under an unexpired lease of nonresidential real property until such lease is assumed or rejected, here until February 11, 2026. 11 U.S.C. § 365(d)(3).

15. The Third Circuit has held that the "clear and express intent of § 365(d)(3) is to require the [debtor] to perform the lease in accordance with its terms" including rent, CAM, taxes, and other charges arising under the applicable lease. *See In re Montgomery Ward Holding Corp.*, 268 F.3d 205, 209 (3d Cir. 2001); *In re Valley Media, Inc.*, 290 B.R. 73 (Bankr. D. Del. 2003); *In re Appliance Store, Inc.*, 148 B.R. 234 (Bankr. W.D. Pa. 1992). The express language of Section 365(d)(3) imposes an affirmative duty upon a debtor to comply with all of its obligations under a written lease - not just base rent charges. *See In re New Almacs, Inc.*, 196 B.R. 244, 248 (Bankr. N.D.N.Y. 1996); *see also In re C.A.F. Bindery, Inc.*, 199 B.R. 828 (Bankr. S.D.N.Y. 1996).

16. The requirement to pay post-petition rent is automatic with landlords not bearing the evidentiary burden of proving that such amounts constitute "actual necessary costs and expenses of preserving the estate" as is required for the payment of an administrative claim under section 503(b)(1) of the Bankruptcy Code. *See In re Goody's Fam. Clothing Inc.*, 610 F.3d 812, 817 (3d Cir. 2010) (Section "365(d)(3) is best understood as an exception to the general procedures of § 503(b)(1) that ordinarily apply."). Indeed, section 365(d)(3) was designed to protect commercial landlords by ensuring that post-petition rent is paid without the need for landlord action. *See In re Montgomery Ward Holding Corp.*, 268 F.3d at 208-09, 211 ("Congress intended that the debtor in possession perform all the obligations . . . at the time required in the lease."). Section 365(d)(3) requiring "timely performance" places "payment of rent before the payment of administrative expenses. That is true even where the bankruptcy estate is administratively insolvent. Congress has spoken clearly." *See, e.g. In re Hitz Rest. Grp.*, 616 B.R. 374, 376

6

(Bankr. N.D. Ill. 2020) (emphasis added); *HA-LO Indus., Inc. v. CenterPoint Props. Tr.*, 342 F.3d 794, 798 (7th Cir. 2003).

17. Debtor continues to pay other administrative expenses, including professional fees, ahead of what has become contractually and statutorily due to Landlord. Through this Motion, therefore, Landlord seeks to compel the payment of its Administrivia Expenses due and payable before Debtor's funds are exhausted.

## WAIVER OF MEMORANDUM OF LAW

18. Landlord respectfully requests that the Court waive the requirement to file a separate memorandum of law pursuant to Local Rule 9013-1(a)(3), as the legal authority supporting the requested relief is set forth herein, and the Motion raises no novel issues of law.

## JOINDER IN MOTIONS RAISED BY OTHER
## LANDLORDS REGARDING THIS MATTER AND RESERVATION OF RIGHTS

19. To the extent consistent with the motions expressed by other landlords on similar issues raised, Landlord also joins in those pleadings of other shopping center lessors, as well as any advanced by other creditors, including the official committee of unsecured creditors. Further, Landlord reserves its rights to make further and or future amendments to this Motion, as additional information is disclosed.

**WHEREFORE,** Landlord respectfully requests that the Court enter the proposed order attached as Exhibit A: (i) directing the Debtor to pay the Administrivia Expenses of $22,816.04 within seven (7) days of entry of this Order in satisfaction of the Post-Petition Charges; and (ii) granting such other and further relief as the Court deems just and proper.

Dated: March 31, 2026        **STARK & STARK**
A Professional Corporation

By:    */s/ Joseph H. Lemkin*   and /s/ *Thomas S. Onder*
Joseph H. Lemkin, Esq.
Thomas S. Onder, Esq.

7

4897-4589-3021, v. 5

# EXHIBIT A

LEASE AGREEMENT
BETWEEN
FEDERAL REALTY INVESTMENT TRUST, LANDLORD
AND
WGS, CORP., TENANT

DATED: _FEBRUARY 11, 1998_

## TABLE OF CONTENTS

I    REFERENECE PROVISIONS, DEFINITIONS AND EXHIBITS
     1.1    Reference Provisions
     1.2    Definitions

II   LEASED PREMISES AND THE SHOPPING CENTER

III  TERM
     3.1    Term
     3.2    End of Term
     3.3    Holding Over

IV   USE AND OPERATION OF THE LEASE PREMISES
     4.1    Continuous Operation by Tenant
     4.2    Use and Trade Name
     4.3    Store Hours
     4.4    Intentionally Deleted
     4.5    Signs and Advertising
     4.6    Tenant's Use of Roof
     4.7    Retail Restriction Limit

V    RENT
     5.1    Rent Payable
     5.2    Payment of Minimum Rent
     5.3    Payment of Percentage Rent
     5.4    "Gross Sales" Defined
     5.5    Statements of Gross Sales
     5.6    Records and Audits
     5.7    Taxes
     5.8    Payment of Tax Rent
     5.9    "Tax Year" Defined
     5.10   Taxes on Tenant's Personal Property
     5.11   Rent for a Partial Month

VI   COMMON AREAS
     6.1    Use of Common Areas
     6.2    Management and Operation of Common Areas
     6.3    Tenant's Proportionate Share of Landlord's Operating Costs
     6.4    Landlord's Operating Costs Defined

VII  UTILITIES
     7.1    Utility Charges
     7.2    Discontinuance and Interruption of Service
     7.3    Landlord's Right to Alter Utilities

VIII INDEMNITY AND INSURANCE
     8.1    Indemnity by Tenant
     8.2    Landlord Not Responsible for Acts of Others
     8.3    Tenant's Insurance
     8.4    Tenant's Contractor's Insurance
     8.5    Policy Requirements
     8.6    Increase in Insurance Premiums
     8.7    Waiver of Right of Recovery

IX      CONSTRUCTION AND ALTERATIONS
    9.1     Condition of Leased Premises
    9.2     Tenant Improvements
    9.3     Alterations
    9.4     Work Requirements
    9.5     Ownership of Improvements
    9.6     Removal of Tenant's Property
    9.7     Mechanic's Liens
    9.8     Changes to Shopping Center

X       REPAIRS, MAINTENANCE, AND LANDLORD'S ACCESS
    10.1    Repairs by Landlord
    10.2    Repairs and Maintenance by Tenant
    10.3    Inspections, Access and Emergency Repairs by Landlord

XI      CASUALTY
    11.1    Fire and Other Casualty
    11.2    Right to Terminate
    11.3    Landlord's Duty to Reconstruct
    11.4    Tenant's Duty to Reconstruct
    11.5    Demolition for Purposes of Reconstruction

XII     CONDEMNATION
    12.1    Taking of Leased Premises
    12.2    Taking of Shopping Center
    12.3    Condemnation Award

XIII    MERCHANT'S ASSOCATION - Intentionally Deleted

XIV     SUBORDINATION AND ATTORNMENT
    14.1    Subordination
    14.2    Attornment
    14.3    Estoppel Certificate
    14.4    Quiet Enjoyment

XV      ASSIGNMENT AND SUBLETTING
    15.1    Landlord's Consent Required

XVI     DEFAULT AND REMEDIES
    16.1    Default
    16.2    Remedies and Damages
    16.3    Remedies Cumulative
    16.4    Waiver

XVII    MISCELLANEOUS PROVISIONS
    17.1    Notices
    17.2    Recording
    17.3    Interest and Administrative Costs
    17.4    Legal Expenses
    17.5    Successors and Assigns
    17.6    Limitation on Right of Recovery Against Landlord
    17.7    Intentionally Deleted
    17.8    No Modification
    17.9    Severability
    17.10   Joint and Several Liability
    17.11   Broker's Commission
    17.12   Irrevocable Offer, No Option
    17.13   Inability to Perform
    17.14   Survival
    17.15   Corporate Tenants
    17.16   Showing of Leased Premises
    17.17   Relationship of Parties
    17.18   Delivery of Leased Premises

LEASE AGREEMENT

This Lease Agreement (the "Lease") is made this _11th_ day of _
_FEBRUARY_____, 1997, by and between FEDERAL REALTY INVESTMENT
TRUST, an unincorporated business trust organized under the laws
of the District of Columbia ("Landlord"), and ~~W.G.S. CORP.~~, a
Massachusetts corporation ("Tenant"), having an office at 555
Turnpike Street, Canton, Massachusetts 02021.

ARTICLE I

REFERENCE PROVISIONS, DEFINITIONS AND EXHIBITS

As used in the Lease, the following terms shall have the
meanings set forth in Sections 1.1 and 1.2 below.

Section 1.1.    Reference Provisions.

A.    Leased Premises:  The "cross-hatched" space indicated
on the site plan attached as Exhibit A, comprising approximately
three thousand two hundred forty-seven (3,247) square feet,
commonly known as Store #1 and located in the Clifton Plaza
Shopping Center, Route 46 and Van Houten Avenue, Clifton, New
Jersey, and as defined in Article II.

B.    Term:  Five (5) Lease Years.  **(The Tenant is
granted the option to extend the Lease Term for an
additional five (5) Lease Years (the "Renewal Term") in
accordance with the provisions of Addendum I).**

C.    Term Commencement Date:  The date upon which the
Landlord delivers the Leased Premises to Tenant, which date ~~shall be~~ is anticipated
on or before February 23, 1998.*
D.    Rent Commencement Date:  The date upon which the
Landlord delivers the Leased Premises to Tenant, subject to
Section 5.2 herein.

E.    Termination Date:  The last day of the Term, or
such earlier date if this Lease is sooner terminated in
accordance with the provisions hereof.

F.    Opening Date:  The earlier of (a) the date Tenant
opens for business from the Leased Premises, or (b) sixty
(60) days after the date upon which Landlord delivers the
Leased Premises to Tenant (the appropriate date to be
confirmed in a letter agreement between Landlord and Tenant).

G.    Minimum Rent:

| Lease Year | Annually | Monthly |
|---|---|---|
| 1 - 2 | $81,180.00 | $6,765.00 |
| 3 - 5 | $86,040.00 | 7,170.00 |
| Renewal | | |
| 1 - 2 | $92,544.00 | $7,712.00 |
| 3 - 5 | 97,416.00 | 8,118.00 |

H.    Tenant's Minimum Sales Amount:  None

I.    Percentage Rent Factor:  Five Percent (5%).

J.    Tenant's Initial Monthly Tax Estimate:  $790.00.

K.    Tenant's Initial Monthly Operating Costs Estimate:
$598.00.

L.    Tenant's Initial Monthly Merchants Association (or
Marketing Fund) Dues:  None.

-1-

*In no event shall Tenant be obligated to accept delivery of the Premises
during the period April 19, 1998 through July 26, 1998 or the period October 2, 1998
through February 25, 1999.

M.    Security Deposit:  None.

N.    Permitted Use:  The sale at retail of work clothes, uniforms, associated footwear, and related accessories as carried in the majority of other ~~WearGuard (Work N' Gear)~~   Work 'N Gear stores, and for no other purpose. Notwithstanding the foregoing, Tenant covenants and agrees not to violate the use restrictions of other tenants set forth on Addendum II.

O.    Store Hours:  Monday through Friday 10:00 A.M. to 9:00 P.M.; Saturday 10:00 A.M. to 6:00 P.M.; Sunday 12:00 P.M. to 5:00 P.M.

P.    Rent Payments:  The rent payments due herein shall be made payable to Levin Management Corporation at:

> Levin Management Corporation
> P.O. Box 326
> Plainfield, New Jersey 07061-0326

Q.    Notice Addresses:

> TO LANDLORD:
> FEDERAL REALTY INVESTMENT TRUST
> c/o Levin Management Corporation
> P.O. Box 326
> Plainfield, New Jersey 07061-0326
> Attention:  Legal Department

> TO TENANT:
> WGS ~~W.G.S.~~ Corp.
> 555 Turnpike Street
> Canton, MA  02021
> Attention:  Joseph H. Cornely, III

R.    Shopping Center:  That certain shopping center known as Clifton Plaza, located in the City of Clifton, County of Passaic, in the State of New Jersey.

S.    Tenant Trade Name:  Work'N Gear.

T.    Schedules and Exhibits:  The schedules and exhibits listed below are attached to the Lease and are hereby incorporated in and made a part of the Lease.

| | |
|---|---|
| Exhibit A | Site Plan |
| Exhibit B | Landlord and Tenant Improvements |
| Exhibit C | Signage Criteria |
| Exhibit D | Rules and Regulations |
| Exhibit E | Gross Sales Form |
| Schedule I | Final Release and Waiver of Liens |
| Schedule II | Affidavit |
| Addendum I | Option to Extend |
| Addendum II | Use Restrictions |
| Exhibit F: | Tenant's Sign Drawings |
| Section 1.2. | Definitions. |

A.    Common Areas:  Any improvements, equipment,  areas and/or spaces (as the same may be enlarged, reduced, replaced, increased, removed or otherwise altered by Landlord)  for the non-exclusive, common and joint use or benefit of Landlord, Tenant and other tenants, occupants and users of the Shopping Center.  The Common Areas may include (not to be deemed a representation as to their availability) sidewalks, parking areas, access roads, driveways, landscaped areas, serviceways, tunnels, loading docks, pedestrian malls, stairs, ramps, elevators, escalators, comfort and first aid stations, public washrooms, and other similar areas and improvements.

- 2 -

B.    Major Tenants:  Those tenants leasing so-called "pad sites," or leasing space within the Shopping Center which contains a floor area of twenty thousand (20,000) square feet or more.

C.    Enclosed Mall:  The portion or portions of the Common Areas, which are enclosed by walls and a roof.

D.    Floor Area:  Unless otherwise specifically set forth in this Lease, "Floor Area," when used with respect to **the Leased Premises, shall mean the actual number of square feet set forth in Section 1.1(A).** When used with respect to any other space in the Shopping Center (or the entire Shopping Center), Floor Area shall mean the actual or approximate number of square feet on the first floor of such space as **actually exists.**

E.    Interest:  A rate per annum equal to three (3) percentage points above the prime rate, published in <u>The Wall Street Journal</u> (or if more than one rate is published, the average prime rate).  Interest shall change on and as of each day on which a change in the prime rate occurs.  If accrual or payment of such interest rate is unlawful, then Interest shall be equal to the maximum lawful rate.

F.    (1)  Lease Year:  If the Term Commencement Date occurs on the first day of a calendar month, the period beginning on the Term Commencement Date and terminating on the last day of the twelfth full calendar month thereafter and each succeeding period of twelve (12) full calendar months during the Term.  If the Term Commencement Date does not occur on the first day of a calendar month, then the period beginning on the first day of the next succeeding calendar month and terminating on the last day of the twelfth full calendar month thereafter, and each succeeding period of twelve (12) full calendar months during the Term.

(2)  Partial Lease Year:  Any period during the Term which is less than a full Lease Year.

G.    Person:  An individual, firm, partnership, association, corporation, or any other entity.

H.    Rent:  All sums payable by Tenant to Landlord under the Lease.

ARTICLE II

<u>LEASED PREMISES AND THE SHOPPING CENTER</u>

Landlord, for and in consideration of the Rent and the other conditions and covenants to be observed, satisfied, fulfilled and performed by Tenant, demises and leases to Tenant, and Tenant leases and takes from Landlord, the Leased Premises, extending, as the case may be, to (i) the exterior faces of those walls abutting the exterior of the Shopping Center, or (ii) the center line of those walls separating the Leased Premises from other premises within the Shopping Center, and shall include the floor coverings, interior ceilings, and, without limitation, space in any mezzanines and basements, if any, leased to Tenant, each upon the terms and conditions of this Lease.  Landlord shall have the exclusive right to (i) use the exterior faces of the exterior walls of the Leased Premises and the roof of the Shopping Center, and (ii) install, maintain, use, repair and replace pipes, ducts, cables, conduits, plumbing, vents, utility lines and wires to, in, through, above and below the Leased Premises and other parts of the Shopping Center as and to the extent that Landlord deems appropriate, **provided, however, Landlord shall repair any damage to the Leased**

- 3 -

Premises resulting from the foregoing. If any of the foregoing are located within the Leased Premises, Landlord's exercise of such rights shall not materially and substantially interfere with the operation of Tenant's business in the Leased Premises.

ARTICLE III

TERM

Section 3.1. Term. The Term shall commence on the Term Commencement Date and expire on the Termination Date. Upon five (5) days' request of Landlord, Tenant agrees to acknowledge and confirm by a written addendum to the Lease the dates specified in Article I.

Section 3.2. End of Term. Upon the expiration or sooner termination of the Term, Tenant shall quit and surrender to Landlord the Leased Premises, broom-clean, in good order and condition, ordinary wear and tear, damage by fire and Casualty excepted; and shall surrender to Landlord all keys to or for the Leased Premises.

Section 3.3. Holding Over. This Lease shall terminate on the Termination Date without the necessity of notice from either Landlord or Tenant. If Tenant fails to vacate the Leased Premises on the Termination Date, Landlord shall have the benefit of all provisions of law respecting the speedy recovery of possession of the Leased Premises (whether by summary proceedings or otherwise) to the same extent as if statutory notice had been given. In addition to and not in limitation of the foregoing, if Tenant fails to surrender the Leased Premises to Landlord on the Termination Date, occupancy subsequent to the Termination Date ("Holdover Occupancy"), without the written consent of Landlord, shall be deemed to be that of a tenancy at will. Holdover Occupancy shall be subject to all of the terms, covenants, and conditions of the Lease, except that the Minimum Rent for each day that Tenant holds over ("Holdover Minimum Rent") shall be in an amount equal to one and one quarter (1 1/4) times the Minimum Rent payable in the last Lease Year divided by three hundred sixty-five (365).

ARTICLE IV

USE AND OPERATION OF THE LEASED PREMISES

Section 4.1. Continuous Operation by Tenant.

A. Tenant shall (i) open the Leased Premises for business on the Opening Date; (ii) carry at all times in the Leased Premises a full stock of merchandise; (iii) conduct its business in the Leased Premises in a manner consistent with reputable business standards and practices; and (iv) operate one hundred percent (100%) of the Leased Premises continuously and uninterruptedly during the entire Term in accordance with the terms of this Lease, and with due diligence and efficiency. Tenant shall utilize for storage and office space only those areas indicated for such use on Tenant's plans approved by Landlord. Notwithstanding the foregoing, Tenant shall have the right to close the Leased Premises for up to three (3) days annually for the purpose of taking inventory.

B. If Tenant violates any provision of this Section 4.1. then, in addition to all other rights and remedies provided in the Lease, Landlord shall have the right to mandatory injunctive relief. Landlord shall also have the right to collect upon demand, in addition to other Rent,

- 4 -

liquidated damages in an amount equal to One Hundred Fifty Percent (150%) of the Minimum Rent per day for each and every day that such violation shall continue.  Payment of such sums are intended to be only a partial and temporary remedy for Landlord during the continuance of such violation, and therefore shall not relieve Tenant of any obligation under the Lease, excuse any such default or waive Landlord's other remedies therefor.

Section 4.2.   <u>Use and Trade Name</u>.  Tenant shall use the Leased Premises solely for the Permitted Use and for no other purpose.  Tenant shall operate its business in the Leased Premises solely under the Tenant Trade Name and under no other name, **unless Tenant changes the Trade Name on a majority of Tenant's other stores, providing a majority of Tenant's other stores is no less than ten (10) stores in the New York/New Jersey metropolitan area at the time of the name change.**

Section 4.3.   <u>Store Hours</u>.  Tenant shall conduct its business in the Leased Premises continuously during the Store Hours, **provided that the Major Tenants and seventy percent (70%) of other tenants are also open during the Store Hours.**

Section 4.4.   **Intentionally Deleted.**

Section 4.5.   <u>Signs and Advertising</u>.

A.   Prior to the Opening Date, Tenant shall install, at its sole cost, sign(s) consistent with the Signage Criteria attached as Exhibit C.  Tenant shall also install professionally lettered signs on its service doors.  All sign permits which are required for any such signs shall be obtained and paid for by Tenant.  The Landlord hereby approves the attached sign drawings marked Exhibit F.

B.   **Except as otherwise provided in Paragraph C of this Section 4.5 below,** Tenant shall not place on the exterior of the Leased Premises, on the door, window or roof thereof, ~~in any display window space,~~ or within **one (1) foot** behind the storefront of the Leased Premises if visible from the Common Areas, any sign, placard, decoration, lettering, advertising matter or descriptive material without Landlord's prior written approval **provided, however, that in the case of interior signs only such approval shall not be unreasonably withheld or delayed. ***

C.   Tenant shall submit to Landlord reasonably detailed drawings of all proposed signs (but **not interior signs**) for review and approval by Landlord prior to utilizing same.  All **exterior** signs, awnings, canopies, decorations, lettering, advertising matter or other items used by Tenant, and approved by Landlord as aforesaid, shall conform to the standards of design, motif, and decor from time to time established by Landlord for the Shopping Center **provided, however, that Tenant shall not be required to remove its initially approved signage provided same has been approved by governmental authorities.**  In all events, hand lettered signs, flashing signs, credit card signs, or other signs and advertisements visible from the Common Areas are prohibited.

D.   Landlord shall have the right, with five (5) days notice to Tenant and at Tenant's sole risk and expense, to remove any items displayed or affixed in or to the Leased Premises which Landlord determines to be in violation of the provisions of this Section 4.5.  All signs installed by Tenant shall be insured, and shall be maintained by Tenant at all times in first class condition, operating order and repair. Tenant shall commence to repair any of Tenant's signs which have been damaged within five (5) days after such damage occurs. Tenant shall perform such other maintenance to its signs and canopies as Landlord shall

- 5 -

* However, Landlord's consent shall not be required for professionally made interior signs used chainwide.

reasonably request.  In the event Tenant fails to repair any of its signs as specified above, Landlord shall have the right to make such reasonable repairs as Landlord deems necessary at Tenant's sole cost and expense, **provided Landlord has given Tenant five (5) days notice and Tenant has failed to repair any of its signs.**

Section 4.6.   Tenant's Use Of Roof.  Tenant shall not use the roof for any use, nor shall Tenant make any penetrations in the roof, without Landlord's prior written consent.

Section 4.7.   Retail Restriction Limit.  Tenant specifically covenants and agrees that during the Term, Tenant (and if Tenant is a corporation or partnership, then Tenant, its officers, directors, stockholders [unless Tenant is a publicly held company], affiliates or partners) shall not directly or indirectly, operate, manage, or have any interest in, any other store or business carrying comparable or similar merchandise **to that merchandise as specified in the Permitted Use** within a radius of **three (3)** miles of the Shopping Center.  This covenant, however, shall be inapplicable to any store or business of Tenant in operation on the date hereof ("Existing Store"), provided that Tenant has heretofore disclosed the existence of the Existing Store.  In  the event of a default of this provision, Landlord may **either (i) terminate this Lease upon thirty (30) days prior written notice to Tenant; or** (ii) as partial and temporary liquidated damages, include all gross sales generated by any violative store or business during the period of such violation in calculating the Gross Sales for purposes of this Lease, in which event the terms and conditions set forth in Sections 5.3. through 5.6. shall apply to the business of such violative store or business.  Tenant agrees that by entering into this Lease, it will not be in breach of any restriction by which it is bound under any other lease or agreement to any other Person.   **In no event, however, shall a breach of this Section 4.7 constitute a Default under the Lease. Notwithstanding anything to the contrary contained in Section 4.7, the retail restriction limit specified in Section 4.7 shall not be applicable to (a) any retail store acquired by Tenant pursuant to an acquisition of five (5) or more retail stores, provided any such store shall not operate under the Trade Name; and (b) Tenant's concessionaire or licensee operations in a full service department store or discount department store, provided such concessionaire or licensee operations do not (i) operate under the Trade Name, (ii) display signage including the Trade Name, or (iii) have entrances or exits separate from the entrances or exits to the full service department store or discount department store.**

ARTICLE V
RENT

Section 5.1.   Rent Payable.

A.    Tenant shall pay the Rent to Landlord, without prior demand therefor and without any offset or deduction whatsoever, at the rates and times set forth herein, at such place as provided in Section 1.1., or at such other place as Landlord may from time to time designate by written notice to Tenant.

B.    In addition to constituting a default under the Lease, and in addition to Landlord's other rights and remedies for such default, if Tenant shall fail to make any payment of Rent post-marked within five (5) calendar days after the due date thereof, Tenant shall pay to Landlord, as a late charge, an amount equal to Twenty Dollars ($20.00) per

- 6 -

day from the due date of such Rent until such Rent is received.  Such payment shall not excuse or waive the late payment of Rent.

C.   If Landlord receives two (2) or more checks from Tenant which are returned by Tenant's bank without honoring, Tenant agrees that all checks for Rent thereafter shall be bank certified and that Landlord shall not be required to accept checks except in such form.  In addition to any bank service charges resulting from dishonored checks, which shall be borne by Tenant, Tenant shall pay to Landlord Fifty Dollars ($50.00) on the occasion of each dishonored check as an administrative fee compensating Landlord for the additional expense involved in processing such check.

D.   Any payment by Tenant of a lesser amount than that due hereunder shall be treated as a payment on account.  In the event that any check for a lesser amount than that due bears an endorsement or statement, or is accompanied by a letter stating, that such lesser amount constitutes "payment in full" (or terms of similar import), Landlord's acceptance thereof shall not be an accord and satisfaction, and such statement shall be given no effect.  Landlord may accept any such check without prejudice to any rights or remedies which Landlord may have against Tenant.

Section 5.2.   _Payment of Minimum Rent_.

Tenant shall pay to Landlord the Minimum Rent provided . in Section 1.1. in equal monthly installments, in advance, commencing on the Rent Commencement Date **as hereinafter defined**, and on the first day of each and every calendar month thereafter throughout the Term.  An amount equal to the amount due for the first full calendar month of the Term shall be paid in advance upon Tenant's execution of the Lease and credited toward the first due payment(s) of Minimum Rent.

Notwithstanding the foregoing, all Rent shall be abated during the period commencing on the Rent Commencement Date and ending sixty (60) days after the date of delivery of possession by Landlord to Tenant of the Leased Premises.  The foregoing abatement of Rent represents Landlord's contribution toward work required by Tenant to open for business from the Leased Premises.

Section 5.3.   _Payment of Percentage Rent_.  Tenant shall pay to Landlord as additional rent for each Lease Year or Partial Lease Year, an amount equal to the product of (a) Tenant's Gross Sales in excess of the following Annual Breakpoints (as hereinafter defined):

| Lease Year | Annual Breakpoint |
|---|---|
| 1 - 2 | $1,500,000.00 |
| 3 - 5 | $1,650,000.00 |
| Renewal | |
| 1 - 2 | $1,815,000.00 |
| 3 - 5 | 1,996,500.00 |

multiplied by (b) the Percentage Rent Factor set forth in Section 1.1. ("Percentage Rent").  Percentage Rent shall be due and payable on or before forty-five (45) days after the close of each Lease Year or Partial Lease Year.

Section 5.4.   _"Gross Sales" Defined_.  The term "Gross Sales" shall mean:  the dollar aggregate of the price charged or allowed for all goods, wares, merchandise, trade-ins, beverages and food sold, leased or licensed, and the income,

- 7 -

receipts, revenues and charges of and for all services or other operations or businesses, sold or rendered, at, in, on or from the Leased Premises by Tenant or any assignee or concessionaire of Tenant, for cash, charge, or credit, on time basis or otherwise, without reserve or deduction for inability or failure to collect, whether prior to or subsequent to the Term Commencement Date.  Gross Sales shall include, but not be limited to, such sales, leases or licenses of goods, wares, merchandise, trade-ins, beverages, food, services or businesses (i) where orders originate or are accepted by Tenant at the Leased Premises but delivery or performance is made from or at a place other than the Leased Premises, or vice versa and; (ii) made pursuant to mail, telegraph, telephone or other similar orders (such as catalogue orders) received, filled or taken at, in or from the Leased Premises.  Gross Sales shall also include (i) amounts includable as Gross Sales pursuant to Section 4.7. above; and (ii) all other gross income derived by Tenant from its operations in, at, on or from the Leased Premises.  In all cases, Gross Sales shall be computed without deduction or allowance for cost of goods sold, or other costs, charges or expenses of purchasing, selling, transportation, overhead or franchise costs, capital stock tax, tax based upon assets or net worth or gross receipt tax, income or similar tax based on income or profits or otherwise.  **There shall not be included in the Calculation of Gross Sales (i) sales taxes or retailer's excise taxes which are separately added by Tenant to the sales price, paid directly by the customer, collected by Tenant and actually paid over to any governmental taxing authorities; (ii) discounts to employees, provided such discounts do not exceed two percent (2%) of Tenant's Gross Sales; (iii) the sale of Tenant's trade fixtures; (iv) any amounts received as a result of an insurance settlement; (v) the actual net amount of refunds, credits or allowances made or allowed by Tenant in accordance with reasonable business practices upon transactions included within Gross Sales (not exceeding in amount the selling price of the item in question) where the item is returned** * **by the purchaser to and accepted by Tenant (provided that anything given in exchange for returned items and any such credits to customers shall be included in Gross Sales); or (vi) bulk sales of merchandise to hospitals, municipalities, institutions, facilities or other sales of merchandise in bulk.**





Section 5.5.   <u>Statements of Gross Sales</u>.

A.   Within fifteen (15) days after the end of each calendar month, Tenant shall deliver to Landlord a written statement certified by Tenant and setting forth the amount of Gross Sales made during such month.

B.   On or before the **forty-fifth (45th)** day following the end of each Lease Year or Partial Lease Year, Tenant shall deliver to Landlord a written statement, certified under oath to be complete and correct by Tenant, showing the amount of Gross Sales and the amount of Percentage Rent to be paid to Landlord for such Lease Year or Partial Lease Year.

C.   All statements of Gross Sales shall be in a form acceptable to Landlord.  The receipt or acceptance by Landlord of any statement of Gross Sales, or any payment of Percentage Rent, shall not bind Landlord to the correctness of the statement or payment, and shall be without prejudice to Landlord's inspection and audit rights as provided in Section 5.6. below.

Section 5.6.   <u>Records and Audits</u>.

A.   The business of Tenant shall be operated so that **serially numbered sales slips** shall be issued with each sale, transaction or other event resulting in Gross Sales ** For the purpose of permitting verification by Landlord of any amounts due as Percentage Rent, Tenant **shall keep and**



- 8 -

\* , if previously excluded from gross sales, then
\*\* (which need not be kept)

preserve **weekly computer compilations of Gross Sales and** such full, complete and accurate books of account as may reasonably be required by Landlord in order to monitor or audit Gross Sales **(hereinafter collectively, the "Records")**.  Tenant shall make all such Records available to Landlord at **Tenant's main office upon ten (10) days prior written notice.  The Records** shall disclose in detail all information required to permit Landlord to verify Tenant's Gross Sales, and shall conform to and be in accordance with generally accepted accounting principles consistently applied with respect to all operations of the business conducted in, at, to or from the Leased Premises. The Records shall be kept and preserved in accordance with the foregoing for at least **two (2)** years after the end of the period to which they pertain, notwithstanding any expiration of the Term.  If any audit is required, or a controversy arises regarding Percentage Rent, Tenant shall retain **the Records** until such audit is terminated or controversy resolved.

B.   Landlord shall have the right, at any time during normal business hours upon not less than **fifteen (15)** days' prior written notice to Tenant, to cause a complete examination or audit to be made of the **Records**. Landlord shall have the further right to require Tenant to provide such other explanations as may be **reasonably** necessary for a proper and complete examination or audit.  If any audit or examination discloses that any statement of Gross Sales understates Gross Sales for the reporting period (i) to any extent Tenant shall pay to Landlord upon demand the resultant deficiency in Percentage Rent, together with Interest thereon from the due date of such Percentage Rent; and (ii) in addition to (i) **if such audit or examination discloses an understatement in Gross Sales of three percent (3%) or more, then** Tenant shall pay to Landlord, upon demand, the **reasonable** cost of the audit or examination (including, without limitation, all reasonable travel expenses incurred by Landlord and its agents in conducting such audit), **provided such costs do not exceed One Thousand Dollars ($1,000.00).**

Section 5.7.   <u>Taxes</u>.

A.   The term "Taxes" shall mean all federal, state, local, governmental, special district and special service area taxes and assessments, exactions, sewer and water rents, permit and license fees, charges (including, without limitation, transit district or transit taxes or assessments, lease or occupancy taxes) and other governmental charges, surcharges, and levies, general and special, ordinary and extraordinary, unforeseen as well as foreseen, of any kind and nature (including interest thereon whenever the same may be payable in installments) which Landlord shall pay or become obligated to pay and arising out of the use, occupancy, ownership, leasing, management, repair, replacement, use of parking or operation of the Shopping Center, any part thereof, any appurtenance thereto or property, fixtures or equipment therein.  The term "Taxes" shall also be deemed to include the costs (including, without limitation, fees of attorneys, consultants and appraisers) of any negotiation, contest or appeal pursued by or on behalf of Landlord to reduce or prevent an increase in any such tax, assessment or charge.  **No inheritance, estate, franchise, corporation, income or profit tax or capital levy that is or may be imposed upon Landlord personally shall be deemed to be included in Taxes.**

- 9 -

Section 5.8.   Payment of Tax Rent:

A.   Tenant's share of Taxes ("Tax Rent") for each Tax Year shall be computed by Landlord by multiplying the amount of the Taxes (less the Tax Rent paid by Major Tenants) by a fraction ("Tenant's Proportionate Share"), the numerator of which shall be the Floor Area of the Leased Premises and the denominator of which shall be  the **total** of the Floor Area other than **the Floor Area leased to** Major Tenants on the first day of each month during the Tax Year, as that term is hereinafter defined

B.   Tax Rent shall be paid by Tenant in equal monthly installments (the "Tax Estimates") as are estimated by Landlord from time to time, **but in no event more than the Taxes actually paid for the prior Lease Year**, with the first installment being due on the Rent Commencement Date and each succeeding installment being due on the first day of each calendar month thereafter.  The initial Tax Estimate shall be in the amount set forth in Section 1.1. hereof.  All succeeding installments shall be in such amount until notice of change is received from Landlord.  Subsequent to the end of each Tax Year, Landlord shall send to Tenant a statement (the "Tax Statement") setting forth the amount of the Tax Rent for the Tax Year in question and the aggregate amount of the Tax Estimates which have been paid by Tenant for such period **with a copy of the tax bill.**  In the event that the total of the Tax Estimates actually paid by Tenant for any Tax Year or portion of a Tax Year is less than the amount of the Tax Rent for such period, Tenant shall remit the difference to Landlord within twenty (20) days after receipt of the Tax Statement.  In the event that the total of the Tax Estimates actually paid by Tenant for such Tax Year is in excess of the Tax Rent for such period, Landlord shall credit the difference toward the Tax Estimates payment(s) next due and a refund to Tenant at the end of the term.  If any tax payable by Landlord to which Tenant has contributed is retroactively decreased, Tenant shall receive its proportionate share of the net refund.  Landlord agrees to pay said taxes when due, and Tenant shall not be responsible for any interest or penalty charged due to Landlord's late payment of Taxes.

Section 5.9.   "Tax Year" Defined for a Partial "Tax Year".  The term "Tax Year" means a twelve (12) month period established by Landlord as the year for purposes of computing Tax Rent.  The Tax Year may or may not coincide with the period designated as the tax year by the taxing authorities having jurisdiction over the Shopping Center.

Section 5.10.   Taxes on Tenant's Personal Property.  If any tax, excise on rents or other imposition, however described, is levied or assessed by any taxing authority on account of, without limitation, Tenant's interest in this Lease, the Rent, trade fixtures, the Leasehold Improvements as defined in Section 9.5, any Tenant property as defined in Section 9.5., Tenant's right to occupy the Leased Premises, or Tenant's business in the Leased Premises, then Tenant shall be responsible for the payment of such tax, if **assessed directly to Tenant,** and shall pay the same before it becomes delinquent.  Tenant shall deliver a duplicate receipt to Landlord within five (5) days after such payment of tax.  If any taxing authority requires that any tax described in this Section 5.10. be paid by Tenant but collected by Landlord and forwarded to such taxing authority, then the same shall be paid by tenant to Landlord at such times as such taxing authority shall require,  but in such event, if Tenant has paid such tax to Landlord, Landlord agrees to indemnify and hold Tenant harmless from any claim arising from the non-payment of same.

- 10 -

Section 5.11.  <u>Rent for a Partial Month</u>.  For any portion of a calendar month included at the beginning or end of the Term, Tenant shall pay in advance, at the beginning of such portion, 1/30th of each monthly installment of Rent (including, without limitation, Minimum Rent, Tax Estimates, Operating Costs Estimates, and Merchant's Association or Marketing Fund Dues) for each day included in such portion.

ARTICLE VI

<u>COMMON AREAS</u>

Section 6.1.   <u>Use of Common Areas</u>.  During the Term Tenant shall have a non-exclusive license to use the Common Areas, such license being subject to the exclusive control and management of Landlord and the rights of Landlord and of other tenants.  Tenant agrees to comply with such rules and regulations as Landlord prescribes regarding use of the Common Areas.  Tenant agrees it shall not use the Common Areas for any sales or display purposes, or for any other purpose which would impede or create hazardous conditions for the flow of pedestrian or other traffic, without Landlord's prior written consent.  Tenant agrees that the parking spaces, fire lanes and the lanes in the front of the Leased Premises shall not be used for the loading or unloading of trucks **unless Tenant does not have a rear delivery entrance.** Trucks are to use such entrances, exits, and service lanes designated by Landlord in the rear of the stores. Tenant further agrees that Tenant and Tenant's employees shall only use the employee parking areas designated by Landlord.  Tenant shall, upon five (5) days' written notice from Landlord, provide to Landlord a list of license numbers of all of Tenant's and its employees' vehicles. In the event Tenant or its employees fail to park their vehicles in designated parking areas, or in the event Tenant undertakes or permits the delivery of merchandise or other items except as herein provided, Landlord may, ~~upon~~ *five (5) days' written notice from Landlord, charge Tenant and Tenant shall pay to Landlord, on demand, $25.00 per day per vehicle parking in any area other than those designated by Landlord and $25.00 per delivery for deliveries undertaken or permitted by Tenant in the manner hereinabove prohibited. **Landlord shall have the right to tow away vehicles parked in non-designated parking areas.  In no event shall a breach of the parking restrictions constitute a Default under the Lease.**

Section 6.2.   <u>Management and Operation of Common Areas</u>. Landlord shall operate, repair, equip and maintain the Common Areas **in a manner consistent with other first class shopping centers in the area** and Landlord shall have the exclusive right and authority to employ and discharge personnel with respect thereto. Without limiting the foregoing, Landlord may (i) utilize the Common Areas for promotions, exhibits, displays, food facilities and any other use which tends to attract customers to or benefits the Shopping Center; (ii) grant the right to conduct sales in the Common Areas; (iii) erect, remove and lease, kiosks, planters, pools, sculptures, buildings and other improvements within the Common Areas **provided that same do not adversely affect access to or visibility of the Leased Premises or reduce the number of parking spaces below that which is required by law;** (iv) enter into, modify and terminate easements and other agreements pertaining to the use and maintenance of the Shopping Center; (v) construct, maintain, operate, replace and remove lighting, other equipment, and signs on all or any part of the Common Areas; (vi) provide security for the Shopping Center; (vii) restrict parking in the Shopping Center **provided such restrictions do not prohibit Tenant or its customers from parking in the Common Areas;** (viii) discourage non-

- 11 -

* if such violation continues for

customer parking; and (ix) temporarily close all or any portion of the Shopping Center as may be necessary to prevent a dedication or accrual of any rights to any person or to the public*, provided, however, if Landlord closes the **Shopping Center for more than three (3) days, Tenant shall after said three (3) day period pay only Percentage Rent in lieu of Minimum Rent during such time the Shopping Center is closed. In addition Tenant shall have the right to close its business and not be in Default during the time the Shopping Center is closed by Landlord, until Landlord has reopened the Shopping Center.**

Section 6.3. <u>Tenant's Proportionate Share of Landlord's Operating Costs</u>.

A. Tenant's share of Landlord's Operating Costs ("Tenant's Proportionate Share of Landlord's Operating Costs") for each full or partial calendar year (or fiscal year selected by Landlord) (the "Operating Costs Year") during the Term shall be computed by Landlord by multiplying the amount of Landlord's Operating Costs (less contributions paid by Major Tenants toward Landlord's Operating Costs) by the fraction described in Section 5.8.A as "Tenant's Proportionate Share."

B. Tenant's Proportionate Share of Landlord's Operating Costs shall be paid by Tenant in equal monthly installments (individually, each an "Operating Costs Estimate, "collectively, the "Operating Costs Estimates") in such amounts as are estimated by Landlord from time to time during the Term **but in no event more than the Operating Costs paid for the prior Lease Year.** The first such installment shall be due on the Rent Commencement Date and each succeeding installment shall be due on the first day of each calendar month thereafter. The initial Operating Costs Estimate shall be in the amount set forth in Section 1.1., and all succeeding installments shall be in such amount until notice of a change in the amount is received from Landlord. Subsequent to the end of each Operating Costs Year, Landlord shall send to Tenant a statement (the "Operating Costs Statement") setting forth the amount of Tenant's Proportionate Share of Landlord's Operating Costs for the Operating Costs Year in question and the aggregate amount of the Operating Costs Estimates which have been paid by Tenant. In the event the total of the Operating Costs Estimates actually paid are less than the amount of Tenant's Proportionate Share of Landlord's Operating Costs for such period, Tenant shall remit the difference to Landlord within twenty (20) days after receipt of the Operating Costs Statement. In the event that the total of the Operating Costs Estimates actually paid by Tenant for such Operating Costs Year are in excess of Tenant's Proportionate Share of Landlord's Operating Costs for such period, Landlord shall credit the difference toward the Operating Costs Estimate **payment(s) next due and a refund to Tenant at the end of the Term.**

Section 6.4. <u>"Landlord's Operating Costs" Defined</u>.

A. The term "Landlord's Operating Costs" shall mean all costs and expenses incurred by Landlord in the operation the **Common Areas of the** Shopping Center. Landlord's Operating Costs shall include, without limitation, costs and expenses associated with the operation, equipping, maintenance and repair of the **Common Areas of the** Shopping Center, including, but not limited to, the costs and expenses of: (i) operating, equipping, maintaining, repairing, replacing, lighting, cleaning, painting and striping of, and removing snow, ice, garbage, trash and debris from, the

- 12 -

\* but Landlord shall not close the Shopping Center for more than 90 days or Tenant may terminate the Lease



Shopping Center (excluding the sidewalks and loading dock immediately adjacent to the Leased Premises); (ii) operating, maintaining, repairing and replacing ducts, conduits and similar items, fire protection systems, sprinkler systems, security alarm systems, storm and sanitary drainage systems and other utility systems, signs and markers, on and off-site traffic regulation and control signs and devices, and compliance with any environmental standards and other laws and regulations; (iii) all premiums, fees and other charges for insurance applicable to the Shopping Center, including self-insurance; (iv) interior and exterior landscaping; (v) decorations; (vi) all replacement and improvements of or to the Shopping Center including, without limitation, floors, roofs escalators, elevators, parking areas and similar facilities; (vii) machinery and equipment (and the costs of maintenance, repair and inspection thereof) and all personal property taxes and other charges incurred in connection with such machinery and equipment; (viii) all license and permit fees and any and all parking surcharges including the cost of obtaining and operating public transportation or shuttle bus systems, if the same are required by any laws, rules, regulations, guidelines or orders; (ix) music program services and loudspeaker systems; (x) on-site personnel and all costs and expenses relating to the employment of such personnel, including, without limitation, the salaries, benefits and insurance costs of such personnel; (xi) all utility costs relating to the Common Areas; and (xii) Landlord's administrative charge in an amount equal to twenty percent (20%) of the total of all other Landlord's Operating Costs. Notwithstanding anything to the contrary in this Article VI, in no event shall Tenant's Proportionate Share of Landlord's Operating Costs contain a component thereof in any one Operating Costs Year (or portion) a charge for capital expenditures incurred, or depreciation or amortization thereof, in excess of the product of fifty cents ($.50) times the Floor Area of the Leased Premises. In no event shall Landlord's Operating Costs include leasing commissions, repairs and/or other services performed for the benefit of a particular tenant or Landlord's repairs under Section 10.1., excluding roof repairs. Tenant shall have the right upon thirty (30) days prior written notice once every Lease Year during regular business hours, to audit Landlord's books regarding Landlord's Operating Costs.

ARTICLE VII

UTILITIES

Section 7.1.    Utility Charges.

A.    Tenant shall pay, as and when the same become due and payable, all charges for water, sewer, electricity, gas, heat, steam, hot and/or chilled water, air-conditioning, ventilation, lighting systems, telephone service and other utilities supplied to the Leased Premises (the "Utility Charges"). If any such utilities are not separately metered or assessed, then in addition to Tenant's payment of separately metered charges, Tenant shall pay to Landlord a proportionate share of charges for such non-separately metered utilities. Tenant's proportionate share of the charges for non-separately metered utilities shall be calculated by multiplying the Utility Charges for such utilities by a fraction, the numerator of which shall be the Floor Area of the Leased Premises and the denominator of which shall be the Floor Area of tenants using such utilities.

B.    At any time, and from time to time, Landlord may, at Landlord's option, install submeters in connection with

- 13 -

the utility services furnished to the Leased Premises.  In the event that Landlord exercises its option to install such submeters at Landlord's cost, Landlord may collect all or any part of the Utility Charges directly from Tenant on the first day of each calendar month provided such Utility Charges shall not exceed the rates Tenant would be charged if billed directly for the same services by the utility company*.

Section 7.2.    <u>Discontinuance and Interruption of Service</u>.  Landlord shall not be liable to Tenant in damages or otherwise for the quality, quantity, failure, unavailability or disruption of any utility service and the same shall not constitute a termination of this Lease, constitute an actual or constructive eviction of Tenant, or entitle Tenant to an abatement of Rent.  **Notwithstanding anything to the contrary in this Lease, in the event utilities serving the Leased Premises are disrupted due to the negligence or acts of Landlord, its agents, contractors, servants or employees, Landlord shall promptly restore the affected utilities at Landlord's sole cost and expense.  If the disrupted utilities are not restored by Landlord within forty-eight (48) hours after the Landlord has knowledge of the disruption, and Tenant is unable to conduct its business in the Leased Premises due to the disruption of utility service, the Minimum Rent shall be abated during the period commencing on the expiration of the aforementioned forty-eight (48) hours and ending on the date Tenant is able to resume conducting its business.  In no event, however, shall Landlord be liable for consequential damages resulting from any disruption of utilities.  In addition, in no event shall a disruption of utility service constitute a termination of this Lease or a constructive or actual eviction of Tenant.**

Section 7.3.    <u>Landlord's Right to Alter Utilities</u>.  Landlord reserves and shall at all times have the right to alter any and all utilities, and the equipment relating thereto, serving the Shopping Center.  Tenant shall execute and deliver to Landlord without delay such documentation as may be required to effect such alteration.

ARTICLE VIII

INDEMNITY AND INSURANCE

Section 8.1.    <u>Indemnity by Tenant</u>.  Tenant shall indemnify, defend and hold Landlord, Landlord's lessors, its officers, shareholders, trustees, principals, agents, property managers, employees and any Mortgagee(s) (collectively, the "Indemnitees") harmless from and against all liabilities, obligations, damages, penalties, claims, costs, charges and expenses, including, without limitation, reasonable architects' and attorneys' fees, which may be imposed upon, incurred by, or asserted against any of the Indemnitees and arising, directly or indirectly, out of or in connection with the use or occupancy of the Leased Premises or the Shopping Center by Tenant, its agents, servants, employees, or contractors.  In case any action or proceeding is brought against any of the Indemnitees by reason of any of the foregoing, Tenant shall, at Tenant's sole cost and expense, resist or defend such action or proceeding by counsel **reasonably** approved by Landlord, **provided, however, Landlord gives Tenant prompt written notice of such claim.  Landlord agrees to accept counsel appointed by Tenant's insurer, provided said counsel is A.V. rated.  Tenant shall not be required to indemnify Landlord for compliance with respect to hazardous materials installed by Landlord prior to the date of this Lease unless necessitated by Tenant's acts, omissions, alterations, repairs or negligence.**

- 14 -

*   , also provided that such utility charges are not included in Landlord's operating costs for common areas.

Section 8.2.    Landlord Not Responsible for Acts of Others. **Except for the negligent acts of Landlord, to the maximum extent permitted by law, the Indemnitees shall not be liable for, and Tenant waives all claims for, loss or damage to Tenant's business or injury or damage to person or property sustained by Tenant, or any person claiming by, through or under Tenant, resulting from any accident or occurrence in, on, or about the Leased Premises or the building of which it is a part, or any other part of the Shopping Center, including, without limitation, claims for loss, theft, injury or damage resulting from:  (i) any equipment or appurtenances becoming out of repair; (ii) wind or weather; (iii) any defect in or failure to operate any sprinkler, HVAC equipment, electric wiring, gas, water or steam pipe, stair, railing or walk; (iv) broken glass; (v) the backing up of any sewer pipe or downspout; (vi) the escape of steam or water; (vii) water, snow or ice being upon the Shopping Center or coming into the Leased Premises; (viii) the falling of any fixture, plaster, tile, stucco or other material; (ix) any act, omission or negligence of other tenants, licensees or any other persons, or occupants of the Shopping Center or adjoining or contiguous buildings, owners of adjacent or contiguous property, or the public, or (x) any other cause of any nature.  To the maximum extent permitted by law, Tenant agrees to use the Leased Premises and the Common Areas at Tenant's own risk.**

Section 8.3.    Tenant's Insurance. Commencing on the Rent Commencement Date and at all times thereafter, Tenant shall carry and maintain, at its sole cost and expense:

A.    Comprehensive general liability insurance, with a broad form comprehensive general liability endorsement applicable to the Leased Premises and its appurtenances, providing coverage which will pay on behalf of any named or additional named insured, all sums which any named and/or additional named insureds shall be legally liable to pay up to the limits of such policy as damages due to bodily injury (including death) or property damage, in the broadest form of such comprehensive general liability coverage, as endorsed with Broad Form Comprehensive General Liability, from time to time available in the jurisdiction in which the Leased Premises are located.  The minimum limits of liability of such insurance shall be no less than Five Hundred Thousand Dollars ($500,000.00) for bodily injury (or death) to any one person, One Million Dollars ($1,000,000.00) for bodily injury (or death) to more than one person, and Five Hundred Thousand Dollars ($500,000.00) for property damage, or in lieu thereof, One Million Dollars ($1,000,000.00) combined single limit.  If Tenant sells, serves or distributes alcoholic beverages in or on the Leased Premises, then such Public Liability Insurance shall include, at the same minimum limits of liability as shown above, Liquor Legal Liability coverage.

Section 8.4.    Tenant's Contractor's Insurance. Prior to the Rent Commencement Date, Tenant shall obtain and maintain, at its expense, in addition to worker's compensation insurance as required by the jurisdiction in which the Shopping Center is located, builder's risk insurance in the amount of the replacement cost of Tenant's Property and Leasehold Improvements and comprehensive general liability insurance (including, without limitation, contractor's liability coverage, contractual liability coverage, completed operations coverage, a broad form property damage endorsement and a contractor's protective liability endorsement) providing on an occurrence basis a minimum combined single limit of $1,000,000.00.

Section 8.5.    Policy Requirements. Any company writing any insurance which Tenant is required to maintain or cause to be maintained pursuant to Sections 8.3. and 8.4. (all such

- 15 -

insurance as well as any other insurance pertaining to the Leased Premises or the operation of Tenant's business therein being referred to as "Tenant's Insurance") shall at all times be subject to Landlord's **reasonable** approval, and each such insurance company shall be licensed and qualified to do business in the jurisdiction in which the Leased Premises are located and shall have received an A+ or better rating by the latest edition of Best's Insurance Rating Service. All policies evidencing Tenant's Insurance shall specify Tenant as named insured, and Landlord (and any designees of Landlord as the interest of such designees shall appear) as additional insured(s). Provided that the coverage afforded Landlord and any designees of Landlord shall not be reduced or otherwise adversely affected, all of Tenant's Insurance may be carried under a blanket policy covering the Leased Premises and any other location of Tenant. No policy for Tenant's insurance shall provide for a deductible amount which exceeds One Hundred Thousand dollars ($100,000.00) or, subject to Landlord's consent which shall not be unreasonably withheld, such higher deductible as Tenant may carry pursuant to a blanket policy of insurance. All policies of Tenant's Insurance shall contain endorsements requiring the insurer(s) to give to Landlord and its designees, if any, at least ten (10) days advance written notice of any material reduction, cancellation, termination or non-renewal of said insurance. Tenant shall be solely responsible for payment of premiums for all of Tenant's Insurance. Tenant shall deliver to Landlord at least fifteen (15) days prior to the time Tenant's Insurance is first required to be carried by Tenant, and upon renewals at least fifteen (15) days prior to the expiration of the term of any such insurance coverage, a certificate of insurance of all policies procured by Tenant in compliance with its obligations under the Lease. The limits of Tenant's Insurance shall in no event limit Tenant's liability under the Lease, at law, or in equity.

If Tenant fails to have a duplicate original or certificate of insurance on deposit with Landlord, after twenty (20) days written notice from Landlord, then Landlord shall have the right to acquire such insurance, and Tenant shall be obligated to pay Landlord the amount of the premium applicable thereto within five (5) days following notice from Landlord. Tenant's failure to make such payment to Landlord may be treated by Landlord as a default in the payment of Rent.

Section 8.6.    <u>Increase in Insurance Premiums</u>.  Tenant shall not keep or do anything in the Leased Premises which will (i) result in an increase in the rate of property or any other insurance on the Shopping Center; (ii) violate the terms of any insurance coverage on the Shopping Center carried by Landlord or any other tenant of which Landlord **has given Tenant prior written notice;** (iii) prevent Landlord from obtaining such policies of insurance acceptable to Landlord or any Mortgagee of the Shopping Center; (iv) contravene the rules, regulations and recommendations of Landlord's insurers, loss prevention consultants, safety engineers, the Fire Insurance Rating Organization or any similar body having jurisdiction over the Leased Premises, or the National Board of Fire Underwriters. In the event of the occurrence of any event set forth in this Section 8.6., Tenant shall pay to Landlord upon demand the amount of any increase in any such insurance premium if Tenant does not **promptly take steps to eliminate the extra charges.** In determining the cause of any increase in insurance premiums, the schedule or rate of the organization issuing the insurance or rating procedures of Landlord's insurer shall be conclusive evidence of the items and charges which comprise the insurance rates and premiums on such property.

- 16 -

Section 8.7.   <u>Waiver of Right of Recovery</u>. If a Casualty, as defined in Section 11.1., or other occurrence which should be covered by the insurance required by this Article VIII shall occur, Landlord or Tenant, as the case may be, shall look solely to their respective insurers for reimbursement, and, to that end, Landlord and Tenant, as the case may be, shall cause such insurance to be so written that the insurer(s) thereunder waive(s) all rights of subrogation and shall have no cause of action against Landlord or Tenant, as the case may be, its agents or employees, as a result of such Casualty or other occurrence; and Landlord or Tenant, as the case may be, hereby release and waive all right of recovery which it might otherwise have against Landlord or Tenant, its agents and employees, by reason of any loss or damage resulting from such Casualty, or other occurrence, to the extent that Landlord or Tenant would be covered by insurance if Landlord or Tenant had complied with the requirements of this Article VIII.

ARTICLE IX
CONSTRUCTION AND ALTERATIONS

Section 9.1.   <u>Condition of Leased Premises</u>. By taking possession of the Leased Premises, Tenant acknowledges that it has:  (i) inspected the Leased Premises; (ii) accepted the Leased Premises, and all improvements, betterments and equipment "AS IS," **in broom-clean condition** with no representation or warranty by Landlord as to the condition or suitability of the Leased Premises or of the Shopping Center for Tenant's purpose **(however, Landlord has not been notified and is not aware of any uncured violations of governmental laws or codes, including environmental laws, with respect to the Leased Premises prior to delivery of possession)**; and (iii) agreed that Landlord has no obligation to improve or repair the Leased Premises, or the Shopping Center, unless said obligation is specifically set forth in this Lease.

Landlord will make necessary repairs to the HVAC (heating, ventilating and air conditioning) system serving the Leased Premises if the need for repairs arises and Landlord receives notice of such need prior to the end of the first Lease Year. Provided, however, Landlord's obligation hereunder shall be void unless Tenant performs each of the following: (1) properly performs all routine and preventative maintenance on the HVAC system (including, but not limited to, replacement of all belts, filters, lubrication, seasonal start-up and shut-down procedures), and (2) provides Landlord with immediate notice of the need for the repairs for which Landlord is responsible. However, Landlord shall have no responsibility whatsoever with respect to the HVAC system after the expiration of the first Lease Year.

Section 9.2.   <u>Tenant Improvements</u>. Tenant, at its sole cost and expense, agrees to provide all improvements to the Leased Premises in accordance with its obligations set forth in Exhibit B, and in accordance with the plans and specifications to be submitted to and approved by Landlord, prior to the Opening Date. Tenant specifically agrees that it shall utilize only modern, all new, and first-class fixtures and furnishings in the Leased Premises, and that it will have the Leased Premises fully constructed and fixtured on the Opening Date. Upon receipt of Landlord's written approval of Tenant's plans and specifications, Tenant shall promptly commence and diligently pursue to completion the construction of the improvements.

Section 9.3.   <u>Alterations</u>. **Except for interior non-structural**repairs costing less than Twenty-five Thousand Dollars ($25,000.00)**, Tenant shall not make or cause to be made any alterations, renovations, improvements

- 17 -

* ; however, as of the time of Delivery, Landlord warrants that the Premises are free from asbestos.

** improvements and/or

or other installations in and to the Leased Premises or any part thereof without Landlord's prior written consent.

Section 9.4.   Work Requirements.   All work performed by Tenant in the Leased Premises shall be performed (i) promptly, at Tenant's sole cost and expense, and in a workmanlike manner with first-class materials; (ii) by duly qualified or licensed persons; (iii) without interference with, or disruption to, the operations of Landlord or other tenants or occupants of the Shopping Center; and (iv) in accordance with professionally prepared plans and specifications as required and approved by Landlord and all governmental permits, rules and regulations.

Section 9.5.   Ownership of Improvements.   All present and future alterations, additions or improvements made to the Leased Premises (the "Leasehold Improvements") shall be deemed to be the property of Landlord and upon Tenant's vacation or abandonment of the Leased Premises, unless Landlord directs otherwise by written notice to Tenant at least thirty (30) days prior to the expiration of the Term of this lease, shall remain upon and be surrendered with the Leased Premises in good order, condition and repair, wear and tear, damage by fire and other casualty excepted.   All movable goods, inventory, office furniture, trade fixtures and other movable personal property belonging to Tenant which are installed, stored, or kept in the Leased Premises by Tenant and are not permanently affixed to the Leased Premises, shall remain Tenant's property ("Tenant's Property") and shall be removable by Tenant at any time provided that:   (i) Tenant is not in default under this Lease; and (ii) Tenant shall repair any damage to the Leased Premises or the Shopping Center caused by the removal of any of Tenant's Property.

Section 9.6.   Removal of Leasehold Improvements and Tenant's Property.   Tenant shall remove all Tenant's Property prior to the Termination Date or the termination of Tenant's right to possession.   Tenant, at its sole cost and expense, shall repair any damage to the remaining Leasehold Improvements, the Leased Premises, or any other portion of the Shopping Center caused by such removal, wear and tear, damage by fire and other casualty excepted.   Should Tenant fail to remove said items then they shall be considered as abandoned and shall become the property of Landlord, or Landlord may have them removed and disposed of at Tenant's sole cost and expense.

Section 9.7.   Mechanic's Liens.   No mechanic's or other lien shall be allowed against the Shopping Center as a result of Tenant's improvements to the Leased Premises.   Tenant shall promptly pay all persons furnishing labor, materials or services with respect to any work performed by Tenant on the Leased Premises.   If any mechanic's or other lien shall be filed against the Leased Premises or the Shopping Center by reason of work, labor, services or materials performed or furnished, or alleged to have been performed or furnished, to or for the benefit of Tenant, Tenant shall cause the same to be discharged of record or bonded to the satisfaction of Landlord within five (5) days   after Tenant's knowledge of the filing thereof.   If Tenant fails to discharge or bond any such lien, Landlord, in addition to all other rights or remedies provided in this Lease, may bond said lien or claim (or pay off said lien or claim if it cannot with reasonable effort be bonded) without inquiring into the validity thereof and all expenses incurred by Landlord in so discharging said lien, including reasonable attorney's fees, shall be paid by Tenant to Landlord as additional rent on five (5) days' demand.

- 18 -

Section 9.8.   Changes to Shopping Center.

A.   Exhibit A sets forth the general layout of the Shopping Center.  Exhibit A is not and shall not be deemed Landlord's representation or agreement that all or any part of the Shopping Center is, will be, or will continue to be, configured as indicated therein.  Landlord reserves the right to determine all tenancies in the Shopping Center, and Tenant does not rely on, nor does Landlord represent, the tenancy of any specific tenant.

B.   Landlord shall have the right, at any time, to (i) make alterations or additions to, or demolish all or any part of, the Shopping Center; (ii) build other buildings or improvements in or about the Shopping Center **provided such buildings or improvements do not adversely affect access to or visibility of the Leased Premises or reduce the number of parking spaces below that which is required by law;** and (iii) convey to others or withdraw portions of the Shopping Center.

C.   In the event that Landlord renovates or remodels the front exterior of the Leased Premises or the Shopping Center, Tenant agrees at its sole risk and expense to: (i) upon request of Landlord, remove its then existing signage to facilitate the remodeling work; (ii) upon direction of Landlord, re-install signage as is appropriate under the new criteria and consistent with such exterior remodeling; and (iii)  otherwise cooperate with Landlord to facilitate such renovation and remodeling.  Tenant consents to the performance of all work deemed appropriate by Landlord to accomplish any of the foregoing, and to any inconvenience caused thereby.  **In the event Landlord renovates the Shopping Center as set forth herein and the renovation takes place during the period of November 1 through December 31 or the two weeks before Father's Day in any Lease Year during the Term hereof, Landlord agrees not to remove Tenant's signage during such time periods.  In addition, if Landlord renovates the Shopping Center during any other time period, Landlord agrees to provide Tenant with temporary signage acceptable to Tenant.**

ARTICLE X

REPAIRS, MAINTENANCE, AND LANDLORD'S ACCESS

Section 10.1.  Repairs by Landlord.  Subject to the terms of this Lease, Landlord shall make structural repairs to the Leased Premises, **utilities serving the Leased Premises in common with other tenants, repairs to the Leased Premises necessitated by Landlord's negligence, any repairs caused by structural fault or failure of the building of which the Leased Premises are a part,** and repairs to the Common Areas (excluding, however, those areas Tenant is obligated to repair) and provided such repairs are not necessitated by any act or omission of Tenant, its agents, employees, assigns, concessionaires, contractors or invitees.

Section 10.2.  Repairs and Maintenance by Tenant.

A.   Tenant shall throughout the Term, at its sole cost and expense, maintain the Leased Premises, the Leasehold Improvements and Tenant's Property in good order, condition and repair. Tenant shall not cause or permit any waste, damage or injury to the Leased Premises or the Shopping Center.

- 19 -

B.    Tenant's obligations shall include, without limitation, repairing, maintaining, and making replacements to items such as the following located within or serving the Leased Premises:  floors (other than structural floors) and floor coverings; walls (other than structural walls) and wall coverings; ceilings; utility meters; pipes and conduits; fixtures; subject to Section 4.6., HVAC equipment and systems which exclusively serve the Leased Premises; plumbing, electrical and other mechanical systems exclusively serving the Leased Premises; sprinkler equipment and other equipment within the Leased Premises; the store front(s); security grilles or similar enclosures; locks and closing devices; window sashes, casements and frames; glass; doors and door frames **except those repairs necessitated by Landlord's negligence and any repairs caused by a structural fault or failure of the building of which the Leased Premises are a part.**  Tenant agrees to maintain with a reputable contractor a regular service and maintenance contract on the HVAC equipment and systems servicing the Leased Premises, with routine inspections and servicing as recommended by the HVAC manufacturer.

C.    Tenant, at its sole cost and expense, shall install and maintain fire extinguishers  as may be  required by any agency having jurisdiction over, or by the underwriters issuing insurance for, the Shopping Center.  Tenant, at its sole cost and expense, agrees to routine inspections of fire protection devices by contractors acceptable to Landlord.  If any bureau, department, or official of the Federal, state or local government of the jurisdiction in which the Shopping Center is located requires or recommends the installation, modification, or alteration of the sprinkler system, or other equipment, **solely** by reason of Tenant's business, or the location of any partitions, trade fixtures, or other contents of the Leased Premises, or for any other reason, or if any such sprinkler system or change thereof becomes necessary to prevent the imposition of any penalty or charge against the full allowance for a sprinkler system in fire insurance rates for the Shopping Center, then Tenant, at Tenant's sole cost and expense, shall promptly install such sprinkler system or changes therein.  **Landlord hereby agrees Tenant shall not be obligated to make any structural changes to the Leased Premises unless structural changes are required due to the nature of Tenant's business or the location of any partitions or trade fixtures.**

D.    Tenant shall keep the service areas, sidewalks, and loading docks or bays adjoining the Leased Premises **reasonably** free from ice and snow and shall not permit the accumulation of garbage, trash or other waste in or around the Leased Premises.

Section 10.3.   Inspections, Access and Emergency Repairs by Landlord.  Tenant shall permit Landlord to enter all parts of the Leased Premises during the Store Hours to inspect the same. In the event of an emergency, Landlord may enter the Leased Premises and make such inspection and repairs as Landlord deems necessary, at the risk and for the account of Tenant. **Except in the event of an emergency, Landlord will not perform any work in the structural or non-structural portions of the Leased Premises during the period of November 1-December 31 or the two (2) weeks before Father's Day in any lease year during the term hereof.**

ARTICLE XI
CASUALTY

Section 11.1.   Fire or Other Casualty.  Tenant shall give prompt notice to Landlord in case of fire or other casualty ("Casualty") to the Leased Premises.

- 20 -

Section 11.2.   Right to Terminate.

A.   If (i) the buildings (taken in the aggregate) in the Shopping Center shall be damaged to the extent of more than **thirty** -five percent **(35%)** of the cost of replacement thereof; or (ii) the Leased Premises shall be damaged in whole or in part during the last three Lease Years or in any Partial Lease Year at the end of the Term; or (iii) either or both of the Leased Premises or the building in which the Leased Premises is located shall be damaged to the extent of **thirty**-five percent **(35%)** or more of the cost of replacement thereof; or (iv) any or all of the buildings or Common Areas of the Shopping Center are damaged to the extent of **thirty**-five percent **(35%)** or more of the replacement cost thereof; then, in any such event, Landlord may terminate this Lease by notice to Tenant prior to the **ninetieth (90th)** day after the date when the damage occurred **provided Landlord terminates a majority of other tenants affected by such Casualty, excluding any Major Tenant.** If Landlord terminates this Lease then the Termination Date shall be the date set forth in the notice to Tenant, which date shall not be less than thirty (30) days after the giving of said notice. The "cost of replacement" shall be determined by the company or companies insuring Landlord against the Casualty in question, or if there shall be no such determination, by a person selected by Landlord qualified to determine such "cost of replacement." **In the event Landlord fails to commence and diligently pursue the repairs to the Shopping Center within one hundred eighty (180) days from the date of Casualty, Tenant shall have the right to terminate this Lease upon thirty (30) days prior written notice to Landlord.**

B.   If the Casualty shall render the Leased Premises untenantable, in whole or in part, and provided that the Casualty or the occurrence causing the untenantability of the Leased Premises is not caused by Tenant, its agents, assignees, concessionaires, employees, contractors, or invitees, all Rent, except Percentage Rent, shall abate proportionately during the period of such untenantability, computed on the basis of the ratio which the amount of Floor Area of the Leased Premises rendered untenantable bears to the total Floor Area of the Leased Premises. Such abatement of Rent shall terminate on the earlier of (i) the date any such repair and restoration work is substantially completed by Landlord pursuant to its obligations under Section 11.3., or thirty (30) days after such date in the event Tenant is required to perform repair work pursuant to Section 11.4., or (ii) the date Tenant reopens for business in the portion of the Leased Premises previously rendered untenantable. Except to the extent specifically set forth in this Section 11.2., neither the Rent nor any other obligations of Tenant under this Lease shall be affected by any Casualty, and **Landlord and** Tenant hereby specifically waives all other rights **they** might otherwise have under law or by statute.

Section 11.3.   Landlord's Duty to Reconstruct. Provided this Lease is not terminated pursuant to any provision hereof, and subject to Landlord's ability to obtain the necessary permits, Landlord shall repair or reconstruct the Leased Premises , to a substantially similar condition as existed prior to the Casualty **except for Tenant's trade fixtures and furniture.**

Section 11.4.   Tenant's Duty to Reconstruct. Provided this Lease is not terminated, Tenant shall promptly commence and diligently pursue to completion (i) the repair of the Leased Premises, in accordance with Section 10.2., and (ii) the redecorating and refixturing of the Leased Premises to a substantially similar condition as existed prior to the

- 21 -

Casualty.  Tenant shall reopen for business in the Leased
Premises as soon as practicable after the occurrence of the
Casualty.

Section 11.5.  Demolition for Purposes of
Reconstruction. If the building in which the Leased Premises
is located shall be so damaged by a Casualty or so adversely
affected by some other occurrence that it is necessary, in
Landlord's judgment, to demolish such building for the
purpose of reconstruction, Landlord may demolish the same, in
which event the Rent shall be abated to the same extent and
according to the same terms as if the Leased Premises were
rendered untenantable by a Casualty, and the terms of
Sections 11.2., 11.3. and 11.4. shall be applicable in the
event of such demolition.

ARTICLE XII

CONDEMNATION

Section 12.1.  Taking of Leased Premises.

A.    If more than twenty-five percent (25%) of the Floor
Area of the Leased Premises shall be appropriated or taken
under the power of eminent domain by any authority, or
conveyance shall be made in anticipation or in lieu thereof
(each being hereinafter referred to as a "Taking"), either
party shall have the right to terminate this Lease as of the
effective date of the Taking by giving notice to the other
party of such election within thirty (30) days prior to such
date.

B.    If there is a Taking of a portion of the Leased
Premises and this Lease shall not be terminated pursuant to
Section 12.1.A, then (i) as of the effective date of the
Taking, this Lease shall terminate only with respect to the
portion taken; (ii) after the effective date of the Taking
and during the balance of the Term the Rent, except
Percentage Rent, shall be reduced by multiplying the same by
a fraction, the numerator of which shall be the Floor Area so
taken and the denominator of which shall be the Floor Area of
the Leased Premises immediately prior to the Taking; (iii) as
soon as reasonably possible after the effective date of the
Taking, Landlord shall, at its expense and to the extent
feasible, restore the remaining portion of the Leased
Premises to a complete unit of a similar condition as existed
prior to such taking.

Section 12.2.  Taking of Shopping Center.  If there is a
taking of fifteen percent (15%) or more of the floor space
within the Shopping Center or if there is a taking of any
portion of the Shopping Center so as to render, in Landlord's
judgment, the remainder unsuitable for use as a shopping
center, Landlord shall have the right to terminate this Lease
upon thirty (30) days' written notice to Tenant, provided
Landlord terminates a majority of other tenants
affected by such Condemnation excluding Major Tenants.
Provided Tenant is not then in default under this Lease,
Tenant shall receive a proportionate refund from Landlord of
any Rent Tenant paid in advance.

Section 12.3.  Condemnation Award.  All compensation
awarded for any Taking of any part of the Leased Premises
(including, without limitation, the Leasehold Improvements)
or the Shopping Center shall belong to and be the property of
Landlord.  Tenant hereby assigns to Landlord all of its
right, title and interest in any such award.  Tenant shall
have the right to collect and pursue any separate award as
may be available under local procedure for moving expenses or

- 22 -

Tenant's Property, so long as such award does not reduce the award otherwise belonging to Landlord as aforesaid.

ARTICLE XIII

MERCHANTS ASSOCIATION

**INTENTIONALLY DELETED**

ARTICLE XIV

SUBORDINATION AND ATTORNMENT

Section 14.1.   Subordination.  Tenant's rights under this Lease are subordinate to:  (i) all present and future ground or underlying leases involving all or any part of the Shopping Center; and (ii) any easement, license, mortgage, deed of trust or other security instrument now or hereafter affecting the Shopping Center; (those documents referred to in (i) and (ii) above hereinafter referred to as a "Mortgage" and the person or persons having the benefit of same being referred to as a "Mortgagee".  Tenant's subordination provided in this Section 14.1 is self-operative and no further instrument of subordination shall be required. *

Section 14.2.   Attornment.  If any person shall succeed to all or part of Landlord's interest in the Leased Premises, whether by purchase, foreclosure, deed in lieu of foreclosure, power of sale, termination of lease or otherwise, Tenant shall, without charge, attorn to such successor-in-interest upon written request.

Section 14.3.   Estoppel Certificate.  **Landlord and** Tenant shall promptly, upon five (5) days' written notice and without charge or cost to **the other**, certify by written instrument, which written instrument **Landlord and** Tenant shall duly execute and deliver to  **the other** or any other person designated by Landlord **or Tenant**: (i) that this Lease is unmodified and in full force and effect (or if there has been a modification, that the same is in full force and effect as modified, and stating the modification); (ii) the dates, if any, to which the Rent due under this Lease has been paid; (iii) whether Landlord **or Tenant** has failed to perform, any covenant, term or condition under this Lease, and the nature of Landlord's **or Tenant's** failure, if any; and (iv) such other relevant information as Landlord may request.

Section 14.4.   Quiet Enjoyment.  Landlord covenants that it has full right, power and authority to enter into this Lease and that Tenant, upon performing all of Tenant's obligations under this Lease, shall peaceably and quietly have, hold and enjoy the Leased Premises during the Term without hindrance, ejection or molestation by any person lawfully claiming by, through or under Landlord, subject, however, to all Mortgages, encumbrances, easements, and matters of record to which this Lease is or may become subject.

ARTICLE XV

ASSIGNMENT AND SUBLETTING

Section 15.1.   Landlord's Consent Required.

A.   Neither Tenant, nor any of its permitted successors or assigns, shall:  (i) transfer, assign, mortgage, encumber, or, by operation of law or otherwise, pledge, hypothecate, or

---

* Landlord will use reasonable efforts to obtain a Non-Disturbance Agreement from any Lender placing a mortgage on the shopping center after the date of this Lease on the Lender's form at Tenant's expense.

- 23 -

assign all or any of its interest in this Lease, or (ii) sublet or permit the Leased Premises, or any part thereof, to be used by others, including, but not by way of limitation, concessionaires or licensees of Tenant, or (iii) sell, assign, hypothecate or otherwise transfer, by operation of law or otherwise, the outstanding voting stock of Tenant (or partnership shares if Tenant is a partner) so as to result in or make possible a change in the present control of Tenant **(provided, however, this limitation shall not be applicable as long as Tenant's stock or its parent's stock is publicly traded on a "national securities exchange" as defined in the Securities Exchange Act of 1934), or (iv) except as otherwise provided in Paragraph C below,** sell, assign or otherwise transfer, by operation of law or otherwise, all or substantially all of Tenant's assets; without the prior written consent of Landlord, in each instance, which consent Landlord may withhold in its sole and absolute discretion.  Any such subletting or assignment shall be referred to as a "Transfer", and the person to whom Tenant's interest is transferred shall be referred to as a "Transferee."

B.    Any Transfer without Landlord's consent shall not be binding upon Landlord, and shall confer no rights upon any third person.  Each such unpermitted Transfer shall, without notice or grace period of any kind, constitute a default by Tenant under this Lease.  The acceptance by Landlord of the payment of Rent following any Transfer prohibited by this Article XV shall not be deemed to be a consent by Landlord to any such Transfer, an acceptance of the Transferee as a tenant, a release of Tenant from the performance of any covenants herein contained, or a waiver by Landlord of any remedy of Landlord under this Lease, although amounts actually received shall be credited by Landlord against Tenant's Rent obligations.  Consent by Landlord to any one Transfer shall not constitute a waiver of the requirement for consent to any other Transfer.  No reference in this Lease to assignees, concessionaires, subtenants or licensees shall be deemed to be a consent by Landlord to the occupancy of the Leased Premises by any such assignee, concessionaire, subtenant or licensee.

C.    Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right, without Landlord's prior written consent, to transfer this Lease to Tenant's parent corporation or a wholly owned subsidiary of Tenant or of Tenant's parent corporation, or as a result of a merger or consolidation provided:

(i)      Landlord is given thirty (30) days prior written notice of Tenant's intent to Transfer,

(ii)     Tenant is not in default of this Lease beyond any applicable cure period,

(iii)    the Transferee assumes, in a writing acceptable to Landlord, all the terms and conditions of this Lease,

(iv)     Tenant (or the transferee in the event Tenant no longer exists pursuant to a merger or consolidation permitted by this Lease) continues to remain liable for performance of all its obligations under this Lease,

(v)      The Guarantor (or the transferee in the event the Guarantor no longer exists pursuant to a merger or consolidation permitted by this Lease) continues to remain liable for performance of all its obligations under this Lease.

(vi)     The Transferee remains or becomes the parent corporation, or remains or becomes a wholly owned subsidiary of Tenant or Tenant's parent corporation.

assign all or any of its interest in this Lease, or (ii) sublet or permit the Leased Premises, or any part thereof, to be used by others, including, but not by way of limitation, concessionaires or licensees of Tenant, or (iii) sell, assign, hypothecate or otherwise transfer, by operation of law or otherwise, the outstanding voting stock of Tenant (or partnership shares if Tenant is a partner) so as to result in or make possible a change in the present control of Tenant **(provided, however, this limitation shall not be applicable as long as Tenant's stock or its parent's stock is publicly traded on a "national securities exchange" as defined in the Securities Exchange Act of 1934)**, or (iv) **except as otherwise provided in Paragraph C below,** sell, assign or otherwise transfer, by operation of law or otherwise, all or substantially all of Tenant's assets; without the prior written consent of Landlord, in each instance, which consent Landlord may withhold in its sole and absolute discretion. Any such subletting or assignment shall be referred to as a "Transfer", and the person to whom Tenant's interest is transferred shall be referred to as a "Transferee."

B. Any Transfer without Landlord's consent shall not be binding upon Landlord, and shall confer no rights upon any third person. Each such unpermitted Transfer shall, without notice or grace period of any kind, constitute a default by Tenant under this Lease. The acceptance by Landlord of the payment of Rent following any Transfer prohibited by this Article XV shall not be deemed to be a consent by Landlord to any such Transfer, an acceptance of the Transferee as a tenant, a release of Tenant from the performance of any covenants herein contained, or a waiver by Landlord of any remedy of Landlord under this Lease, although amounts actually received shall be credited by Landlord against Tenant's Rent obligations. Consent by Landlord to any one Transfer shall not constitute a waiver of the requirement for consent to any other Transfer. No reference in this Lease to assignees, concessionaires, subtenants or licensees shall be deemed to be a consent by Landlord to the occupancy of the Leased Premises by any such assignee, concessionaire, subtenant or licensee.

C. Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right, without Landlord's prior written consent, to transfer this Lease to Tenant's parent corporation or a wholly owned subsidiary of Tenant or of Tenant's parent corporation, or as a result of a merger or consolidation provided:

(i) Landlord is given thirty (30) days prior written notice of Tenant's intent to Transfer,

(ii) Tenant is not in default of this Lease beyond any applicable cure period,

(iii) the Transferee assumes, in a writing acceptable to Landlord, all the terms and conditions of this Lease,

(iv) Tenant (or the transferee in the event Tenant no longer exists pursuant to a merger or consolidation permitted by this Lease) continues to remain liable for performance of all its obligations under this Lease,

(v) The Guarantor (or the transferee in the event the Guarantor no longer exists pursuant to a merger or consolidation permitted by this Lease) continues to remain liable for performance of all its obligations under this Lease.

(vi) The Transferee remains or becomes the parent corporation, or remains or becomes a wholly owned subsidiary of Tenant or Tenant's parent corporation.

Furthermore, notwithstanding anything contained in the Lease to the contrary, Tenant shall have the right to transfer this Lease pursuant to a sale of substantially all of Tenant's assets provided:

(i)     Tenant is not in Default of this Lease beyond any applicable period,

(ii)    the Transferee assumes in a writing acceptable to Landlord, all of the terms and conditions on this Lease,

(iii)   Tenant (or the transferee in the event Tenant no longer exists pursuant to a merger or consolidation permitted by this Lease) continues to remain liable for the performance of all its obligations under this Lease,

(iv)    The Guarantor (or the transferee in the event Guarantor no longer exists pursuant to a merger or consolidation permitted by this Lease) continues to remain liable for the performance of all its obligations under this Lease,

(v)     Tenant provides Landlord notice of such sale.

D.    In the event Landlord's consent is required to a proposed Transfer and Landlord fails to give Tenant written notice of its consent or denial of the proposed Transfer within thirty (30) days after receipt of Tenant's request therefor, then, Landlord shall be deemed to have granted its consent to the proposed Transfer.

ARTICLE XVI
DEFAULT AND REMEDIES

Section 16.1.   Default.

A.    Any one or more of the following events shall constitute a default (each, a "Default") by Tenant under this Lease:  if (i) Tenant fails to pay any Rent and the same is not paid within ten (10) days after Tenant's receipt of written notice of such failure; (ii) Tenant shall breach or fail in the observance or performance of any of the terms, conditions or covenants of this Lease to be observed or performed by Tenant, other than those involving the payment of money and such is not cured within twenty (20) days after Tenant's receipt of written notice thereof.

B.    Upon the occurrence of any event described in Section 16.1.A, Landlord shall have all the rights and remedies provided in Section 16.2., in addition to all other remedies available under the Lease or provided at law or in equity.

Section 16.2.    Remedies and Damages.

A.    It shall be lawful for Landlord, by summary proceedings or any other action or proceeding, to terminate the Lease or to terminate Tenant's right to possession without terminating the Lease (as Landlord may elect), and to enter upon the Leased Premises or any part thereof and expel Tenant or any persons or entities occupying the Leased Premises, and to repossess and enjoy the Leased Premises.  If the Lease or Tenant's right to possession under the Lease shall at any time be terminated under the terms and conditions of this Section 16.2., or in any other way, Tenant hereby covenants and agrees to immediately surrender and deliver the Leased Premises peaceably to Landlord.

B.    Landlord may also perform after Default of Tenant, on behalf and at the expense of Tenant, any

- 25 -

obligation of Tenant under the Lease which Tenant has failed to perform, the cost of which shall be deemed additional Rent and shall be payable by Tenant to Landlord upon demand, along with an administrative fee equal to **ten** percent **(10%)** of such cost to cover Landlord's overhead in connection therewith. In performing any obligations of Tenant, Landlord shall incur no liability for any loss or damage that may accrue to Tenant, the Leased Premises or Tenant's Property by reason thereof, except if caused by Landlord's willful and malicious act. The performance by Landlord of any such obligation shall not constitute a release or waiver of any of Tenant's obligations under the Lease.

C. Upon termination of this Lease or the termination of Tenant's right to possession under this Lease, or both, as the case may be, Landlord may at any time and from time to time relet the Leased Premises (or any part thereof) for the account of Tenant or otherwise, at such rentals and upon such terms and conditions as Landlord shall deem appropriate. Landlord shall receive and collect the rents therefor, applying the same first to the payment of such expenses as Landlord may have incurred in recovering possession of the Leased Premises, including, without limitation, legal expenses and attorneys' fees, and for placing the same in good order and condition and preparing or altering the same for re-rental, and expenses, commissions and charges paid, assumed or incurred by or on behalf of Landlord in connection with the reletting of the Leased Premises, and then to the fulfillment of the covenants of Tenant under the Lease. Any such reletting or relettings may be for the remainder of the Term or for a longer or shorter period, as Landlord elects. In any such case, whether or not the Leased Premises or any part thereof be relet, Tenant shall pay to Landlord the Rent and all other sums payable up to termination of the Lease or Tenant's right to possession under the Lease. Thereafter, Tenant covenants and agrees to pay Landlord until the end of the Term of this Lease the equivalent of the amount of all the Rent and all other sums reserved herein required to be paid by Tenant less the net avails of such reletting, if any, and the same shall be due and payable by Tenant to Landlord on the dates such Rent and other sums above specified are due. Any reletting by Landlord shall not be construed as an election on the part of Landlord to terminate this Lease unless a notice of such intention is given by Landlord to Tenant. Notwithstanding any reletting without termination of this Lease, Landlord may at any time thereafter elect to terminate this Lease. In any event, Landlord shall not be liable for, nor shall Tenant's obligations hereunder be diminished by reason of, any failure by Landlord to relet the Leased Premises or any failure by Landlord to collect any sums due upon such reletting, provided, however, Landlord uses its best efforts to relet the Leased Premises.

D. _Intentionally Deleted_

Section 16.3. _Remedies Cumulative_. No reference to any specific right or remedy in this Lease shall preclude Landlord from exercising any other right, from having any other remedy, or from maintaining any action to which it may otherwise be entitled under this Lease, at law or in equity.

Section 16.4. _Waiver_.

A. Landlord **or** Tenant shall not be deemed to have waived any provision of this Lease, including breach of any term, covenant, or condition herein contained, unless the same has been specifically waived by Landlord **or** Tenant in a writing executed by an authorized officer of Landlord or **Tenant**. Any waiver of a breach shall not be deemed to be a

- 26 -

waiver of any subsequent breach of the same or any other term, covenant or condition herein contained.

B.   **Landlord and** Tenant hereby waive any and all rights of redemption and all rights to relief from forfeiture granted by or under any present or future laws.  To the fullest extent permitted by law, **Landlord and** Tenant waive the right to a trial by jury.

ARTICLE XVII

MISCELLANEOUS PROVISIONS

Section 17.1.   Notices.

A.   Whenever any demand, request, approval, consent or notice ("Notice") shall or may be given by one party to the other, Notice shall be by registered or certified mail return receipt requested **or by national overnight courier only** at the respective addresses of the parties as set forth in Section 1.1.  Any Notice shall be deemed to have been given and received * on the date specified in the return receipt or **delivery receipt**.  Either party may, at any time, change its Notice address by giving the other party Notice, in accordance with the above, stating the change and setting forth the new address.

B.   If any Mortgagee shall notify Tenant that it is the holder of a Mortgage affecting the Leased Premises, no Notice thereafter sent by Tenant to Landlord shall be effective unless and until a copy of the same shall also be sent to such Mortgagee in the manner prescribed in this Section 17.1. and to such address as such Mortgagee shall designate.

Section 17.2.   Recording.  This Lease shall not be recorded without the written consent of Landlord.

Section 17.3.   Interest and Administrative Costs.

A.   If (i) Tenant fails to make any payment under this Lease when due, (ii) Landlord or Tenant perform any obligation of the other under this Lease, or (iii) Landlord or Tenant incur any costs or expenses as a result of Landlord's or Tenant's Default under this Lease, then Landlord or Tenant shall pay, upon demand, Interest from the date such payment was due or from the date Landlord or Tenant incur such costs or expenses relating to the performance of any such obligation or Landlord's or Tenant's Default, as the case may be, plus the payment due under (i), or the amount of such costs and expenses incurred under (ii) or (iii), and Landlord's or Tenant's administrative costs in connection therewith regardless of whether or not otherwise expressly provided for in this Lease.

B.   **INTENTIONALLY  DELETED**

Section 17.4.   Legal Expenses.  If any action or proceeding is commenced in which Landlord or Tenant is made a party by reason of being the Landlord or Tenant under this Lease, or if Landlord or Tenant shall deem it necessary to engage attorneys or institute any suit against the other in connection with the enforcement of Landlord's rights under this Lease, the violation of any term of this Lease, the

- 27 -

\* on the date that it is deposited in the U.S. Mail or, if by national overnight courier, on the  date specified on the



declaration of Landlord's or Tenant's rights hereunder, or the protection of Landlord's or Tenant's interests under this Lease, the prevailing party shall be reimbursed by the other for its expenses incurred as a result thereof including, without limitation, court costs and reasonable attorneys' fees.

Section 17.5. <u>Successors and Assigns</u>. This Lease and the covenants and conditions herein contained shall inure to the benefit of and be binding upon Landlord and Tenant, and their respective permitted successors and assigns. Upon any sale or other transfer by Landlord of its interest in the Leased Premises, Landlord shall be relieved of any obligations under this Lease occurring subsequent to such sale or other transfer.

Section 17.6. <u>Limitation on Right of Recovery Against Landlord</u>. It is specifically understood and agreed that there shall be no personal liability of any shareholder, trustee, officer, employee, representative, or agent of Landlord, in respect to any of the covenants, conditions or provisions of this Lease. In the event of a breach or default by Landlord of any of its obligations under this Lease, Tenant shall look solely to the equity of the Landlord in the Shopping Center for the satisfaction of Tenant's remedies. The name "Federal Realty Investment Trust" refers to the Trustees, as trustees, but not individually or personally, under a Third Amended and Restated Declaration of Trust on file in the office of the Recorder of Deeds of the District of Columbia, which Declaration provides that neither the shareholders nor the Trustees, nor any officer, employee, representative or agent of Federal Realty Investment Trust shall be personally liable for the satisfaction of obligations of any nature whatsoever of Federal Realty Investment Trust. Accordingly Tenant hereby agrees to look solely to Federal Realty Investment Trust's equity in the Shopping Center for the satisfaction of any claim arising from this Lease and shall not seek to impose personal liability on any shareholder, trustee, officer, employee, representative or agent of Federal Realty Investment Trust. A similar limitation on liability shall be inserted in each document executed by Federal Realty Investment Trust pursuant to this Lease.

Section 17.7. <u>Intentionally Deleted</u>.

Section 17.8. <u>No Modification</u>. This Lease is intended by the parties as a final expression of their agreement and as a complete and exclusive statement of the terms thereof, all prior negotiations, considerations and representations between the parties (oral or written) having been incorporated herein. No course of prior dealings between the parties or their officers, employees, agents or affiliates shall be relevant or admissible to supplement, explain or vary any of the terms of this Lease. No representations, understandings, agreements, warranties or promises with respect to the Leased Premises or the building or Shopping Center of which they are a part or with respect to past, present or future tenancies, rents, expenses, operations, or any other matter have been made or relied upon in the making of this Lease, other than those specifically set forth herein. This Lease may only be modified, or a term thereof waived, by a writing signed by an authorized officer of Landlord and by Tenant.

Section 17.9. <u>Severability</u>. If any term or provision of this Lease, or the application thereof to any person or circumstance shall, to any extent, be invalid or unenforceable, the remainder of this Lease, or the application of such term or provision to persons or circumstances other than those as to

- 28 -

which it is held invalid or unenforceable, shall not be affected thereby, and each term and provision of this Lease shall be valid and be enforced to the fullest extent permitted by law.

Section 17.10.  Joint and Several Liability.  If two or more individuals, corporations, partnerships or other persons (or any combination of two or more thereof) shall sign this Lease as Tenant, the liability of each such individual, corporation, partnership or other persons to pay the Rent and perform all other obligations hereunder shall be deemed to be joint and several, and all notices, payments and agreements given or made by, with or to any one of such individuals, corporations, partnerships or other persons shall be deemed to have been given or made by, with or to all of them.  In like manner, if Tenant shall be a partnership or other legal entity, the members of which are, by virtue of any applicable law or regulation, subject to personal liability, the liability of each such member shall be joint and several.

Section 17.11.  Broker's Commission.  Landlord and Tenant warrant and represent to each other that no broker, finder or agent has acted for or on their behalf in connection with the negotiation, execution or procurement of this Lease. Landlord and Tenant agree to indemnify and hold the other harmless from and against all liabilities, obligations and damages arising, directly or indirectly, out of or in connection with a claim from a broker, finder or agent with respect to this Lease or the negotiation thereof, including costs and attorneys' fees incurred in the defense of any claim made by a broker alleging to have performed services on behalf of the indemnifying party.

Section 17.12.  Irrevocable Offer, No Option.  This Lease shall become effective only upon execution thereof by both parties and delivery thereof to Tenant.

Section 17.13.  Inability to Perform.  If Landlord or **Tenant** is delayed or prevented from performing any of its obligations under this Lease by reason of strike, labor troubles, or any cause whatsoever beyond Landlord's or **Tenant's** control, the period of such delay or such prevention shall be deemed added to the time herein provided for the performance of any such obligation by Landlord or **Tenant**.

Section 17.14.  Survival.  Notwithstanding anything to the contrary contained in this Lease, the expiration of the Term of this Lease, whether by lapse of time or otherwise, shall not relieve Tenant from its obligations accruing prior to the expiration of the Term.

Section 17.15.  Corporate Tenants.  If Tenant is a corporation, the person(s) executing this Lease on behalf of Tenant hereby covenant(s) and warrant(s) that:  Tenant is a duly formed corporation qualified to do business in the state in which the Shopping Center is located; Tenant will remain qualified to do business in said state throughout the Term; and such persons are duly authorized by such corporation to execute and deliver this Lease on behalf of the corporation.

Section 17.16.  Showing of Leased Premises.  Landlord shall have the right to enter upon the Leased Premises for purposes of showing the Leased Premises to prospective tenants during the last six (6) months of the Term.

Section 17.17.  Relationship of Parties.  This Lease shall not create any relationship between the parties other than that of Landlord and Tenant.

- 29 -

Section 17.18. <u>Delivery of Leased Premises</u>. If, due to causes constituting force majeure, Landlord fails to deliver the Leased Premises to Tenant within twelve (12) months from the date of this Lease, either party may terminate this Lease by providing the other party thirty (30) days prior written notice.

IN WITNESS WHEREOF, the parties hereto intending to be legally bound hereby have executed this Lease under their respective hands and seals as of the day and year first above written.

WITNESS:

LANDLORD:
FEDERAL REALTY INVESTMENT TRUST,
an unincorporated business trust

By: _____
Name: ~~Catherine R. Mack~~ THOMAS L. PATTERSON
Title: Vice President ~~General~~ Counsel
       REAL ESTATE

ATTEST:

MARK T. BEAUDOUIN
[Corporate Seal]
SECRETARY

TENANT:
~~W.C.S. CORP.~~ WGS, CORP.
a Massachusetts corporation

By: _____
Name: JOSEPH H. CORNELY III
Title: ~~FIRST SENIOR VICE PRESIDENT~~

By: _____
Name: ALAN I. WEINSTEIN
Title: SENIOR EXECUTIVE VICE PRESIDENT

- 30 -



VAN HOUTEN AVENUE

EXHIBIT A: Plot Plan: To be attached to and made part of a Lease dated                , 1997,
between FEDERAL REALTY INVESTMENT TRUST, Landlord, and W.G.S. CORP., Tenant, Clifton
Plaza. Clifton, New Jersey.

## LANDLORD IMPROVEMENTS

**Landlord agrees to deliver the Leased Premises to Tenant in an "As Is" condition.  Tenant is fully aware of the condition of the Leased Premises and agrees to accept the Leased Premises in an "As Is" condition.**

## TENANT IMPROVEMENTS

Tenant hereby agrees, at its sole cost and expense, to remodel, refurbish and redecorate the interior of the Leased Premises, including the making of all interior improvements, alterations and changes to the Leased Premises necessary to place same in a first class, modern and attractive condition, and to enable Tenant to properly use the Leased Premises for the purposes set forth in this Lease, all of such improvements herein after referred to as "work".  Such work shall specifically include but not be limited to:

1. Demolish interior construction of the existing Tenant space to concrete slab, gypsum board demising walls ~~and exposed roof structure,~~ as required for Tenant's Work.

2. Remove existing wallhung fixtures, paneling or finishes as required to provide surface suitable for new finish as required for Tenant's Work.

3. Tenant to re-use existing HVAC system.

4. Refurbish existing toilet rooms to meet all codes, including the ADA.

5. ~~Installation of new 2'x 4' acoustical ceiling.~~

6. Installation of new recessed 2x4 fluorescent lay-in [or parabolic,] light fixture(s) with acrylic lens, one per 100 sq.ft.  Installation of emergency [and exit and] supplemental track lighting based on Tenant's plan. [at Tenant's option,]

7. Installation of 110-volt wall duplex outlets at approximately 20'-0" on center located approximately 12" above finish floor commencing 5'-0" back from storefront on demising walls only.

8. Installation of any additional electrical and lighting, under floor conduit, emergency and exit lighting, dedicated circuits, etc. as required by Tenant's plans.

9. Provide utility meters and accounts with local utility companies.

10. Installation and responsibility for all connections of telephone systems and required outlets, including all conduit, equipment boards and wiring.

11. Installation of new carpeting and paint all walls.

12. Installation of new trade fixtures, including all electrical connections and new stock.

13. Installation of interior partitions, including drywall, taped, spackled and ready for finish, as required by Tenant.

14. Installation of interior doors and hardware.

15.  Installation of new storefront signage per Landlord criteria.

16.  Installation of undercanopy sign, per Landlord criteria.

17.  Secure required construction permits to perform Tenant's Work including payment of all fees as required by applicable jurisdictions and codes.

18.  Provide architectural/engineering documents for Tenant fit out work for review and approval of Landlord.



Plan Submittal Procedure

All work to be performed by Tenant hereunder shall be in accordance with detailed plans and specifications, to be prepared by Tenant's architect **(who may be an in-house architect\* if permitted by law)** in reproducible form (sepias), including Tenant's material sample board, all of which shall be submitted to Landlord within fifteen (15) days of the mutual execution of this Lease for Landlord's written approval (as to both design and materials) which such approval may be granted or withheld in Landlord's sole and absolute discretion.  It is expressly agreed that Tenant shall not commence any such work until said plans and specifications and material board have been approved by Landlord. **\*\***

No changes of materials or finishes are permitted after final approval by Landlord of working drawings unless approved in writing by Landlord.

As soon as Tenant has received final Landlord approval of all working drawings and specifications, application shall be made by Tenant for all appropriate building permits.  When the building permit is issued, the Tenant shall give a copy of the permit to the Landlord.



Construction Requirements

Tenant shall commence construction of Tenant's work in the Leased Premises not later than five (5) days after whichever of the following shall be the later to occur:

(a)  Written notice from Landlord that Landlord has substantially completed the Landlord's work and that the Leased Premises are ready for Tenant's work; or

(b)  Approval by Landlord of Tenant's working drawings and specifications and receipt of all appropriate building permits.

It is expressly understood and agreed that any such alterations, changes or improvements shall in no way harm the structure of the Leased Premises or diminish the value of same or of the Shopping Center.

Tenant must place the electric, water and/or gas meters in their name with the appropriate utility companies prior to the start of Tenant's work in the premises.

All work to be performed by Tenant shall be performed in a good and workmanlike manner, in accordance with all rules, regulations, codes and ordinances of any local, municipal, state  and/or federal authorities having jurisdiction thereof.  Permits, licenses or approvals required for said work from such authorities shall be obtained by Tenant at its sole cost and expense.

\*   or in-house draftsperson.

\*\*  Notwithstanding the above, Tenant will be required to use an architect and/or engineer only if and to the extend required by code.

Tenant expressly agrees to protect, indemnify and save the Landlord harmless from any liability to any person or estate for damage to person or property occurring during the work proposed hereunder.

At the completion of Tenant's work, Tenant shall deliver to Landlord a copy of its Certificate of Occupancy.

Tenant agrees that it shall fully complete the remodeling of the Leased Premises as above set forth within **sixty (60)** days from the date Landlord delivers the Leased Premises to Tenant and within **thirty (30)** days thereafter shall submit to Landlord final lien waivers from all contractors, subcontractors and suppliers together with a verified list of same on the forms set forth on Schedules I and II of this Lease.

EXHIBIT  C

**SIGNAGE CRITERIA**
**CLIFTON SHOPPING CENTER**
**CLIFTON , NJ**
**12-2-97**

The required signage criteria for the **Clifton Shopping Center** as described in this
exhibit plays an important role both for Tenant identification and as an external graphic
element of the strip store's decor.  All signs shall be designed in accordance with this
uniform sign criteria.  **All proposed signage must be submitted for Landlord's**
**approval.**

**SECTION 1**

The advertising or informative content of all signs shall be limited to letters designating
the store name and/or type store (any such designation of the store type shall be by
general descriptive terms and shall not include any specifications of the merchandise
offered for sale therein or the services rendered therein) only and shall contain no
advertising devices, slogans, symbols or marks (other than the store name and/or type of
store).  Crests and corporate shield designs are not permitted.

**SECTION 2**

The letters of the canopy fascia sign shall be internally illuminated channel letters
constructed of .040 aluminum. All channel letter exterior side returns will be sprayed
with a color to match Pantone # 5605C ( dark green ) . All Interior surfaces will be
sprayed white enamel.  The depth of all channel letters shall  not exceed five inches (5").
All signs will have one (1) line of copy. All facade signage will be mounted  on a
raceway not to exceed "8" inches in height and "8" inches in depth. The raceway will be
mounted using stainless steel hardware and painted to match the surface on which it is
mounted.

All signs will be installed on the sign band with the lower edge of the lowest letter
located  6" above the bottom of the fascia sign band or installed at the same height as the
adjacent stores signage if applicable. No facade signage will exceed 30" inches in height.
All signs must be centered on the sign band and must not extend past the demising walls
of the storefront.  The total square footage of all storefront  signage is regulated by the
signage criteria set forth by  the **City of Clifton.**  All Tenant signage is subject to the
review and approval of the local cities building department officials.  (Specific storefront
sign criteria is available from the city ).

EXHIBIT C (continued)

**SIGNAGE CRITERIA
CLIFTON SHOPPING CENTER
CLIFTON , NJ**

## SECTION 3

The character, design, size, color and layout of all signs shall be subject to **Landlord's prior written approval** and shall be in accordance with this criteria.

The signage contractor must provide a **"Certificate of Insurance"** naming **Federal Realty Investment Trust, Levin Management Corporation, and Levin Properties, L.P.** as additional insured for The **Clifton Shopping Center.**

The **Tenants** signage applications, permits, approvals and fees are the sole responsibility of the Tenant and/or Tenant's signage contractor.

In the event that the exterior of the shopping center should be renovated, in the future, the Tenant must comply with any signage criteria set forth for that renovation by the Landlord. All future changes to signage will be the responsibility of the Tenant.

## SECTION 4

All signs shall be fabricated and installed in accordance with the following requirements:

(a)   The location of the sign will be determined by the Landlord.  The sign and any part thereof shall be centered top to bottom on the raceway.

(b)   Except for those signs mounted on a sign band, no sign or any part thereof shall be located on the roof on the Leases Premises.

(c)   Prior to fabrication of the sign, Tenant shall submit three (3) sets of shop drawings to Landlord for approval.  These drawings are to be to scale, showing a front elevation and section through the sign, dimensioned to show overall length, height and letter depth, along with distance from end of letters to store demising lines.  In addition, aid drawings shall specify all details of sign construction, including materials, thickness, color, wiring, tubing, transformer specifications and mounting details.

(d)   All signs shall be fabricated and installed in compliance with all applicable building and electric codes and bear a U.L. approved and the sign shall have a U.L. label attached to exterior of raceway, as required.

EXHIBIT C (continued)

## SIGNAGE CRITERIA
## CLIFTON SHOPPING CENTER
## CLIFTON, NJ

(e)    All letter shall have 60 m.a. transformers, housed within fascia, and shall have two (2) rows of 13mm white 6500 neon tubing, using exterior gas in tubing, for letters with a 3" or larger stroke.  All secondary power connections must be made through P K Housing or equal to meet U.L. approved installation and material requirements, all secondary wiring jumps must be made through liquid tight greenfield conduit.  Each letter to have at least one 1/4" weep hole.

(f)    All necessary permits required for sign installation shall be obtained by Tenant or Tenant's contractor.

(g)    No sign should be fabricated and placed in final position without the written approval of Landlord.

(H)    All undercanopy signage must match the centers existing criteria.  All tenant copy is subject to the landlords approval.

## SECTION 5

The fabrication, installation and operation of all signs shall be subject to the following restrictions:

(a)    No flashing, moving, flickering or blinking illumination shall be permitted.

(b)    No animation, moving lights or floodlight illumination shall be permitted

(c)    The name and/or stamp of the sign contractor or sign company or both shall not be exposed to view.

(d)    No exposed fluorescent tubing, incandescent lamps, raceways, ballast boxes, electrical transformers, crossovers, conduit or sign cabinets shall be permitted.

## SECTION 6

The following temporary signs are subject to Landlord's approval only:

(a)    Paper signs, or stickers utilized as signs, inside or outside glass storefront.

(b)    Signs of a temporary character or purpose, irrespective of the composition of the sign or material used therefore.

EXHIBIT D

RULES AND REGULATIONS


Tenant expressly covenants and agrees, at all times during the Term, and at such other times as Tenant occupies the Leased Premises or any part thereof, to comply, at its own cost and expense, with the following:

1.    Any handling of freight for any purpose, or deliveries to or from the Leased Premises, shall be made in a manner which is consistent with good shopping center practice , in such areas, and through such entrances and exits as are from time to time designated for such purposes by Landlord.  Any truck or machine used for handling freight or making deliveries in the Leased Premises or in the Shopping Center shall have rubber wheels only.

2.    All garbage and other refuse shall be kept inside the Leased Premises in the type of container specified by Landlord until such time as it is to be collected.  All garbage shall be prepared for collection, and collected in the manner and at the times and places specified by Landlord.  If Landlord elects to furnish or designate any service for the removal of garbage and other refuse, Tenant shall use such service.  Tenant shall not be obligated to pay more for such service than the prevailing competitive rates charged by reputable, independent trash removal contractors for equal service on a direct and individual basis.  If furnished or billed by or through Landlord, Tenant shall pay for such service monthly as additional Rent.  Landlord may also provide trash compactors for compacting Tenant's trash and add the cost thereof to Landlord's Operating Costs.  If Landlord does not provide such service, Tenant shall be solely responsible for contracting for the removal of all garbage and other refuse from the Leased Premises and shall pay promptly all charges therefor.

3.    Tenant shall not (i) suffer, allow or permit any vibration, noise, odor or flashing or bright light to emanate from the Leased Premises or from any machine or other installation located therein, or otherwise suffer, allow or permit the same to constitute a nuisance to or interference with the safety, comfort or convenience of Landlord or of any other occupant or user of the Shopping Center; (ii) paint or cause to be displayed, painted or placed, any handbills, bumper stickers or other advertising devices on any vehicle(s) parked in the parking area(s) of the Shopping Center, whether belonging to Tenant, its employee(s); (iii) solicit business, distribute, or cause to be distributed, in the Common Areas, any handbills, promotional materials or other advertising; (iv) conduct or permit any other activities in the Leased Premises that might constitute a public or private nuisance; (v) permit the parking of any vehicles or the placement of any displays, trash receptacles or other items, so as to interfere with the use of any driveway, fire lane, corridor, walkway, parking area, mall or any other Common Area; or (vi) use or occupy the Leased Premises or do or permit anything to be done therein which in any manner might cause injury or damage in or about the Shopping Center, or (vii) use or occupy the Leased Premises in any manner which is unreasonably annoying to other tenants in the Shopping Center unless directly occasioned by the proper conduct of Tenant's business in the Leased Premises.

4.    Intentionally Deleted.

5.    Tenant shall use, and allow to be used, the plumbing within the Leased Premises and the Shopping Center only for the purpose for which it is designed.  Tenant shall be solely responsible for any breakage, stoppage or damage resulting from

its violation of this provision, and shall pay any costs associated therewith to Landlord upon demand as additional Rent.

6. Tenant shall contract for and utilize termite and pest extermination services for the Leased Premises as, and with such contractor as, Landlord may from time to time designate. Tenant shall not be obligated to pay more for such service than the prevailing competitive rate charged by reputable, independent contractors. If Landlord does not designate such contractor, Tenant may employ a reputable contractor of its choosing, subject to Landlord's prior written consent.

7. Tenant shall install and maintain at all times a display of merchandise in the display windows (if any) of the Leased Premises and shall keep such display windows well lighted during all Shopping Center business hours and for at least one (1) hour thereafter. Tenant shall also keep the display windows lighted during such other hours as Landlord may from time to time designate **provided a majority of tenants are likewise obligated.** All articles, and the arrangement, style, color and general appearance thereof shall be in keeping with the character and standards of the Shopping Center as reasonably determined by Landlord.

8. Tenant shall participate in any window cleaning program that may be established by Landlord. Tenant shall not be obligated to pay more for its participation in such window cleaning program than the prevailing competitive rate charged by reputable independent window cleaning contractors for equal service on a direct and individual basis.

9. Tenant shall not take any action which would violate any labor contracts affecting the Shopping Center, or which would cause any work stoppage, picketing, labor disruption or dispute, or any interference with the business of Landlord or any other tenant of the Shopping Center, or with the rights and privileges of any person lawfully in the Shopping Center. At Landlord's request, Tenant shall immediately suspend any construction work being performed in the Leased Premises giving rise to such labor problems, until such time as Landlord shall have given its written consent for the resumption of such work. Tenant shall have no claim for damages of any nature against Landlord in connection therewith. **Furthermore, if Tenant suspends its construction work at Landlord's request,** The Term Commencement Date **shall** be extended **day by day** as a result thereof.

10. Tenant shall promptly obtain all permits, including occupancy permits, for the Leased Premises or its use thereof. Tenant shall pay before delinquency all license and permit fees, and other charges of a similar nature, for the conduct of any business in, or any use of, the Leased Premises.

11. Tenant shall use the Shopping Center name and logo and include the Tenant Trade Name and the address and identity of Tenant's business in the Leased Premises in all advertisements made by Tenant in any manner and in any medium.

12. Tenant shall not conduct or permit to be conducted any auction, fire, "going out of business" or similar type of sale (whether real or fictitious) from the Leased Premises; provided, however that this provision shall not restrict the absolute freedom (as between Landlord and Tenant) of Tenant to determine its own selling prices nor shall it preclude periodic, seasonal, promotional or clearance sales held in the ordinary course of business.

13. Tenant shall not place a load on any floor in the Shopping Center which exceeds the load which it was designed to

carry, or which may result in improper weight distribution on such floors.

14. Tenant shall not install, operate or maintain in the Leased Premises or in any area of the Shopping Center any electrical equipment which does not bear the Underwriters Laboratories seal of approval, or which would overload the electrical system or any part thereof beyond its capacity for proper, efficient and safe operation as determined by Landlord.

15. To the extent required by Landlord, or any environmental or other law, rule, regulation, guideline or order, Tenant shall provide sound barriers for all mechanical systems serving the Leased Premises.

16. Tenant shall not store, display, sell, or distribute any alcoholic beverages or any dangerous materials, flammable materials, explosives, or weapons in the Leased Premises, or conduct any unsafe activities therein, unless permitted pursuant to Section 1.1.

17. Tenant shall not sell, distribute, display or offer for sale any item which, in Landlord's good faith judgment, is inconsistent with the quality of operation of the Shopping Center, or may tend to injure or detract from the moral character or image of the Shopping Center within the community. Without limiting the generality of the foregoing, Tenant shall not sell, distribute, display or offer for sale any paraphernalia commonly employed in the use or ingestion of illicit drugs, or any x-rated, pornographic, lewd, or so-called adult" newspaper, book, magazine, film, picture, video tape or video disk unless permitted pursuant to Section 1.1, or other representation or merchandise of any kind.

18. Tenant shall not operate or permit to be operated in the Leased Premises any coin or token operated vending machine or similar device including, without limitation, telephones, lockers, toilets, scales, amusement devices and machines for the sale of beverages, foods, candy, cigarettes or other goods, except for use by Tenant's employees.

19. No radio or television aerial or other device may be erected by Tenant on the roof or on any exterior wall of the Leased Premises, or the building in which the Leased Premises are located, without Landlord's prior written consent. Any aerial or other device installed without such written consent shall be subject to removal by or at the direction of Landlord at Tenant's sole risk and expense, at any time without notice.

20. Tenant shall comply with all other reasonable rules and regulations for the use of the Shopping Center from time to time established by Landlord which apply generally to all other stores (other than Major Tenants) in Tenant's building.

EXHIBIT E

Tenant Name: __WGS____ __Corp.__

Shopping Center: __Clifton Plaza__


Date:


Levin Management Corporation
P.O. Box 326
Plainfield, New Jersey 07061-0326 _____

Gentlemen:

I hereby certify that Gross Sales for the above-mentioned
store for the month of _____, 19_____ are $_

Very truly yours,


__
Signature

FRONT ELEVATION - NOT TO SCALE

EXHIBIT F - TENANT'S SIGN DRAWINGS



50'-0"

25'-6-1/4" COPY SPREAD

2'-5-1/2" (OAH) OF COPY

5'-0"

62.576 SQ. FT.

FABRICATED .040 ALUM.
RETURNS FINISHED GRIP
GUARD PMS #5605C

#8 x 1/2" NON-CORROSIVE
FASTENERS FINISHED TO
TRIM CAP

1" RED TRIM CAP

GLASS TUBE SUPPORT

3/16 ACRYLITE #211 (RED)
FACES

DOUBLE STROKE
13mm ø500
CLEAR RED NEON

PYREX GLASS ELECTRODE
HOUSING
5/16" WEEP HOLES

.063 ALUMINUM BACKS
WITH WHITE INTERIOR FINISH

.090 ALUMINUM RACEWAY
WITH REMOVABLE TOP
FINISHED TO MATCH META FLEX
DURONODIC BRONZE.

1" ALUM SQ. FRAMING & 2" ALUM. SQ.
MOUNTING AREAS (MOUNTED INSIDE RACEWAY)
WITH NON-CORROSIVE FASTENERS AS NEEDED

JUNCTION BOX ATTACHED
INSIDE RACEWAY

JUNCTION BOX LOCATED
INSIDE FACADE WITHIN 3' OF
SIGN WITH PRIMARY FEED
JUNCTION (BY OTHERS)

TRANSFORMER

5"    8"

FACADE MATERIAL MUST BE
VERIFIED FOR THE PROPER
MOUNTING OF THE
PROPOSED SIGN.

# TYPICAL CHANNEL LETTER ON A RACEWAY

# NOT TO SCALE

NOTES

Drawing No    97-1408-1   KS

Scale : 1/8" = 1'-0"    Date: 2/2/98

Designed Specifically for the Approval of:

WORK N GEAR
RT 46 & VAN HOUTEN AVE
CLIFTON, NJ 07013

Approved by:

Date:

2 Connecticut Drive, Burlington, NJ 08016
Phone: 800 776-SIGN    609 386-0100
Fax 609 386-0105
Web Site



30'-0"

25'-6-1/4" COPY SPREAD

2'-5-1/2" (OAH) OF COPY

5'-0"



FABRICATED .040 ALUM.
RETURNS FINISHED GRIP
GUARD PMS #5605C

#8 x 1/2" NON CORROSIVE
FASTENERS FINISHED TO
TRIM CAP

1" RED TRIM CAP

GLASS TUBE SUPPORT

3/16" ACRYLITE #211 (RED)
FACES

DOUBLE STROKE
13mm 5500
CLEAR RED NEON

PYREX GLASS ELECTRODE
HOUSING

#/16" WEEP HOLES

.063 ALUMINUM BACKS
WITH WHITE INTERIOR FINISH

.090 ALUMINUM RACEWAY
WITH REMOVABLE TOP
FINISHED TO MATCH META FLEX
DURONODIC BRONZE.

1" ALUM. SQ. FRAMING & 2" ALUM. SQ.
MOUNTING AREAS (MOUNTED INSIDE RACEWAY)
WITH NON-CORROSIVE FASTENERS AS NEEDED

JUNCTION BOX ATTACHED
INSIDE RACEWAY

JUNCTION BOX LOCATED
INSIDE FACADE WITHIN 3' OF
SIGN WITH PRIMARY FEED
JUNCTION (BY OTHERS)

TRANSFORMER

5"    8"

FACADE MATERIAL MUST BE
VERIFIED FOR THE PROPER
MOUNTING OF THE
PROPOSED SIGN.

## TYPICAL CHANNEL LETTER ON A RACEWAY
## NOT TO SCALE

| NOTES | | |
|---|---|---|
| | | Drawing No    97-1409-1  KS |
| | | Scale : 1/8" = 1'-0"   Date: 2/2/98 |
| | | Designed Specifically for the Approval of: |
| | 112 Connecticut Drive, Burlington, NJ 08016 Phone: 800 776-SIGN (7446) or 609 386-0100 Fax: 609 386-1108 Web Site: www.dvssign.com | WORK N GEAR RT 46 & VAN HOUTEN AVE CLIFTON, NJ 07013 |
| | | Approved by: |
| | | Date: |

THIS IS AN ORIGINAL UNPUBLISHED DRAWING CREATED BY DVS INDUSTRIES. IT IS SUBMITTED
FOR YOUR PERSONAL USE IN CONNECTION WITH A PROJECT BEING PLANNED FOR YOU BY DVS
INDUSTRIES. IT IS NOT TO BE SHOWN TO ANYONE OUTSIDE YOUR ORGANIZATION NOR IS IT
TO BE USED, REPRODUCED, COPIED OR EXHIBITED IN ANY FASHION WITHOUT THE EXPRESSED
WRITTEN CONSENT OF DVS INDUSTRIES



PROPOSED REAR ELEVATION - NOT TO SCALE



1-1/2" EXTRUDED ALUMINUM RETAINERS FINISHED TO MATCH SIGN BOX

EXTRUDED ALUMINUM SIGN BOX FINISHED META FLEX FLAT BLACK

HIGH OUTPUT FLOURESCENT BALLAST

.040 ALUMINUM LAMP RACEWAY

HO/CW FLOURESCENT LAMPS

3/16" WHITE LEXAN FACES

3M TRANSLUCENT VINYL #230-53 CARDINAL RED

.040 ALUMINUM BACK PANEL INTERIOR FINISHED WHITE

8-1/4"

SECTION DETAIL
NOT TO SCALE

10'-0" SIGN BOX

9'-5" COPY SPREAD

2'-0" SIGN BOX

11" (OAH) OF COPY



Work'n Gear™

| NOTES | | |
|---|---|---|
| | Drawing No.    97-1461-1    GB/KS | |
| | Scale : 1/2" = 1'-0"    Date: 2/2/98 | |
| | Designed Specifically for the Approval of: | |
| | **WORK N GEAR**<br>**CLIFTON, NJ 07013** | |
| | Approved by: | |
| | Date: | |

112 Connecticut Drive, Burlington, NJ 08016
Phone: 800 776-SIGN (7446) or 609 386-0100
Fax: 609 386-1108
Web Site: www.dvssign.com

THIS IS AN ORIGINAL UNPUBLISHED DRAWING CREATED BY DVS INDUSTRIES. IT IS SUBMITTED FOR YOUR PERSONAL USE, IN CONNECTION WITH A PROJECT BEING PLANNED FOR YOU BY DVS INDUSTRIES. IT IS NOT TO BE SHOWN TO ANYONE OUTSIDE YOUR ORGANIZATION, NOR IS IT TO BE USED, REPRODUCED, COPIED OR EXHIBITED IN ANY FASHION WITHOUT THE EXPRESSED WRITTEN CONSENT OF DVS INDUSTRIES.

NOTE: THIS IS A PRELIMINARY DRAWING.  ALL COLORS AND DIMENSIONS MUST BE FIELD VERIFIED PRIOR TO THE CONSTRUCTION OF ALL PROPOSED SIGNS.

SCHEDULE I

FINAL RELEASE AND WAIVER OF LIENS

We, the undersigned, are general contractor or subcontractors, materialmen, or other persons furnishing services or labor or materials, as indicated under our respective signatures below, in the construction or repair of improvements upon real estate owned by Federal Realty Investment Trust and described as follows:

In exchange for payment in the total amount of _____, the receipt and sufficiency of which is hereby acknowledged, we do hereby, for ourselves, our employees, our subcontractors and materialmen, and all other persons acting for, through or under us, waive, relinquish and release, all right to file or to have filed or to maintain any mechanics' lien or liens or claims against the said building or buildings and appurtenant facilities and structures and real property appurtenant thereto. This Release and Waiver is executed and given in favor of and for the benefit of each and every party legally or equitably, now or hereafter, owning an interest in the subject property and to any party who has made or who in the future makes a loan or loans accrued on said real property and improvements and his, its or their successors and assigns and, we do further warrant that we have the full right to execute this Release and Waiver and to bind the parties on whose behalf we have affixed our signatures below. This Release and Waiver of Liens shall be an independent covenant and shall operate and be effective as well with respect to work and labor done and materials furnished under any supplemental contract or contracts, whether oral or written, for extra or additional work, and for any other and further work done or materials furnished at any time with respect to the subject property subsequent to the execution of this Release and Waiver.

All of the undersigned respectively warrant that all subcontractors and laborers employed by them upon the aforesaid premises have been fully paid and that none of such subcontractors or laborers have any claim, demand, or lien against said premises; and further, that no chattel mortgage, conditional bill of sale or retention of title agreement has been given or executed by any general contractor or other party or any of us, for or in connection with any material, appliances, machinery, fixtures, or furnishings placed upon or installed in the aforesaid premises by any of us, other than:

It is understood and agreed that any and all signatures below are for all services rendered, work done and material furnished previously and in the future by the undersigned in any and all capacities, and are not understood to be only for the particular item against which the signature is affixed. This Release and Waiver is final and unconditional, is specifically made for the benefit of the Owner, and may be relied upon unconditionally by the Owner.

SCHEDULE I PAGE TWO - FINAL WAIVER OF LIENS


Witness the following signatures and seals this ____ day
of _____, 19____.


(TYPE OF SERVICES, LABOR OR          "Firm" .
MATERIAL FURNISHED)                  _____

   —

_____

_____  By: _____ _____
                                    Name:_
_____  Title: _____ _____

      ************************************************************

STATE OF                  )
                          ) ss:
COUNTY OF                 )


      I, _____, a Notary Public for said
County and State, do hereby certify that _____
personally appeared before me this day and acknowledged that
due execution of the foregoing instrument.


      Witness my hand and notarial seal this _____ day of _____
, 19__.



                          _____
                          Notary Public


[Notarial Seal]     My Commission Expires: _____

SCHEDULE II

AFFIDAVIT

_____, being duly sworn according to
law, deposes and states that he is the _____ of _____
, that he is executing this agreement on behalf of
_____, and that the following facts are true
and correct to the best of his knowledge, information and
belief:

1. Attached hereto as Schedule A is a true and correct
   list of all contractors, subcontractors,
   materialmen and other parties who have furnished
   labor, services, goods or materials in the
   construction, installation, modification and repair
   of improvements commonly known as the _____
   , located at _____,_____, _____
   , _____;and

2. That all of the parties listed on Schedule A have
   been paid in full for all labor, services, goods or
   materials utilized in the construction,
   installation, modification and repair of
   improvements commonly known as _____,
   except for the monies owed to those parties, if
   any, listed in Schedule B attached hereto.

Further Affiant Sayeth Not.

"Firm"

_____

By: _____
        Name
        Title

*************************************************************

STATE OF                    )
                            ) ss:
COUNTY OF                   )

      I, _____, a Notary Public for said
County and State, do hereby certify that _____
personally appeared before me this day and acknowledged that
due execution of the foregoing instrument.

      Witness my hand and notarial seal this _____ day of _____
, 19__.

                              _____
                              Notary Public

[Notarial Seal]         My Commission Expires: _____

ADDENDUM I

<u>OPTION TO EXTEND</u>

Subject to the following terms and conditions, Tenant shall have the option to extend the Term hereof for one (1) additional period of five (5) years (hereinafter "Option Period"), provided that at the time of the exercise, Tenant is not in Default under any of its obligations under this Lease.

Tenant may exercise such option by giving Landlord written notice, via Certified Mail-Return Receipt Requested, of its intent to exercise said option, such notice to be received by Landlord at least twelve (12) months prior to the expiration of the Term.  All of the terms and conditions contained herein shall apply during the Option Period.

If the option is not timely exercised, Tenant's right to renew shall expire and the Lease shall terminate at the end of the Term.

ADDENDUM II

Clifton Plaza
Clifton, NJ

<u>Use Restrictions</u>

**ACME MARKETS, INC.,** Lease dated May 23, 1958

<u>Article 24.  Landlord's Property Within 2640 Feet.</u>  During the term of this lease, or any extension thereof, Landlord agrees not to use, let or sublet or to permit the use, letting or subletting of any other store in this building or on any other ground owned, leased or controlled by Landlord within 2640 feet of the boundary line of the herein demised store building and parking area, for the sale or storage of food, except in so far as Landlord's properties are being used for such purposes at the date of the execution of this lease, and Landlord agrees that this restriction shall run with the land and be binding upon Landlord's heirs, personal representatives, grantees, successors and assigns and shall be incorporated in any deed or deeds covering the sale or other disposition of said premises by Landlord.

However, the foregoing restriction shall not apply to the sale or storage, or to the offering for sale of food above restricted in connection with the operation of a luncheon counter, soda fountain, restaurant or of any eating place where the said restricted items are consumed on the premises of such business. (*)

(*)  or to a bakery baking on the premises, with a floor area not in excess of 2,825 square feet.

<u>RIDER, Paragraph 3</u>:  It is understood and agreed between Landlord and Tenant that Paragraph 24 shall not apply to the W.T. Grant Company.  This exception is limited to that company, and shall not apply to its assigns.  Further the prohibitions of said Paragraph shall not be applicable to any first mortgagee who succeeds to Landlord's position by foreclosure or otherwise, provided, however, that such mortgagee may not, after it obtains possession of the demised premises, change the use of any other property of which it has control within the restricted area from its then use to a use that would permit the sale or storage of groceries, meats or provisions, but this will not prevent the mortgagee from continuing the use, even if such use would be in competition with the Tenant by entering into new leases or extending existing leases.

**CHANNEL HOME CENTERS REALTY CORPORATION,** Lease dated May 24, 1958

<u>Article 26. (a)</u>  The Landlord agrees that it will not occupy or use, or permit to be occupied or used, any store premises in the Shopping Center for any department store, junior department store, 5 and 10 Cent Store, 5 Cent to $1.00 Store, 25 Cent to $1.00 Store, Variety Store (whether limited priced or not) without the Tenant's written consent in each instance, except the store premises herein demised.

April 1, 1997

ADDENDUM II (Continued)

**FIELD LIQUORS, INC.,** Lease Rider Paragraph 3, dated March 25, 1997:

A. As long as this Lease is in full force and effect and the Tenant is not in Default under this Lease and is using and occupying the Demised Premises for the Permitted Use with Tenant's Trade Name, the Landlord agrees that it will not enter into a lease for premises in the Shopping Center with any tenant whose main or primary business is the operation of a package liquor store for the retail sale of packaged liquor for off-premises consumption. However, this restriction shall be wholly inapplicable to and shall not limit or restrict any use whatsoever of: (i) any premises leased to a supermarket or drug store; (ii) any premises in the Shopping Center which sell alcoholic beverages for off-premises consumption as an incidental use; (iii) any premises which sell liquor, beer and/or wine for on-premises consumption; or (iv) any use in contravention of the foregoing restriction which is permitted by any existing lease or any extension, renewal or modification thereof.

**VALLEY NATIONAL BANK,** Lease Rider dated September 27, 1971

Paragraph 18.   So long as this lease is in full force and effect and the Tenant hereunder, its successors or assigns, are not in default of any of the terms, covenants or provisions set forth herein, the Landlord agrees that it will not lease or permit to be used, any other space in the Shopping Center as presently being developed or in the future enlarged, for occupancy by a Commercial Bank, Savings and Loan Office, Building and Loan Office, Savings Bank, Small Loan Office, except for the small loan office presently leased by Guardian Loan Company of Clifton, its successors, assigns, or others with whom this loan company may consolidate or merge.

**J.P.C.N, INC.,** Lease Rider Paragraph 11, dated April 15, 1993:

11. Restrictions on other Tenants

A. As long as this Lease is in full force and effect and the Tenant is not in Default under this Lease and is using and occupying the Demised Premises for the Permitted Use with Tenant's Trade Name, the Landlord agrees that it will not enter into a lease for premises in the Shopping Center with any tenant whose main or primary business is the operation of a video tape rental store. The foregoing restriction shall be wholly inapplicable to and shall not limit or restrict the use of any other premises in the Shopping Center for the following: (i) the retail sale and/or rental of video tapes as incidental to any other use, or (ii) any use in contravention of the foregoing restriction which is permitted by any existing lease in the Shopping Center or any extension or renewal thereof.   If Landlord violates the foregoing, Tenant shall have as its sole and exclusive remedy the one time right exercisable upon ninety (90) days notice given within thirty (30) days after the date on which the violating store opens for business to terminate this Lease, TIME IS OF THE ESSENCE.   Landlord may, however, nullify Tenant's notice

April 1, 1997

ADDENDUM II (Continued)

of termination if the violating store ceases operations within the ninety (90) day notice period. If Tenant terminates this Lease and the termination is not nullified, it shall be cancelled as of the last day of the ninety (90) day notice period and Tenant shall quit and surrender the Demised Premises to Landlord in accordance with the terms of this Lease on or before such date and Landlord shall have no further liability to Tenant.

B. Tenant acknowledges and agrees that this provision has been incorporated into this Lease at its request and hereby agrees to indemnify, defend and hold Landlord harmless from and against any claims, losses and expenses or causes of action whatsoever arising from the insertion of this provision into this Lease or from any enforcement of its provisions. The foregoing indemnification, shall include, without limitation, the alleged violation of any federal or state anti-trust law or similar statute.

April 1, 1997

GUARANTY OF LEASE

Lease between FEDERAL REALTY INVESTMENT TRUST, Landlord and W.G.S. Corp., Tenant

   RE:   Clifton Plaza, Clifton, New Jersey

KNOW ALL MEN BY THESE PRESENTS, THAT:

WHEREAS, FEDERAL REALTY INVESTMENT TRUST (hereinafter called "Landlord"), demised to W.G.S. Corp. (hereinafter called "Tenant") by lease of even date herewith (hereinafter called "Lease") certain premises located in the Clifton Plaza Shopping Center, Route 46 and Van Houten Avenue, Clifton, New Jersey, which Lease is incorporated herein by reference thereto; and

WHEREAS, the undersigned, J. BAKER, INC., a Massachusetts corporation, having an office at 555 Turnpike Street, Canton, Massachusetts and (hereinafter called "Guarantor") hereby acknowledges that said Landlord would not enter into said Lease unless this instrument was executed and delivered;

NOW THEREFORE, in consideration of the letting of the premises aforementioned by Landlord to said Tenant and of the payment of the sum of One Dollar ($1.00) to the undersigned Guarantor at or before the ensealing of this instrument, the receipt and sufficiency of which is hereby acknowledged by Guarantor, the undersigned,

A.    Covenants and agrees with the above-named Landlord, its successors and assigns, that if Tenant, its successors or assigns, shall default at any time during the term granted by said Lease in the payment of Minimum Rent, Percentage Rent, or Additional Rent, or other charges, or in the performance of any of the terms, covenants or conditions of said Lease on Tenant's part to be performed, then the undersigned will on demand well and truly perform said terms, covenants or conditions and pay to Landlord the said Minimum Rent, Percentage Rent, and Additional Rent and other charges, or any arrears thereof that may remain due to the Landlord, and also all damages that may arise in consequence of Tenant's default, including all reasonable attorneys' fees that may be incurred by Landlord in enforcing Tenant's covenants and agreements of the undersigned hereunder, without requiring notice from Landlord of any such default or defaults by Tenant;

B.    Covenants and agrees with Landlord, its successors and assigns, that the undersigned may, at Landlord's option, be joined in any action or proceeding commenced by Landlord against Tenant in connection with and based upon said Lease or any term, covenant or condition thereof, and that recovery may be had against the undersigned in such action or proceeding or in any independent action or proceeding against the undersigned without Landlord, its successors or assigns, first asserting, prosecuting or exhausting any remedy or claim against Tenant, its successors or assigns;

C.    Covenants and agrees with Landlord, its successors and assigns, that this Agreement and Guaranty shall remain and continue in full force and effect as to any renewal, extension, modification or amendment of said Lease and as to any assignee of Tenant's interest in said Lease;

D.    Covenants and agrees with Landlord, its successors and assigns, that the validity of this Agreement and Guaranty and the obligations of the undersigned hereunder shall not be terminated, affected, or impaired by reason of any action which Landlord may take or fail to take against Tenant or by reason of any waiver of, or failure to enforce any of the rights or remedies reserved to Landlord in said Lease or otherwise;

E.    Waives notice of any and all defaults by Tenant in the payment of Minimum Rent, Percentage Rent, or Additional Rent, or other charges, and notice of any and all defaults by Tenant in the performance of any of the terms, covenants or conditions of said Lease on Tenant's part to be performed;

F.    Waives notice of any and all notices or demands which may be given by Landlord to Tenant, whether or not required to be given to Tenant under the terms of said Lease;

G.    Waives a trial by jury of any and all issues arising in any action or proceeding between the parties upon, under or connected with this Guaranty or any of its provisions, directly or indirectly, or any and all negotiations in connection therewith; and

H.    Warrants and represents that the undersigned is the owner and holder of all the issued and outstanding stock of W.G.S. Corp.

WGS

IN WITNESS WHEREOF, the undersigned has duly executed this Guaranty the 2nd day of February, 1998.

ATTEST:

By: _____
         MARK T. BEAUDOUIN
              SECRETARY

J. BAKER, INC.                    Guarantor

By: _____
         JOSEPH H. CORNELY, III, President
         FIRST SENIOR VICE PRESIDENT

By: _____
         ALAN I. WEINSTEIN
              PRESIDENT

STATE OF    MASSACHUSETTS    )
                                                   ) SS:
COUNTY OF  NORFOLK              )

BE IT REMEMBERED that on this 2nd day of February, 1998 before me, the subscriber, personally appeared Joseph H. Cornely, III and Alan I. Weinstein who I am satisfied, are the person(s) mentioned in the within Instrument and thereupon them acknowledged that they signed, sealed and delivered the same as their act and deed, for the uses and purposes therein expressed.

_____
         TRACY A. GIUFFRIDA
         NOTARY PUBLIC
         MY COMMISSION EXPIRES APRIL 2, 2004

# EXHIBIT B

SIXTH LEASE EXTENSION AND MODIFICATION AGREEMENT

AGREEMENT made this __9th__ day of __October__, 2023 (the "Effective Date"), by and between LEVIN PROPERTIES, L.P., a New Jersey limited partnership, having its offices at 975 U.S. Highway 22, North Plainfield, New Jersey 07060, and its mailing address c/o Levin Management Corporation, P.O. Box 326, Plainfield, New Jersey 07061-0326, hereinafter referred to as "Landlord," and WORK 'N GEAR, LLC, a New York limited liability company, having its offices at 2300 Crown Colony Drive, Suite 300, Quincy, Massachusetts, 02169, hereinafter referred to as "Tenant".

By Lease dated February 11, 1998, Assignment dated May 5, 2002, Lease Extension and Modification Agreement dated May 16, 2007, Second Lease Extension and Modification Agreement dated February 6, 2009, Third Lease Extension and Modification Agreement dated May 28, 2013, Fourth Lease Extension and Modification Agreement dated August 29, 2018 and Fifth Lease Modification Agreement dated July 2, 2020 (collectively, the "Lease"). Landlord's predecessor-in-interest leased to Tenant premises containing approximately 3,247 square feet (the "Leased Premises") within the Clifton Plaza Shopping Center located at Route 46 and Van Houten Avenue, Clifton, Passaic County, New Jersey (the "Shopping Center").

The "Term" (as defined in the Lease) commenced on February 23, 1998 and will expire on February 29, 2024.

The parties desire to extend the Term and modify the Lease as hereinafter provided.

1. Term

   Refer to Article I, Section 1.1, Paragraph B, of the Lease:

   The Term is extended for an additional period of five (5) Lease Years, commencing on March 1, 2024 and expiring on February 28, 2029 (the "Extended Term") and Tenant shall thereafter have no option or right to extend the Term, anything in the Lease to the contrary notwithstanding.

2. Minimum Rent

   Refer to Article I, Section 1.1, Paragraph G, of the Lease:

   In addition to payment of "Additional Rent" and "Percentage Rent" (as defined in the Lease) Tenant shall pay Minimum Rent during the Extended Term in accordance with the provisions of the Lease in the following amounts:

   | Lease Year | Annual Amount | Monthly Installment |
   |---|---|---|
   | 3/1/24 - 2/28/25 | $133,484.16 | $11,123.68 |
   | 3/1/25 - 2/28/26 | $136,146.72 | $11,345.56 |
   | 3/1/26 - 2/28/27 | $138,874.20 | $11,572.85 |
   | 3/1/27 - 2/29/28 | $141,666.60 | $11,805.55 |
   | 3/1/28 - 2/28/29 | $144,491.52 | $12,040.96 |

3. Percentage Rent

   Refer to Article V, Section 5.3 of the Lease:

   The Annual Breakpoints used for computation of Percentage Rent during the Extended Term shall be as follows:

   | Lease Years | Sales Base |
   |---|---|
   | 3/1/24 – 2/28/29 | $2,000,000.00 |

4. Fiduciaries

If any person or corporation executing this Agreement as or on behalf of Landlord is acting in a fiduciary or other representative capacity, such person or corporation shall be liable hereunder only in such fiduciary or representative capacity and not individually or in any other capacity. Further, no shareholder, member, trustee, partner, director, officer, employee or agent of Landlord shall have any personal liability with respect to any covenant, condition or provision of the Lease.

5.  Representations of Tenant and Landlord

The Tenant represents that to Tenant's knowledge, the Premises are in good order and repair as required by the Lease and Tenant certifies that: (a) Tenant is in possession of the Premises; (b) any improvements to the Premises required to be made by Landlord have been completed to the satisfaction of Tenant in all respects, and Landlord has fulfilled all of its other duties under the Lease; (c) the Lease is valid and in full force and effect and the Landlord is not in default thereunder; and (d) Tenant has no defense, setoff, claim or counterclaim against Landlord arising out of the Lease or in any way relating thereto. Landlord certifies that the Lease is valid and in full force and effect and the Tenant is not in default thereunder.

6.  Prohibited Persons

A.  Certification

Tenant hereby certifies to Landlord that:

(1) Tenant of this Lease is not acting, directly or indirectly for or on behalf of any person, group, entity or nation named by any Executive Order or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person" (as so defined therein or thereby) or other banned or blocked person, entity, nation or transaction pursuant to any law, order, rule or regulation that is enforced or administered by the Office of Foreign Assets Control; and

(2) Tenant of this Lease is not engaged in this transaction, directly or indirectly on behalf of, or instigating or facilitating this transaction, directly or indirectly on behalf of, any such person, group, entity or nation.

B.  Indemnification

Tenant hereby agrees to defend, indemnify, and hold Landlord harmless from and against any and all claims, damages, fines, losses, risks, liabilities and expenses (including but not limited to attorneys' fees and costs) arising from or related to any breach by Tenant of the foregoing certification. This indemnity shall survive the expiration or sooner termination of this Lease.

7.  Counterparts/Facsimile/PDF Signatures

This Agreement may be executed in counterparts and each counterpart shall have the same force and effect as an original and shall constitute an effective, binding agreement on the part of each of the undersigned and all of which taken together shall constitute one and the same agreement. Execution and delivery of a facsimile or PDF copy shall have the same force and effect as execution and delivery of an original.

8.  Ratification and Confirmation

Except as expressly modified herein, all of the terms and conditions of the Lease are ratified and incorporated as if set forth fully herein including, without limitation, Tenant's obligation for the payment of Tax Rent, Operating Costs and utilities in accordance with the provisions of the Lease.

**(Signature Page to Follow)**

2

IN WITNESS WHEREOF, the parties have executed this Agreement on the date set forth above.

ATTEST:

By: _Stacy A. Garrity_
Stacy A. Garrity, Secretary

WITNESS:

State of _MA_ County of _Plymouth_
The foregoing instrument was acknowledged before me
this _13_ day of _October_, 20 _23_.
by _John P. McAuliffe_

_____ Notary Public

My Commission Expires _April 17, 2026_

LANDLORD
LEVIN PROPERTIES, L.P.
By:   JHL Holdings, Inc., general partner

By: _Antoinette Puccia_
Antoinette Puccia, Vice President

TENANT
WORK 'N GEAR, LLC

By: _____
Name: _John P. McAuliffe_
Title: _President & CFO_

CHRISTOPHER A. ANGELL
Notary Public. Commonwealth of Massachusetts
My Commission Expires April 17, 2026

TO BE ATTACHED TO and made part of Sixth Lease Extension and Modification Agreement dated as of the Effective Date between Levin Properties, L.P., Landlord, and Work 'N Gear, LLC, Tenant, Clifton Plaza Shopping Center, Clifton, New Jersey.

3

# EXHIBIT C

Order Filed on February 11, 2026
by Clerk
U.S. Bankruptcy Court
District of New Jersey

| |
|---|
| **UNITED STATES BANKRUPTCY COURT**<br>**DISTRICT OF NEW JERSEY** |
| *Caption in Compliance with D.N.J. LBR 9004-2* |
| **A.Y. STRAUSS LLC**<br>Eric H. Horn, Esq.<br>Maria A.G. Harper, Esq.<br>290 West Mount Pleasant Avenue, Suite 3260<br>Livingston, New Jersey 07039<br>Tel. (973) 287-0966<br>Fax  (973) 533-0127<br><br>*Counsel to the Debtor*<br>*and Debtor in Possession* |

| | |
|---|---|
| In re:<br><br>Work 'N Gear, LLC,<br><br>         Debtor. | Chapter 11<br><br>Case No. 25-17472 (MEH) |

**THIRD OMNIBUS ORDER, PURSUANT TO SECTIONS 105(a), 365(a), AND 554(a) OF THE BANKRUPTCY CODE, AUTHORIZING THE DEBTOR TO REJECT CERTAIN UNEXPIRED LEASES OF NONRESIDENTIAL REAL PROPERTY AND ABANDON <u>PERSONAL PROPERTY, EFFECTIVE AS OF  THE REJECTION DATE</u>**

      The relief set forth on the following pages numbered two (2) through four (4) is hereby

  **ORDERED**

**DATED: February 11, 2026**

_____
Honorable Mark E. Hall
United States Bankruptcy Judge

Debtor:      Work 'N Gear, LLC
Case No.:    25-17472 (MEH)
Caption:     *Third Omnibus Order Rejecting Non-Residential Real Property Leases, Among Other Things*

_____

Upon the motion (the "***Motion***")[1] of the Debtor for the entry of an order, pursuant to

sections 105(a), 365(a), and 554(a) of the Bankruptcy Code, authorizing the Debtor to (i) reject

the Rejected Leases set forth on **Exhibit 1** to this Order, (the "***Rejection Date***"), and (ii) abandon,

effective as of the Rejection Date, any Personal Property that remains, as of the Rejection Date, on

any of the Premises subject to the Rejected Leases; and upon consideration of the record of this

Chapter 11 Case; and it appearing that this Court has jurisdiction to consider the Motion pursuant

to 28 U.S.C. §§ 1334 and 157 and the *Standing Order of Reference to the Bankruptcy Court Under*

*Title 11* of the United States District Court for the District of New Jersey, entered on July 23, 1984,

and amended on September 18, 2012 (Simandle, C.J.); and it appearing that this is a core matter

pursuant to 28 U.S.C. § 157(b)(2); and it appearing that venue of this Chapter 11 Case and of the

Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and it appearing that due and adequate

notice of the Motion has been given under the circumstances, and that no other or further notice

need be given; and it appearing that the relief requested in the Motion is in the best interests of the

Debtor, its estate, its creditors, and other parties in interest; and after due deliberation and sufficient

cause appearing therefor;

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is GRANTED as set forth herein.

2.      Pursuant to sections 105(a) and 365(a) of the Bankruptcy Code and Bankruptcy

Rule 6006, the Rejected Leases, to the extent not already terminated in accordance with their

applicable terms or upon agreement of the parties, are hereby rejected by the Debtor, with such

_____

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to such term in the Motion.

2

Debtor:    Work 'N Gear, LLC
Case No.:  25-17472 (MEH)
Caption:   *Third Omnibus Order Rejecting Non-Residential Real Property Leases, Among Other Things*

_____

rejection being effective as of February 11, 2026 (the "***Rejection Date***").[2]

3. Pursuant to sections 105(a) and 554(a) of the Bankruptcy Code and Bankruptcy Rule 6007, any Personal Property remaining as of 11:59 p.m. (ET) on February 13, 2026 (the "***Abandonment Date***") on any of the Premises is hereby deemed abandoned by the Debtor, with such abandonment being effective as of the Abandonment Date. Counterparties to the Rejected Leases may use or dispose of any and all abandoned Personal Property remaining on the Premises as of the Abandonment Date without further notice or liability to the Debtor or any third party, and the automatic stay shall be modified to allow such use or disposition. Such abandonment shall be without prejudice to any Counterparty's right to assert any claim based on the Debtor's abandonment of any Personal Property and without prejudice to the Debtor or any other party in interest to object thereto. For the avoidance of any doubt, the Debtor shall have unfettered access to the Rejected Leases locations (other than the lease with Federal Realty – Dedham Location) until 11:59 p.m. (ET) on the Abandonment Date; *provided however*, that with regard to the Dedham Location, the Abandonment Date shall be 11:59 p.m. on the Dedham Rejection Date.

4. If the Debtor has deposited monies with a Counterparty to a Rejected Lease set forth on **Exhibit 1** hereto as a security deposit or other arrangement, such Counterparty may not setoff or recoup or otherwise use such deposit absent further order of this Court.

5. Any person or entity that holds a claim that arises from the Rejected Leases must file a proof of claim no later thirty (30) days from the date of this Order.

6. Nothing in this Order shall impair, prejudice, waive, or otherwise affect any rights

_____

[2]   With regard to Debtor's lease with Federal Realty OP LP (Dedham, MA location) (the "***Dedham Property***"), such lease shall be rejected as of the later of (a) February 11, 2026 and (b) the date the Debtor vacates and unequivocally surrenders possession of the Dedham Property to Federal Realty by written notice of the Debtor's intent to vacate and surrender possession of the Dedham Property's premises and the turn over of the keys, key codes and security codes, if any, to Federal Realty or, if such keys are not available, written notice that Federal Realty may re-key the applicable premises as of the date set forth in such notice (the "***Dedham Rejection Date***").

3

Debtor:       Work 'N Gear, LLC
Case No.:     25-17472 (MEH)
Caption:      *Third Omnibus Order Rejecting Non-Residential Real Property Leases, Among Other Things*

_____

of the Debtor or its estate to assert that any claims for damages arising from the Debtor's rejection

of the Rejected Leases are limited to any remedies available under any applicable termination

provisions of such Rejected Leases, or that any such claims are obligations of a third party, and

not those of the Debtor or its estate.

7.      The rights of the Debtor and its estate to assert that the Rejected Leases rejected

hereby expired by their own terms or were terminated prior to the date hereof are fully preserved,

and the Debtor and its estate do not waive any claims that they may have against the counterparties

to the Rejected Leases, whether or not such claims arise under, are related to the rejection of, or

are independent of the Rejected Leases.

8.      Nothing contained in the Motion or this Order is or should be construed as: (i) an

admission as to the validity of any claim against the Debtor; (ii) a waiver of the Debtor's rights to

dispute any claim on any grounds; (iii) a promise to pay any claim; or (iv) an implication or

admission that any particular claim would constitute an allowed claim.

9.      This Order is immediately effective and enforceable, notwithstanding the possible

applicability of Bankruptcy Rule 6004(h) or otherwise.

10.     The requirements in Bankruptcy Rule 6006 and 6007 are satisfied.

11.     This Court retains jurisdiction with respect to all matters arising from or related to

the implementation or interpretation of this Order.

| Landlord | Landlord Address | Store or Office Address |
|---|---|---|
| AGREE SHELF PA, LLC | PO BOX  645308 PITTSBURGH PA 15264-53008 Attn: Edward A. Eickhoff | 80 N MacDade Blvd, Glenolden, PA 19036 |
| CITGO PETROLEUM CORPORATION | Department #510 TULSA OK 74182 Attn: Jack Rackleff | 355 Quincy Ave E. Braintree, MA 02184 |
| ELMONT ASSOCIATES | 414 MAIN STREET SUITE 202 PORT JEFFERSON. NY 11777 Attn: Anthony Gitto | 1393 Hempstead Turnpike.  Elmont, NY 11003 |
| FEDERAL REALTY INVESTMENT TRUST | P.O. Box 8500-9320 Philadelphia PA 19178 Attn: Liz Ryan | 745 Providence Hwy. Dedham, MA 02026 |
| FREEPORT SUNRISE HENRY, LLC | C/O METRORIPCO PO BOX 440 JERICHO NY 11753 Attn: Michael Korff | 34 E Sunrise Hwy. Freeport, NY 11520 |
| H & P REALTY | 38 BRUSHWOOD ROAD STAMFORD CT 06903 Attn:Hilary Nuger | 218 Memorial Ave W.        West Springfield, MA 01089 |
| JHW CONSTRUCTION , INC | P.O. BOX 746 SHORT HILLS NJ 07078-0746 Attn: Mike Gartenberg | 945 Bald Hill Rd. Warwick, RI 02886 |
| LEVIN MANAGEMENT | Levin Management Corporation P.O. BOX 326 PLAINFIELD NJ 07061 Attn: Vanessa Fernandez | 1006 US-46 Clifton, NJ 07013 |
| LOCUST GROVE PLAZA, LLC | MAJESTIC CONSTRUCTION 275 NO. FRANKLIN TURNPIKE RAMSEY, NJ 07446 Attn:Jeff Litke | 692 Clements Bridge Rd ste h, Deptford, NJ 08096 |

| Landlord | Landlord Address | Store or Office Address |
|---|---|---|
| PATCHOGUE ASSOCIATES | C/O PERGAMENT PROPERTIES 95 FROEHLICH FARM BLVD WOODBURY NY 11797 Attn: Cathy Dubas | 499-26 Sunrise Hwy. Patchogue, NY 11772 |
| PITROCK REALTY CORP | 940 THIRD AVE. 3RD FLOOR NEW YORK NY 10022 Attn: Adam Pliskin | 2019 Lincoln Hwy. Langhorne, PA 19047 |
| REALTY PRO GROUP | 222 Route 59 Suite 300 Suffern NY 10901 | 420 Boston Post Rd, Orange, CT 06477 |
| SAUGUS REALTY COMPANY | c/o Finard Properties LLC P.O Box 550249 Waltham MA 02455 Attn: Mike Redfern | 327 Broadway Saugus, MA 01906 |
| SHARONA, INC | 628 MILL STREET WORCESTER MA 01602 Attn: Sharona Sefarady | 1233 Main St. Worcester, MA 01603 |
| SOUNDWATER DARTMOUTH LLC | c/o Berkshire Bank PO BOX 185-G WORCESTER MA 01613-0185 Attn: Irwin Chase | 73 Faunce Corner Mall Rd. Dartmouth, MA 02747 |
| UNICORN REALTY TRUST | 293R WASHINGTON STREET NORWELL MA 02061 | 1810 Washington St. Hanover, MA 02339 |

# EXHIBIT D

**Fill in this information to identify the case:**

Debtor 1   Work 'N Gear, LLC

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court   **District of New Jersey**

Case number:  **25-17472**

**FILED**

**U.S. Bankruptcy Court**
**District of New Jersey**

3/13/2026

**Jeanne Naughton, Clerk**

Official Form 410
# Proof of Claim

04/25

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy** (Form 309) **that you received.**

---

**Part 1:**  **Identify the Claim**

**1. Who is the current creditor?**

Levin Management Corporation

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

Levin Management Corporation

Name

c/o Stark & Stark, PC Attn. Thomas Onder, Esq.
P.O. Box 5315
Princeton, NJ 08543

Contact phone _____609-219-7458_____

Contact email _____tonder@stark-stark.com_____

Uniform claim identifier (if you use one):
_____

**Where should payments to the creditor be sent?** (if different)

Name

Contact phone _____

Contact email _____

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____   Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

---

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

| | | |
|---|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ | |

| | | |
|---|---|---|
| 7. **How much is the claim?** | $      22816.04 | **Does this amount include interest or other charges?**<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| 8. **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as healthcare information.<br><br>Administrative Claim |

| | |
|---|---|
| 9. **Is all or part of the claim secured?** | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br><br>**Nature of property:**<br>☐ Real estate.   If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim*.<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br><br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:**   $ _____<br><br>**Amount of the claim that is secured:**   $ _____<br><br>**Amount of the claim that is unsecured:**   $ _____   (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:**   $ _____<br><br>**Annual Interest Rate** (when case was filed)    _____ %<br>☐ Fixed<br>☐ Variable |

| | |
|---|---|
| 10. **Is this claim based on a lease?** | ☐ No<br>☑ Yes. **Amount necessary to cure any default as of the date of the petition.**   $ 15372.66 |

| | |
|---|---|
| 11. **Is this claim subject to a right of setoff?** | ☑ No<br>☐ Yes. Identify the property: _____ |

| 12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☐ No<br>☑ Yes. *Check all that apply*: | Amount entitled to priority |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| | ☐ Up to $3,800* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| | ☐ Wages, salaries, or commissions (up to $17,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| | ☑ Other. Specify subsection of 11 U.S.C. § 507(a)(2) that applies | $ 22816.04 |
| | * Amounts are subject to adjustment on 4/01/28 and every 3 years after that for cases begun on or after the date of adjustment. | |

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(3) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.**

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    3/13/2026

MM / DD / YYYY

/s/ Thomas S. Onder, Esq.

Signature

Print the name of the person who is completing and signing this claim:

Name    Thomas S. Onder, Esq.

First name    Middle name    Last name

Title    Esquire

Company    Stark & Stark, PC

Identify the corporate servicer as the company if the authorized agent is a servicer

Address    100 American Metro Blvd.

Number   Street

Hamilton, NJ 08619

City   State   ZIP Code

Contact phone    609–219–7458    Email    tonder@stark–stark.com

## SCHEDULE A

Creditor, Levin Management Corporation files the following claims for its lease at Clifton Plaza, 1006 US-46, Unit #1, Clifton, NJ 07013.

- **Pre-Petition claim of $15,372.66**, plus additional rents for amount prior to July 16, 2025 (petition date);

- **Administrative claim of $22,816.04**, plus additional rents for amounts from July 16, 2025 petition date of to February 12, 2026; and

- **Rejection claim of $189,402.84** for one year's worth of rent from March 1, 2026 to February 1, 2027 per the Bankruptcy Code.

Levin Management Corporation reserves its right to supplement, modify, amend these claims with additional documentation and/or assert additional claims.

4914-4657-5508, v. 2

|  |  |  |  |  |  |  | Date:03/04/2026 |  |
|---|---|---|---|---|---|---|---|---|
| **Tenant ID** | **Tenant Name** |  |  | **Property Name** | **Lease Start Date** | **Lease End** | **Square Feet** | **Security Deposit** |
| **3T 034** | **Work N'Gear LLC #8052,** |  |  | **CLIFTON PLAZA** | **4/1/1998** | **2/28/2029** | **3,247** | **$0.00** |
| **Results based on:** Start Date = None AND End Date = None | | | | | | | | |
| **Date IN** | **A/R Desc** | **Inv #** | **Voucher** | **Type** | **Amount Billed** | **Payments** | **Running Bal.** | **Description** |
| 11/1/2024 | **Payments** | 13580 | DNG | Cash |  | 14,981.46 | -14,981.46 |  |
| 11/1/2024 | L - LATE CHARGES | 331527 | G9Q | Debit | 280 |  | -14,701.46 | LATE FEE |
| 11/1/2024 | YC - YEAR END CAM SU | 333211 | ENU | Debit | 361.3 |  | -14,340.16 | 2023 YE SU |
| 11/1/2024 | PY - PYLON REIMBURSE | 343257 | DNG | Debit | 100 |  | -14,240.16 |  |
| 11/1/2024 | RE - RE TAX MONTHLY | 343257 | DNG | Debit | 1,653.58 |  | -12,586.58 |  |
| 11/1/2024 | M3 - MONTHLY MAINT. | 343257 | DNG | Debit | 2,004.20 |  | -10,582.38 |  |
| 11/1/2024 | R - RENT | 343257 | DNG | Debit | 11,123.68 |  | 541.30 |  |
| 11/1/2024 | SP - SPRINKLER CHGS | 344246 | EDR | Debit | 352.68 |  | 893.98 | SPRINKLER #1 - 2023 |
| 11/25/2024 | **Payments** | 13705 | EDR | Cash |  | 15,334.14 | -14,440.16 |  |
| 12/1/2024 | PY - PYLON REIMBURSE | 345089 | EHV | Invoice | 100 |  | -14,340.16 |  |
| 12/1/2024 | RE - RE TAX MONTHLY | 345089 | EHV | Invoice | 1,653.58 |  | -12,686.58 |  |
| 12/1/2024 | M3 - MONTHLY MAINT. | 345089 | EHV | Invoice | 2,004.20 |  | -10,682.38 |  |
| 12/1/2024 | R - RENT | 345089 | EHV | Invoice | 11,123.68 |  | 441.30 |  |
| 12/2/2024 | **Payments** | 0 | EHV | Cash |  | 0 | 441.30 |  |
| 12/3/2024 | **Payments** | 13784 | ENU | Cash |  | 361.3 | 80.00 |  |
| 1/1/2025 | PY - PYLON REIMBURSE | 347095 | FS3 | Invoice | 100 |  | 180.00 |  |
| 1/1/2025 | RE - RE TAX MONTHLY | 347095 | FS3 | Invoice | 1,653.58 |  | 1,833.58 |  |
| 1/1/2025 | M3 - MONTHLY MAINT. | 347095 | FS3 | Invoice | 2,004.20 |  | 3,837.78 |  |
| 1/1/2025 | R - RENT | 347095 | FS3 | Invoice | 11,123.68 |  | 14,961.46 |  |
| 1/3/2025 | **Payments** | 14080 | FS3 | Cash |  | 14,981.46 | -20.00 |  |
| 1/13/2025 | **Payments** | 0 | G9Q | Cash |  | 0 | -20.00 |  |
| 1/13/2025 | L - LATE CHARGES | 348245 | G9Q | Credit | -280 |  | -300.00 | REM110124LATE |
| 1/21/2025 | YT - YEAR END TAX SU | 349211 | GXL | Debit | 659.72 |  | 359.72 | 2024 YE SU |
| 1/21/2025 | RE - RE TAX MONTHLY | 349222 | GXL | Debit | 54.98 |  | 414.70 | JAN 2025 ESC ADJ |
| 2/1/2025 | PY - PYLON REIMBURSE | 348693 | GXL | Invoice | 100 |  | 514.70 |  |
| 2/1/2025 | RE - RE TAX MONTHLY | 348693 | GXL | Invoice | 1,708.56 |  | 2,223.26 |  |
| 2/1/2025 | M3 - MONTHLY MAINT. | 348693 | GXL | Invoice | 2,004.20 |  | 4,227.46 |  |
| 2/1/2025 | R - RENT | 348693 | GXL | Invoice | 11,123.68 |  | 15,351.14 |  |
| 2/4/2025 | **Payments** | 14330 | GXL | Cash |  | 15,712.44 | -361.30 |  |
| 3/1/2025 | PY - PYLON REIMBURSE | 350402 | HXO | Invoice | 100 |  | -261.30 |  |
| 3/1/2025 | RE - RE TAX MONTHLY | 350402 | HXO | Invoice | 1,708.56 |  | 1,447.26 |  |
| 3/1/2025 | M3 - MONTHLY MAINT. | 350402 | HXO | Invoice | 2,004.20 |  | 3,451.46 |  |
| 3/1/2025 | R - RENT | 350402 | HXO | Invoice | 11,345.56 |  | 14,797.02 |  |
| 3/4/2025 | **Payments** | 14563 | HXO | Cash |  | 15,158.32 | -361.30 |  |
| 4/1/2025 | PY - PYLON REIMBURSE | 351665 | J1F | Invoice | 100 |  | -261.30 |  |
| 4/1/2025 | RE - RE TAX MONTHLY | 351665 | J1F | Invoice | 1,708.56 |  | 1,447.26 |  |
| 4/1/2025 | M3 - MONTHLY MAINT. | 351665 | J1F | Invoice | 2,004.20 |  | 3,451.46 |  |
| 4/1/2025 | R - RENT | 351665 | J1F | Invoice | 11,345.56 |  | 14,797.02 |  |
| 4/4/2025 | **Payments** | 14842 | J1F | Cash |  | 15,158.32 | -361.30 |  |
| 4/16/2025 | YC - YEAR END CAM SU | 352918 | KHV | Debit | 653.26 |  | 291.96 | 2024 YE SU |
| 5/1/2025 | PY - PYLON REIMBURSE | 353266 | JVW | Invoice | 100 |  | 391.96 |  |
| 5/1/2025 | RE - RE TAX MONTHLY | 353266 | JVW | Invoice | 1,708.56 |  | 2,100.52 |  |
| 5/1/2025 | M3 - MONTHLY MAINT. | 353266 | JVW | Invoice | 2,004.20 |  | 4,104.72 |  |
| 5/1/2025 | R - RENT | 353266 | JVW | Invoice | 11,345.56 |  | 15,450.28 |  |
| 5/6/2025 | **Payments** | 15120 | JVW | Cash |  | 15,158.32 | 291.96 |  |
| 6/1/2025 | PY - PYLON REIMBURSE | 354785 | KHV | Invoice | 100 |  | 391.96 |  |
| 6/1/2025 | RE - RE TAX MONTHLY | 354785 | KHV | Invoice | 1,708.56 |  | 2,100.52 |  |
| 6/1/2025 | M3 - MONTHLY MAINT. | 354785 |  | Invoice | 2,004.20 |  | 4,104.72 |  |
| 6/1/2025 | R - RENT | 354785 | KHV | Invoice | 11,345.56 |  | 15,450.28 |  |
| 6/2/2025 | **Payments** | 15453 | KHV | Cash |  | 15,515.94 | -65.66 |  |
| 7/1/2025 | **Payments** | 0 | LN1 | Cash |  | 0 | -65.66 |  |
| 7/1/2025 | PY - PYLON REIMBURSE | 356305 |  | Invoice | 100 |  | 34.34 |  |
| 7/1/2025 | RE - RE TAX MONTHLY | 356305 | LN1 | Invoice | 1,708.56 |  | 1,742.90 |  |
| 7/1/2025 | M3 - MONTHLY MAINT. | 356305 |  | Invoice | 2,004.20 |  | 3,747.10 |  |
| 7/1/2025 | R - RENT | 356305 |  | Invoice | 11,345.56 |  | 15,092.66 |  |
| 7/15/2025 | L - LATE CHARGES | 357223 |  | Debit | 280 |  | 15,372.66 | LATE FEE |
| | | | | **Tenant Totals:** | **137,734.36** | **122,361.70** | **15,372.66** | |

| | | | | | | | Date:03/04/2026 | |
|---|---|---|---|---|---|---|---|---|
| **Tenant ID** | **Tenant Name** | | **Property Name** | | **Lease Start Date** | **Lease End** | **Square Feet** | **Security Deposit** |
| **3T 034** | **Work N'Gear LLC #8052,** | | **CLIFTON PLAZA** | | **4/1/1998** | **2/28/2029** | **3,247** | **$0.00** |
| **Results based on:** Start Date = None AND End Date = None | | | | | | | | |
| **Date IN** | **A/R Desc** | **Inv #** | **Voucher** | **Type** | **Amount Billed** | **Payments** | **Running Bal.** | **Description** |
| 11/1/2024 | **Payments** | 13580 | DNG | Cash | | 14,981.46 | -14,981.46 | |
| 11/1/2024 | L - LATE CHARGES | 331527 | G9Q | Debit | 280 | | -14,701.46 | LATE FEE |
| 11/1/2024 | YC - YEAR END CAM SU | 333211 | ENU | Debit | 361.3 | | -14,340.16 | 2023 YE SU |
| 11/1/2024 | PY - PYLON REIMBURSE | 343257 | DNG | Debit | 100 | | -14,240.16 | |
| 11/1/2024 | RE - RE TAX MONTHLY | 343257 | DNG | Debit | 1,653.58 | | -12,586.58 | |
| 11/1/2024 | M3 - MONTHLY MAINT. | 343257 | DNG | Debit | 2,004.20 | | -10,582.38 | |
| 11/1/2024 | R - RENT | 343257 | DNG | Debit | 11,123.68 | | 541.30 | |
| 11/1/2024 | SP - SPRINKLER CHGS | 344246 | EDR | Debit | 352.68 | | 893.98 | SPRINKLER #1 - 2023 |
| 11/25/2024 | **Payments** | 13705 | EDR | Cash | | 15,334.14 | -14,440.16 | |
| 12/1/2024 | PY - PYLON REIMBURSE | 345089 | EHV | Invoice | 100 | | -14,340.16 | |
| 12/1/2024 | RE - RE TAX MONTHLY | 345089 | EHV | Invoice | 1,653.58 | | -12,686.58 | |
| 12/1/2024 | M3 - MONTHLY MAINT. | 345089 | EHV | Invoice | 2,004.20 | | -10,682.38 | |
| 12/1/2024 | R - RENT | 345089 | EHV | Invoice | 11,123.68 | | 441.30 | |
| 12/2/2024 | **Payments** | 0 | EHV | Cash | | 0 | 441.30 | |
| 12/3/2024 | **Payments** | 13784 | ENU | Cash | | 361.3 | 80.00 | |
| 1/1/2025 | PY - PYLON REIMBURSE | 347095 | FS3 | Invoice | 100 | | 180.00 | |
| 1/1/2025 | RE - RE TAX MONTHLY | 347095 | FS3 | Invoice | 1,653.58 | | 1,833.58 | |
| 1/1/2025 | M3 - MONTHLY MAINT. | 347095 | FS3 | Invoice | 2,004.20 | | 3,837.78 | |
| 1/1/2025 | R - RENT | 347095 | FS3 | Invoice | 11,123.68 | | 14,961.46 | |
| 1/3/2025 | **Payments** | 14080 | FS3 | Cash | | 14,981.46 | -20.00 | |
| 1/13/2025 | **Payments** | 0 | G9Q | Cash | | 0 | -20.00 | |
| 1/13/2025 | L - LATE CHARGES | 348245 | G9Q | Credit | -280 | | -300.00 | REM110124LATE |
| 1/21/2025 | YT - YEAR END TAX SU | 349211 | GXL | Debit | 659.72 | | 359.72 | 2024 YE SU |
| 1/21/2025 | RE - RE TAX MONTHLY | 349222 | GXL | Debit | 54.98 | | 414.70 | JAN 2025 ESC ADJ |
| 2/1/2025 | PY - PYLON REIMBURSE | 348693 | GXL | Invoice | 100 | | 514.70 | |
| 2/1/2025 | RE - RE TAX MONTHLY | 348693 | GXL | Invoice | 1,708.56 | | 2,223.26 | |
| 2/1/2025 | M3 - MONTHLY MAINT. | 348693 | GXL | Invoice | 2,004.20 | | 4,227.46 | |
| 2/1/2025 | R - RENT | 348693 | GXL | Invoice | 11,123.68 | | 15,351.14 | |
| 2/4/2025 | **Payments** | 14330 | GXL | Cash | | 15,712.44 | -361.30 | |
| 3/1/2025 | PY - PYLON REIMBURSE | 350402 | HXO | Invoice | 100 | | -261.30 | |
| 3/1/2025 | RE - RE TAX MONTHLY | 350402 | HXO | Invoice | 1,708.56 | | 1,447.26 | |
| 3/1/2025 | M3 - MONTHLY MAINT. | 350402 | HXO | Invoice | 2,004.20 | | 3,451.46 | |
| 3/1/2025 | R - RENT | 350402 | HXO | Invoice | 11,345.56 | | 14,797.02 | |
| 3/4/2025 | **Payments** | 14563 | HXO | Cash | | 15,158.32 | -361.30 | |
| 4/1/2025 | PY - PYLON REIMBURSE | 351665 | J1F | Invoice | 100 | | -261.30 | |
| 4/1/2025 | RE - RE TAX MONTHLY | 351665 | J1F | Invoice | 1,708.56 | | 1,447.26 | |
| 4/1/2025 | M3 - MONTHLY MAINT. | 351665 | J1F | Invoice | 2,004.20 | | 3,451.46 | |
| 4/1/2025 | R - RENT | 351665 | J1F | Invoice | 11,345.56 | | 14,797.02 | |
| 4/4/2025 | **Payments** | 14842 | J1F | Cash | | 15,158.32 | -361.30 | |
| 4/16/2025 | YC - YEAR END CAM SU | 352918 | KHV | Debit | 653.26 | | 291.96 | 2024 YE SU |
| 5/1/2025 | PY - PYLON REIMBURSE | 353266 | JVW | Invoice | 100 | | 391.96 | |
| 5/1/2025 | RE - RE TAX MONTHLY | 353266 | JVW | Invoice | 1,708.56 | | 2,100.52 | |
| 5/1/2025 | M3 - MONTHLY MAINT. | 353266 | JVW | Invoice | 2,004.20 | | 4,104.72 | |
| 5/1/2025 | R - RENT | 353266 | JVW | Invoice | 11,345.56 | | 15,450.28 | |
| 5/6/2025 | **Payments** | 15120 | JVW | Cash | | 15,158.32 | 291.96 | |
| 6/1/2025 | PY - PYLON REIMBURSE | 354785 | KHV | Invoice | 100 | | 391.96 | |
| 6/1/2025 | RE - RE TAX MONTHLY | 354785 | KHV | Invoice | 1,708.56 | | 2,100.52 | |
| 6/1/2025 | M3 - MONTHLY MAINT. | 354785 | | Invoice | 2,004.20 | | 4,104.72 | |
| 6/1/2025 | R - RENT | 354785 | KHV | Invoice | 11,345.56 | | 15,450.28 | |
| 6/2/2025 | **Payments** | 15453 | KHV | Cash | | 15,515.94 | -65.66 | |
| 7/1/2025 | **Payments** | 0 | LN1 | Cash | | 0 | -65.66 | |
| 7/1/2025 | PY - PYLON REIMBURSE | 356305 | | Invoice | 100 | | 34.34 | |
| 7/1/2025 | RE - RE TAX MONTHLY | 356305 | LN1 | Invoice | 1,708.56 | | 1,742.90 | |
| 7/1/2025 | M3 - MONTHLY MAINT. | 356305 | | Invoice | 2,004.20 | | 3,747.10 | |
| 7/1/2025 | R - RENT | 356305 | | Invoice | 11,345.56 | | 15,092.66 | |
| 7/15/2025 | L - LATE CHARGES | 357223 | | Debit | 280 | | 15,372.66 | LATE FEE |
| 8/1/2025 | PY - PYLON REIMBURSE | 357787 | NAT | Invoice | 100 | | 15,472.66 | |

| Date | Description | Ref | Code | Type | Charge | Payment | Balance | Note |
|---|---|---|---|---|---|---|---|---|
| 8/1/2025 | RE - RE TAX MONTHLY | 357787 | NAT | Invoice | 1,708.56 | | 17,181.22 | |
| 8/1/2025 | M3 - MONTHLY MAINT. | 357787 | NAT | Invoice | 2,004.20 | | 19,185.42 | |
| 8/1/2025 | R - RENT | 357787 | NAT | Invoice | 11,345.56 | | 30,530.98 | |
| 8/15/2025 | L - LATE CHARGES | 358610 | | Debit | 280 | | 30,810.98 | LATE FEE |
| 8/18/2025 | **Payments** | 15869 | NAT | Cash | | 22,737.48 | 8,073.50 | |
| 9/1/2025 | PY - PYLON REIMBURSE | 359206 | O2X | Invoice | 100 | | 8,173.50 | |
| 9/1/2025 | RE - RE TAX MONTHLY | 359206 | | Invoice | 1,708.56 | | 9,882.06 | |
| 9/1/2025 | M3 - MONTHLY MAINT. | 359206 | O2X | Invoice | 2,004.20 | | 11,886.26 | |
| 9/1/2025 | R - RENT | 359206 | O2X | Invoice | 11,345.56 | | 23,231.82 | |
| 9/11/2025 | **Payments** | 15986 | O2X | Cash | | 15,079.76 | 8,152.06 | |
| 10/1/2025 | PY - PYLON REIMBURSE | 360327 | P3P | Invoice | 100 | | 8,252.06 | |
| 10/1/2025 | RE - RE TAX MONTHLY | 360327 | P3P | Invoice | 1,708.56 | | 9,960.62 | |
| 10/1/2025 | M3 - MONTHLY MAINT. | 360327 | P3P | Invoice | 2,004.20 | | 11,964.82 | |
| 10/1/2025 | R - RENT | 360327 | P3P | Invoice | 11,345.56 | | 23,310.38 | |
| 10/14/2025 | **Payments** | 6123 | P3P | Cash | | 15,158.32 | 8,152.06 | |
| 11/1/2025 | PY - PYLON REIMBURSE | 361711 | QAN | Invoice | 100 | | 8,252.06 | |
| 11/1/2025 | RE - RE TAX MONTHLY | 361711 | QAN | Invoice | 1,708.56 | | 9,960.62 | |
| 11/1/2025 | M3 - MONTHLY MAINT. | 361711 | QAN | Invoice | 2,004.20 | | 11,964.82 | |
| 11/1/2025 | R - RENT | 361711 | QAN | Invoice | 11,345.56 | | 23,310.38 | |
| 11/24/2025 | **Payments** | 6329 | QAN | Cash | | 15,158.32 | 8,152.06 | |
| 12/1/2025 | PY - PYLON REIMBURSE | 362964 | R18 | Invoice | 100 | | 8,252.06 | |
| 12/1/2025 | RE - RE TAX MONTHLY | 362964 | R18 | Invoice | 1,708.56 | | 9,960.62 | |
| 12/1/2025 | M3 - MONTHLY MAINT. | 362964 | R18 | Invoice | 2,004.20 | | 11,964.82 | |
| 12/1/2025 | R - RENT | 362964 | R18 | Invoice | 11,345.56 | | 23,310.38 | |
| 12/16/2025 | **Payments** | 16436 | R18 | Cash | | 15,158.32 | 8,152.06 | |
| 1/1/2026 | PY - PYLON REIMBURSE | 365459 | | Invoice | 100 | | 8,252.06 | |
| 1/1/2026 | RE - RE TAX MONTHLY | 365459 | | Invoice | 1,708.56 | | 9,960.62 | |
| 1/1/2026 | M3 - MONTHLY MAINT. | 365459 | | Invoice | 2,402.16 | | 12,362.78 | |
| 1/1/2026 | R - RENT | 365459 | | Invoice | 11,345.56 | | 23,708.34 | |
| 2/1/2026 | PY - PYLON REIMBURSE | 365459 | | Invoice | 100 | | 23,808.34 | |
| 2/1/2026 | RE - RE TAX MONTHLY | 365459 | | Invoice | 1,708.56 | | 25,516.90 | |
| 2/1/2026 | M3 - MONTHLY MAINT. | 365459 | | Invoice | 2,402.16 | | 27,919.06 | |
| 2/1/2026 | R - RENT | 365459 | | Invoice | 11,345.56 | | 39,264.62 | |
| | **Tenant Totals:** | | | | **244,918.52** | **205,653.90** | **39,264.62** | |

| | | | | | | | Date:03/04/2026 | |
|---|---|---|---|---|---|---|---|---|
| **Tenant ID** | **Tenant Name** | | | **Property Name** | **Lease Start Date** | **Lease End** | **Square Feet** | **Security Deposit** |
| **3T 034** | **Work N'Gear LLC #8052,** | | | **CLIFTON PLAZA** | **4/1/1998** | **2/28/2029** | **3,247** | **$0.00** |
| **Results based on:** Start Date = None AND End Date = None | | | | | | | | |
| **Date IN** | **A/R Desc** | **Inv #** | **Voucher** | **Type** | **Amount Billed** | **Payments** | **Running Bal.** | **Description** |
| 11/1/2024 | **Payments** | 13580 | DNG | Cash | | 14,981.46 | -14,981.46 | |
| 11/1/2024 | L - LATE CHARGES | 331527 | G9Q | Debit | 280 | | -14,701.46 | LATE FEE |
| 11/1/2024 | YC - YEAR END CAM SU | 333211 | ENU | Debit | 361.3 | | -14,340.16 | 2023 YE SU |
| 11/1/2024 | PY - PYLON REIMBURSE | 343257 | DNG | Debit | 100 | | -14,240.16 | |
| 11/1/2024 | RE - RE TAX MONTHLY | 343257 | DNG | Debit | 1,653.58 | | -12,586.58 | |
| 11/1/2024 | M3 - MONTHLY MAINT. | 343257 | DNG | Debit | 2,004.20 | | -10,582.38 | |
| 11/1/2024 | R - RENT | 343257 | DNG | Debit | 11,123.68 | | 541.30 | |
| 11/1/2024 | SP - SPRINKLER CHGS | 344246 | EDR | Debit | 352.68 | | 893.98 | SPRINKLER #1 - 2023 |
| 11/25/2024 | **Payments** | 13705 | EDR | Cash | | 15,334.14 | -14,440.16 | |
| 12/1/2024 | PY - PYLON REIMBURSE | 345089 | EHV | Invoice | 100 | | -14,340.16 | |
| 12/1/2024 | RE - RE TAX MONTHLY | 345089 | EHV | Invoice | 1,653.58 | | -12,686.58 | |
| 12/1/2024 | M3 - MONTHLY MAINT. | 345089 | EHV | Invoice | 2,004.20 | | -10,682.38 | |
| 12/1/2024 | R - RENT | 345089 | EHV | Invoice | 11,123.68 | | 441.30 | |
| 12/2/2024 | **Payments** | 0 | EHV | Cash | | 0 | 441.30 | |
| 12/3/2024 | **Payments** | 13784 | ENU | Cash | | 361.3 | 80.00 | |
| 1/1/2025 | PY - PYLON REIMBURSE | 347095 | FS3 | Invoice | 100 | | 180.00 | |
| 1/1/2025 | RE - RE TAX MONTHLY | 347095 | FS3 | Invoice | 1,653.58 | | 1,833.58 | |
| 1/1/2025 | M3 - MONTHLY MAINT. | 347095 | FS3 | Invoice | 2,004.20 | | 3,837.78 | |
| 1/1/2025 | R - RENT | 347095 | FS3 | Invoice | 11,123.68 | | 14,961.46 | |
| 1/3/2025 | **Payments** | 14080 | FS3 | Cash | | 14,981.46 | -20.00 | |
| 1/13/2025 | **Payments** | 0 | G9Q | Cash | | 0 | -20.00 | |
| 1/13/2025 | L - LATE CHARGES | 348245 | G9Q | Credit | -280 | | -300.00 | REM110124LATE |
| 1/21/2025 | YT - YEAR END TAX SU | 349211 | GXL | Debit | 659.72 | | 359.72 | 2024 YE SU |
| 1/21/2025 | RE - RE TAX MONTHLY | 349222 | GXL | Debit | 54.98 | | 414.70 | JAN 2025 ESC ADJ |
| 2/1/2025 | PY - PYLON REIMBURSE | 348693 | GXL | Invoice | 100 | | 514.70 | |
| 2/1/2025 | RE - RE TAX MONTHLY | 348693 | GXL | Invoice | 1,708.56 | | 2,223.26 | |
| 2/1/2025 | M3 - MONTHLY MAINT. | 348693 | GXL | Invoice | 2,004.20 | | 4,227.46 | |
| 2/1/2025 | R - RENT | 348693 | GXL | Invoice | 11,123.68 | | 15,351.14 | |
| 2/4/2025 | **Payments** | 14330 | GXL | Cash | | 15,712.44 | -361.30 | |
| 3/1/2025 | PY - PYLON REIMBURSE | 350402 | HXO | Invoice | 100 | | -261.30 | |
| 3/1/2025 | RE - RE TAX MONTHLY | 350402 | HXO | Invoice | 1,708.56 | | 1,447.26 | |
| 3/1/2025 | M3 - MONTHLY MAINT. | 350402 | HXO | Invoice | 2,004.20 | | 3,451.46 | |
| 3/1/2025 | R - RENT | 350402 | HXO | Invoice | 11,345.56 | | 14,797.02 | |
| 3/4/2025 | **Payments** | 14563 | HXO | Cash | | 15,158.32 | -361.30 | |
| 4/1/2025 | PY - PYLON REIMBURSE | 351665 | J1F | Invoice | 100 | | -261.30 | |
| 4/1/2025 | RE - RE TAX MONTHLY | 351665 | J1F | Invoice | 1,708.56 | | 1,447.26 | |
| 4/1/2025 | M3 - MONTHLY MAINT. | 351665 | J1F | Invoice | 2,004.20 | | 3,451.46 | |
| 4/1/2025 | R - RENT | 351665 | J1F | Invoice | 11,345.56 | | 14,797.02 | |
| 4/4/2025 | **Payments** | 14842 | J1F | Cash | | 15,158.32 | -361.30 | |
| 4/16/2025 | YC - YEAR END CAM SU | 352918 | KHV | Debit | 653.26 | | 291.96 | 2024 YE SU |
| 5/1/2025 | PY - PYLON REIMBURSE | 353266 | JVW | Invoice | 100 | | 391.96 | |
| 5/1/2025 | RE - RE TAX MONTHLY | 353266 | JVW | Invoice | 1,708.56 | | 2,100.52 | |
| 5/1/2025 | M3 - MONTHLY MAINT. | 353266 | JVW | Invoice | 2,004.20 | | 4,104.72 | |
| 5/1/2025 | R - RENT | 353266 | JVW | Invoice | 11,345.56 | | 15,450.28 | |
| 5/6/2025 | **Payments** | 15120 | JVW | Cash | | 15,158.32 | 291.96 | |
| 6/1/2025 | PY - PYLON REIMBURSE | 354785 | KHV | Invoice | 100 | | 391.96 | |
| 6/1/2025 | RE - RE TAX MONTHLY | 354785 | KHV | Invoice | 1,708.56 | | 2,100.52 | |
| 6/1/2025 | M3 - MONTHLY MAINT. | 354785 | | Invoice | 2,004.20 | | 4,104.72 | |
| 6/1/2025 | R - RENT | 354785 | KHV | Invoice | 11,345.56 | | 15,450.28 | |
| 6/2/2025 | **Payments** | 15453 | KHV | Cash | | 15,515.94 | -65.66 | |
| 7/1/2025 | **Payments** | 0 | LN1 | Cash | | 0 | -65.66 | |
| 7/1/2025 | PY - PYLON REIMBURSE | 356305 | | Invoice | 100 | | 34.34 | |
| 7/1/2025 | RE - RE TAX MONTHLY | 356305 | LN1 | Invoice | 1,708.56 | | 1,742.90 | |
| 7/1/2025 | M3 - MONTHLY MAINT. | 356305 | | Invoice | 2,004.20 | | 3,747.10 | |
| 7/1/2025 | R - RENT | 356305 | | Invoice | 11,345.56 | | 15,092.66 | |
| 7/15/2025 | L - LATE CHARGES | 357223 | | Debit | 280 | | 15,372.66 | LATE FEE |
| 8/1/2025 | PY - PYLON REIMBURSE | 357787 | NAT | Invoice | 100 | | 15,472.66 | |

| Date | Description | Invoice | Code | Type | Charge | Payment | Balance | Notes |
|---|---|---|---|---|---|---|---|---|
| 8/1/2025 | RE - RE TAX MONTHLY | 357787 | NAT | Invoice | 1,708.56 | | 17,181.22 | |
| 8/1/2025 | M3 - MONTHLY MAINT. | 357787 | NAT | Invoice | 2,004.20 | | 19,185.42 | |
| 8/1/2025 | R - RENT | 357787 | NAT | Invoice | 11,345.56 | | 30,530.98 | |
| 8/15/2025 | L - LATE CHARGES | 358610 | | Debit | 280 | | 30,810.98 | LATE FEE |
| 8/18/2025 | **Payments** | 15869 | NAT | Cash | | 22,737.48 | 8,073.50 | |
| 9/1/2025 | PY - PYLON REIMBURSE | 359206 | O2X | Invoice | 100 | | 8,173.50 | |
| 9/1/2025 | RE - RE TAX MONTHLY | 359206 | | Invoice | 1,708.56 | | 9,882.06 | |
| 9/1/2025 | M3 - MONTHLY MAINT. | 359206 | O2X | Invoice | 2,004.20 | | 11,886.26 | |
| 9/1/2025 | R - RENT | 359206 | O2X | Invoice | 11,345.56 | | 23,231.82 | |
| 9/11/2025 | **Payments** | 15986 | O2X | Cash | | 15,079.76 | 8,152.06 | |
| 10/1/2025 | PY - PYLON REIMBURSE | 360327 | P3P | Invoice | 100 | | 8,252.06 | |
| 10/1/2025 | RE - RE TAX MONTHLY | 360327 | P3P | Invoice | 1,708.56 | | 9,960.62 | |
| 10/1/2025 | M3 - MONTHLY MAINT. | 360327 | P3P | Invoice | 2,004.20 | | 11,964.82 | |
| 10/1/2025 | R - RENT | 360327 | P3P | Invoice | 11,345.56 | | 23,310.38 | |
| 10/14/2025 | **Payments** | 6123 | P3P | Cash | | 15,158.32 | 8,152.06 | |
| 11/1/2025 | PY - PYLON REIMBURSE | 361711 | QAN | Invoice | 100 | | 8,252.06 | |
| 11/1/2025 | RE - RE TAX MONTHLY | 361711 | QAN | Invoice | 1,708.56 | | 9,960.62 | |
| 11/1/2025 | M3 - MONTHLY MAINT. | 361711 | QAN | Invoice | 2,004.20 | | 11,964.82 | |
| 11/1/2025 | R - RENT | 361711 | QAN | Invoice | 11,345.56 | | 23,310.38 | |
| 11/24/2025 | **Payments** | 6329 | QAN | Cash | | 15,158.32 | 8,152.06 | |
| 12/1/2025 | PY - PYLON REIMBURSE | 362964 | R18 | Invoice | 100 | | 8,252.06 | |
| 12/1/2025 | RE - RE TAX MONTHLY | 362964 | R18 | Invoice | 1,708.56 | | 9,960.62 | |
| 12/1/2025 | M3 - MONTHLY MAINT. | 362964 | R18 | Invoice | 2,004.20 | | 11,964.82 | |
| 12/1/2025 | R - RENT | 362964 | R18 | Invoice | 11,345.56 | | 23,310.38 | |
| 12/16/2025 | **Payments** | 16436 | R18 | Cash | | 15,158.32 | 8,152.06 | |
| 1/1/2026 | PY - PYLON REIMBURSE | 365459 | | Invoice | 100 | | 8,252.06 | |
| 1/1/2026 | RE - RE TAX MONTHLY | 365459 | | Invoice | 1,708.56 | | 9,960.62 | |
| 1/1/2026 | M3 - MONTHLY MAINT. | 365459 | | Invoice | 2,402.16 | | 12,362.78 | |
| 1/1/2026 | R - RENT | 365459 | | Invoice | 11,345.56 | | 23,708.34 | |
| 2/1/2026 | PY - PYLON REIMBURSE | 365459 | | Invoice | 100 | | 23,808.34 | |
| 2/1/2026 | RE - RE TAX MONTHLY | 365459 | | Invoice | 1,708.56 | | 25,516.90 | |
| 2/1/2026 | M3 - MONTHLY MAINT. | 365459 | | Invoice | 2,402.16 | | 27,919.06 | |
| 2/1/2026 | R - RENT | 365459 | | Invoice | 11,345.56 | | 39,264.62 | |
| 3/1/2026 | PY - PYLON REIMBURSE | 365459 | | Invoice | 1200 | | 40,464.62 | 03/01/2026 - 02/28/2027 Pylon Charge Annualized |
| 3/1/2026 | RE - RE TAX MONTHLY | 365459 | | Invoice | 20,502.72 | | 60,967.34 | 03/01/2026 - 02/28/2027 Real Estate Charge Annualized |
| 3/1/2026 | M3 - MONTHLY MAINT. | 365459 | | Invoice | 28,825.92 | | 89,793.26 | 03/01/2026 - 02/28/2027 Maintanance Annualized |
| 3/1/2026 | R - RENT | 365459 | | Invoice | 138,874.20 | | 228,667.46 | 03/01/2026 - 02/28/2027 Minimum Rent Annualized |
| 3/1/2027 | PY - PYLON REIMBURSE | 365459 | | Invoice | 1200 | | 229,867.46 | 03/01/2027 - 02/29/2028 Pylon Charge Annualized |
| 3/1/2027 | RE - RE TAX MONTHLY | 365459 | | Invoice | 20,502.72 | | 250,370.18 | 03/01/2027 - 02/29/2028 Real Estate Charge Annualized |
| 3/1/2027 | M3 - MONTHLY MAINT. | 365459 | | Invoice | 28,825.92 | | 279,196.10 | 03/01/2027 - 02/29/2028 Maintanance Annualized |
| 3/1/2027 | R - RENT | 365459 | | Invoice | 141,666.60 | | 420,862.70 | 03/01/2027 - 02/29/2028 Minimum Rent Annualized |
| 3/1/2028 | PY - PYLON REIMBURSE | 365459 | | Invoice | 1200 | | 422,062.70 | 03/01/2028 - 02/28/2029 Pylon Charge Annualized |
| 3/1/2028 | RE - RE TAX MONTHLY | 365459 | | Invoice | 20,502.72 | | 442,565.42 | 03/01/2028 - 02/28/2029 Real Estate Charge Annualized |
| 3/1/2028 | M3 - MONTHLY MAINT. | 365459 | | Invoice | 28,825.92 | | 471,391.34 | 03/01/2028 - 02/28/2029 Maintanance Annualized |
| 3/1/2028 | R - RENT | 365459 | | Invoice | 144,491.52 | | 615,882.86 | 03/01/2028 - 02/28/2029 Minimum Rent Annualized |
| | | **Tenant Totals:** | | | **821,536.76** | **205,653.90** | **615,882.86** | |